IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                     )
SAFARI CLUB INTERNATIONAL,  et al.          )
                                                     )
        Plaintiffs,                                  )
                                                     )
        v.                                           )
                                                     )
DIRK KEMPTHORNE, et al.,                     )
                                                     )        Civ. No. 08-0881 (EGS)
        Defendants,                                 )
                                                     )
and                                                  )
                                                     )
THE HUMANE SOCIETY OF THE                )
UNITED STATES, et al.,                         )
                                                     )
        Proposed-Intervenor-Defendants.      )
_____)

**THE HUMANE SOCIETY OF THE UNITED STATES,**
**INTERNATIONAL FUND FOR ANIMAL WELFARE, AND**
**DEFENDERS OF WILDLIFE'S MOTION TO INTERVENE**

Pursuant to Rule 24 of the Federal Rules of Civil Procedure, The Humane Society of the

United States ("HSUS"), International Fund for Animal Welfare ("IFAW"), and Defenders of

Wildlife ("Defenders") hereby move to intervene in this action.  Proposed intervenors meet all of

the criteria for intervention of right under Rule 24(a), and, alternatively, the proposed intervenors

seek permissive intervention pursuant to Rule 24(b).

In support of this motion, proposed intervenors submit the accompanying memorandum of

law, eight declarations and several additional exhibits, a Proposed Answer, and a Proposed Order.

Proposed intervenors' counsel has contacted counsel for the plaintiffs and defendants.  Plaintiffs'

counsel represents that plaintiffs take no position until they have reviewed the motion. Counsel

for the federal defendants represents that defendants take no position on the motion.

Respectfully Submitted,

_____/s/_____
Howard M. Crystal (D.C. Bar No. 446189)
Eric R. Glitzenstein (D.C. Bar No. 358287)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C. 20009
(202) 588-5206

June 16, 2008                     Attorneys for Proposed-Intervenors

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| SAFARI CLUB INTERNATIONAL,  et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| DIRK KEMPTHORNE, et al., ) | |
| ) | Civ. No. 08-0881 (EGS) |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| THE HUMANE SOCIETY OF THE ) | |
| UNITED STATES, et al., ) | |
| ) | |
| Proposed-Intervenor-Defendants. ) | |
| _____) | |

**MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE
BY THE HUMANE SOCIETY OF THE UNITED STATES, INTERNATIONAL FUND
FOR ANIMAL WELFARE, AND DEFENDERS OF WILDLIFE**

**INTRODUCTION**

Pursuant to Rule 24 of the Federal Rules of Civil Procedure, The Humane Society of the

United States ("HSUS"), International Fund for Animal Welfare ("IFAW"), and Defenders of

Wildlife ("Defenders") respectfully request leave to intervene in this case, in which plaintiffs seek

an order requiring the U.S. Fish and Wildlife Service ("FWS") to grant permits that would

authorize hunters who have killed polar bears killed in Canada to import the bear's body parts into

the United States.  As explained below, HSUS, IFAW and Defenders are all wildlife protection

and conservation organizations dedicated to the protection of the polar bear, among other species,

and their conservation missions, as well as their members' appreciation and enjoyment of polar

bears in their natural environment, would be impaired by the relief that plaintiffs seek in this case.

As demonstrated below, the proposed intervenors satisfy the standards for both intervention of right under Rule 24(a) and permissive intervention under Rule 24(b). Accordingly, they should be allowed to participate as parties in this matter.

## BACKGROUND

A.    **Statutory Framework**

1.    **The Endangered Species Act**

Recognizing that all of the nation's "species of fish, wildlife and plants are of esthetic, ecological, educational, historical, recreational and scientific value to the Nation and its people," 16 U.S.C. § 1531(a)(3), Congress enacted the ESA with the express purpose of providing both "a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] a program for the conservation of such endangered species and threatened species . . . ." Id. at § 1531(b). Under the ESA, a species is listed as "endangered" where it is "in danger of extinction throughout all or a significant portion of its range . . . ." 16 U.S.C. § 1532(6). A species is listed as "threatened" where it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." Id. at § 1532(20).

Once a species is listed as endangered under the ESA, it is entitled to a number of protections. For example, it becomes illegal for anyone to "take" the species, 16 U.S.C. § 1538(a)(1); 50 C.F.R. §§ 17.21, which includes "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). It also becomes illegal to "import any such species into, or export any such species from the United States." Id. § 1538(a)(1)(A).

2

Under ESA Section 4(d), the U.S. Fish and Wildlife Service ("FWS") – which implements the ESA for species such as the polar bear, 50 C.F.R. § 402.01(b) – has discretion to extend these protections to species designated as "threatened." 16 U.S.C. § 1533(d). In the absence of a specific regulation under section 4(d) (hereafter "4(d) Rule"), all of the prohibitions for endangered species apply to threatened species as well. 50 C.F.R. § 17.31.

Any interested person may petition for a species to be listed under the ESA, id. at § 1533(b)(3)(A); 50 C.F.R. § 424.14(a), and, upon receipt of a petition, the FWS must decide whether listing is warranted within one year. 16 U.S.C. § 1533(b)(3)(B); 50 C.F.R. § 424.14(b)(3).

## 2.    The Marine Mammal Protection Act

Recognizing that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities," Congress passed the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1361, et seq., to insure that they are "protected and encouraged to develop to the greatest extent feasible . . . to maintain the health and stability of the marine ecosystem." Id. § 1361. The MMPA prohibits the "take" of all marine mammals, including the polar bear. Id. § 1372(a). To "take" under the MMPA includes to "harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill, any marine mammal." Id. § 1362(13).

Under the MMPA, a species is automatically designated as "depleted" at the time it "is listed as an endangered or a threatened species under the Endangered Species Act of 1973." Id. The MMPA further provides that "no permit may be issued for the taking of any marine mammal which has been designated by the Secretary as depleted, and no importation may be made of any

such mammal." Id. § 1371(a)(3)(B) (emphasis added). Thus, ESA listing also has the legal effect of prohibiting imports under the MMPA.

**B.    Relevant Facts**

**1.    Litigation Regarding The Listing Of The Polar Bear Under The ESA**

In response to a long-standing suit over the FWS's failure to make a final ESA listing decision for the polar bear, in April 2008, the district court for the Northern District of California ordered the FWS to make a final ESA listing determination for the species by no later than May 15, 2008. See Center for Biological Diversity v. Kempthorne, No. C 08-1339, 2008 WL 1902703 (N.D. Cal. Apr. 28, 2008). The court further ordered that the FWS make any polar bear listing effective immediately. Id. at ** 4-5.

Subsequent to that Order, the Safari Club International and Safari Club International Foundation (hereafter "SCI") filed an Amicus brief urging the Court to reconsider the ruling that the listing be deemed effective on the date the rule is issued. See Case No. 08-1339, DN 42 (May 6, 2008). In that filing SCI claimed that an immediate effective date will preclude SCI members from importing the body parts of polar bears they have or intend to kill, because an ESA listing will preclude further imports. Id. at 3; see also id. at 10 (claiming that an "ESA listing [will have] the effect of making previously legal activity (e.g. importing a polar bear trophy) illegal"). Another group, Conservation Force, presented similar arguments. Id., DN 61 (May 9, 2008).

Although the court denied reconsideration of its decision to require that the polar bear listing rule become effective immediately, the Court permitted further briefing on the question whether hunters who filed import permit applications prior to April 17, 2008 – the date of the

court's listing Order – are entitled to import body parts of the polar bears they kill.  Id., DN 65 (Order of May 12, 2008).

      **2.**      **The Polar Bear Listing And Subsequent Developments In The California Suit.**

On May 15, 2008, the FWS listed the polar bear as a threatened species.  73 Fed. Reg. 28,212 (May 15, 2008).  In the listing preamble the Service explained that, prior to 1973, the polar bear was declining due to "severe overharvest" that occurred in light of "the economic or trophy value of their pelts."  Id. at 28,238.  At that time the range countries – Canada, Denmark, Norway, Russia, and the U.S. – entered into a conservation agreement that largely ended this hunting.  Id.  In addition, with passage of the MMPA in 1972 the taking or importing of polar bears or their body parts also largely became illegal under U.S. law (with exceptions for hunting by Native peoples for subsistence purposes).  Id.

Although the end of large-scale hunting provided some protection to the polar bear, other threats have continued to cause population declines, including climate change-induced reductions in sea ice; reduced prey availability; and continued overharvest in certain areas.  Id. at 28,255-28,292.  In light of these threats, the Service concluded that the polar bear is likely to become an endangered species "within the foreseeable future," and consequently listed the species as threatened under the ESA.  Id. at 28,238.

Concurrent with listing the species the Service issued a 4(d) Rule.  73 Fed. Reg. 28,306 (May 15, 2008).  The 4(d) Rule provides that if an activity is permitted under the MMPA. it will also be permitted under the ESA.  73 Fed. Reg. at 28,318; 50 C.F.R. § 17.40(q).

Pursuant to the court's May 12, 2008 briefing order, see supra at 4, on May 27, 2008 the FWS filed a brief in the Northern District of California explaining that, while prior to the ESA listing, MMPA import permits were routinely granted under 16 U.S.C. § 1374(c)(5) – which authorized such permits for polar bears legally harvested in Canada where certain conditions were satisfied – as a result of the ESA listing hunters may no longer import the body parts of polar bears killed in Canada into the United States. Case No. 08-1339, DN 81. The California district court has not yet ruled on the pending question whether hunters who applied for import permits prior to the court's ruling may import their trophy kills – which is similar to the relief sought in plaintiff's second prayer for relief in this case. See Complaint at 20. In the meantime, the plaintiffs in the California lawsuit have filed an amended complaint challenging the 4(d) Rule associated with the new listing determination. See Case No. 08-1339, DN76 (May 16, 2008).

### 3.    The Present Suit Raising Matters Already Pending In The California Court.

Although the question of whether polar bear import permits can be granted despite the ESA listing is presently pending before the Court in California, on May 23, 2008, SCI filed a new lawsuit in this court also claiming that the listing did not make imports unlawful under the MMPA. Thus, the Complaint alleges that SCI members have pending permit applications for polar bear trophy imports, Complaint ¶ 4, and requests that the Court order the FWS to process those and other permit applications despite the listing. Id. at 21. The Complaint also avers that SCI intends to supplement its Complaint to challenge the polar bear listing under the ESA. Id. ¶ 19.[1]

---

[1]    It is not clear why SCI chose to raise matters here that are pending in the California suit, rather than allowing them to be resolved in that forum – where there has been considerable litigation over the polar bear listing, and where SCI itself has sought some of the

**ARGUMENT**

**I.    THE PROPOSED INTERVENORS ARE ENTITLED TO INTERVENE AS A MATTER OF RIGHT.**

Prior to Congress's 1966 amendments to Rule 24, courts had applied stringent criteria in determining whether seemingly affected parties should be allowed to intervene in ongoing litigation as a matter of right.  See Nuesse v. Camp, 385 F.2d 694, 701 (D.C. Cir. 1967).  The 1966 amendments relaxed the intervention standards considerably.  Rule 24(a)(2) now provides:

> [o]n timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2).  As explained in Nuesse, the D.C. Circuit's seminal opinion on intervention, the 1966 revision was "obviously designed to liberalize the right to intervene in federal actions."  Id.  Accordingly, an applicant is entitled to intervene under Rule 24(a)(2) by demonstrating "(I) an interest in the transaction, (ii) which the applicant may be impeded in protecting because of the action, (iii) that is not adequately represented by others," and that the motion to intervene is timely.  Id. at 699.   As demonstrated below, the proposed intervenors clearly satisfy each of these standards.

**A.    The Proposed Intervenors' Motion Is Timely.**

Whether a motion to intervene is timely is a matter left to the Court's discretion, to be "determined from all the circumstances."  NAACP v. New York, 413 U.S. 345, 366 (1973).

---

same relief at issue here.

Plainly, where, as here, the applicants for intervention are seeking party status within several weeks after the Complaint was filed – and before any other motions have been filed by any of the existing parties – the intervention application is timely.

**B.    The Proposed Intervenors Have Legally Cognizable Interests That May Be Impaired By The Relief Sought By Plaintiffs.**

Proposed intervenors clearly have an "interest" in this litigation that is protectable within the meaning of Rule 24(a).  The D.C. Circuit has construed the protectable "interest" requirement of Rule 24(a)(2) to mean that the proposed intervenors must demonstrate that they have Article III standing.  Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1074 (D.C. Cir. 1998); see also Fund for Animals, Inc.  v. Norton, 322 F.3d 728, 732-33 (D.C. Cir. 2003).  Here, the proposed intervenors satisfy the requirements for Article III standing – i.e., injury in fact, causation, and redressability.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).[2]

**1.    The Membership Organizations Have Standing To Sue On Behalf Of Their Members.**

It is well established that an organization seeking to establish standing on behalf of its members may do so by demonstrating that at least one of its members would otherwise have standing to sue in their own right, that the interests the organization seeks to protect are "germane" to its overall purpose, and that neither the claim asserted nor the relief requested requires the participation of individual members.  Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977).

---

[2]    Only one party needs to have standing for the Court to grant intervention.  See, e.g., Military Toxics Project v. EPA, 146 F.3d 948, 953-54 (D.C. Cir. 1998) ("because [one applicant] has standing, we need not determine whether the other intervenor-applicants . . . also have standing").

Here, as demonstrated in the attached declarations, the proposed intervenors are all membership organizations and the protection of polar bears from sport hunting is clearly germane to their organizational purposes. These organizations have long been involved in polar bear conservation efforts, including advocating for the listing of the polar bear and seeking a ban on the import of polar bear body parts. See Declarations of Naomi Rose ¶¶ 4-7 ("Rose Decl."); Else Poulsen ¶ 2 ("Poulsen Decl."); Jim Pissot ¶¶ 2-7 ("Pissot Decl."); see also Exhibits 1-2 (proposed intervenors' comments on polar bear listing proposal).

In addition, the organizations have members who travel to Canada in order to observe, study, and otherwise enjoy polar bears, including the bear populations that SCI's members hunt. See, e.g., Declarations of Carolyn Potts ¶¶ 4-18; Robert Laidlaw ¶¶ 406; Vicki Burns ¶¶ 4-7; Lorie Zerweck ¶¶ 5-10; see also Poulsen Decl. ¶¶ 3-12; Pissot Decl. ¶ 3. In light of the concrete conservation benefits associated with the ESA listing of the polar bear and consequent designation of the polar bear as a depleted species under the MMPA, including the prohibition on the import of polar bear body parts into the United States, these individuals are directly benefitted from the FWS's decisions challenged in this case – and thus have concrete interests of precisely the sort that have been recognized by the courts as adequate to confer Article III standing. See, e.g., Animal Legal Defense Fund v. Glickman, 154 F.3d 426, 432 (D.C. Cir. 1998) (en banc) ("[t]he Supreme Court has repeatedly made clear that injury to an aesthetic interest in the observation of animals is sufficient to satisfy the demands of Article III standing") (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 562-62 (1992); Japan Whaling Ass'n v. American Cetacean Soc'y, 478 U.S. 221, 231 n. 4 (1986)); see also Coast Alliance v. Babbitt, 6 F. Supp. 2d 29, 32-33 (D.D.C. 1998) (Sullivan, J.) (where government's actions would harm plaintiffs' interests in observing

9

endangered sea turtles and migratory birds in specific locations in Florida plaintiffs demonstrated "sufficient injury to meet the Article III injury requirements").

The organizations' members also readily satisfy the causation and redressability prong of Article III standing. Indeed, since the members' interests in observing and otherwise enjoying polar bears may be significantly impaired in several distinct ways by the relief sought by plaintiffs, the threatened injuries to the members is unquestionably "fairly traceable" to intervenors' claims for relief. Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976); see also Larson v. Valente, 456 U.S. 228, 243 n.15 (1982) (parties satisfy the redressability requirement when they show that a favorable decision will relieve some of their injuries, and "need not show [it] will relieve [] every injury") (emphasis in original); Meese v. Keene, 481 U.S. 465, 476 (1987); Friends of the Earth, Inc. v. Laidlaw Environmental Services, 528 U.S. 167, 185-86 (2000) (holding that the plaintiffs' injuries would be redressed even where the relief sought merely deterred the conduct in question).[3]

---

[3]    In addition to the impact of the import ban on the number and types of polar bears that are killed, see, e.g., Rose Decl. ¶¶ 11-20 and 24-25, the ESA listing of the polar bear, and the "depleted" designation under the MMPA, are also likely to both (a) cause Canada and the native communities involved in polar bear hunting to take steps to further polar bear conservation, id. ¶¶ 29-36, and (b) further efforts to strengthen international protections for the polar bear, id. ¶¶ 37-39. See, e.g., Animal Welfare Inst. v. Kreps, 561 F.2d 1002, 1010 (D.C. Cir. 1977). The listing and depleted status designation will also insure that the species obtains the conservation benefits of a Recovery Plan under the ESA, 16 U.S.C. § 1533(f), and a Conservation Plan under the MMPA, 16 U.S.C. § 1383b(b) – which will be vital to the protection and recovery of the species.

2.    <u>The Organizations Also Have Standing To Sue On Their Own Behalf</u>.

The organizations also have standing to sue on their own behalf here because they have devoted substantial organizational resources in an effort to halt the importation of sport-hunted polar bear trophies, and will be compelled to do so again if plaintiffs prevail in this suit.  <u>See, e.g.</u> Declaration of Andrew Page ¶¶ 7-16.  With the import ban, the organizations can now devote more of their limited resources to other projects that further their conservation missions.  <u>Id.</u> ¶¶ 17-20.  Moreover, the United States' prohibition on the importation of sport-hunted polar bear trophies will benefit the organizations' continuing efforts to minimize the impacts of sport hunting of polar bears through the establishment of conservation measures on an international scale.  <u>See, e.g.</u>, Rose Decl. ¶¶ 37-39.   Accordingly, since the relief sought here at least "perceptibly impair[s]" the organizations' missions, "there can be no question that the organization[s] [have] suffered injury in fact."  <u>Havens Realty Corp. v. Coleman</u>, 455 U.S. 363, 378-79 (1982);  <u>Abigail Alliance v. Eschenbach</u>, 469 F.3d 129, 132-33 (D.C. Cir. 2006).[4]

---

[4]        The Conservation/Recovery Plans will also provide important information to the intervenor organizations, <u>see, e.g.</u>, 16 U.S.C. § 1533(f)(1)(B) (requiring Recovery Plan to include a "description of" the management actions necessary to recover the species), the statutory right to which also confers standing here.  <u>E.g.</u> <u>Federal Election Comm'n v. Akins</u>, 524 U.S. 11, 21 (1998) (discussing organizational injury based on a statutory right to information); <u>Ethyl Corp. v. EPA</u>, 306 F.3d 1144, 1148 (D.C. Cir. 2002) ("a denial of access to information can work an 'injury in fact' for standing purposes, at least where a statute (on the claimant's reading) requires that the information 'be publicly disclosed'") (internal citations omitted); <u>see also</u> <u>In re Thornburgh</u>, 869 F.2d 1503, 1511 (D.C. Cir. 1989) (the redressability test "<u>assumes</u> that a decision on the merits would be favorable") (emphasis in original).

**C.    The Interests of Applicants for Intervention Are Not Adequately
Represented By The Federal Defendants.**

The final criterion for intervention of right – a demonstration that the applicants' interests
are not "adequately represented by existing parties" – is also easily shown here.  Fed. R. Civ. P.
24(a).  Indeed, it is well established, especially in this Circuit, that this requirement "is not
onerous."  Dimond v. Dist. of Columbia, 792 F.2d 179, 192 (D.C. Cir. 1986).  Rather, "[t]he
requirement of the Rule is satisfied if the applicant shows that representation of his interest 'may
be' inadequate," and "the burden of making that showing should be treated as minimal."
Trbovich v. United Mine Workers of Am., 404 U.S. 528, 538 n.10 (1972) (emphasis added); see
also Nuesse, 385 F.2d at 703.  Moreover, the interests asserted by the applicants "need not be
wholly 'adverse' before there is a basis for concluding that existing representation of a 'different'
interest may be inadequate."  Nuesse, 385 F.2d at 703.

This "minimal" standard is certainly satisfied here.  To begin with, although it is to be
hoped that the government will vigorously defend its recent decision to enhance protection for the
polar bear under the ESA and MMPA, the background of the regulation at issue hardly instills
confidence that will be the case.  Indeed, defendants had to be sued in federal court – twice –
before they would even make a final decision on listing of the polar bear.  Defendants were first
petitioned to list the polar bear in 2005 and, under the ESA, they were supposed to have made a
decision on that petition within one year.  See 16 U.S.C. § 1533(b)(3)(B).  Because defendants
failed to do so, they were sued in the U.S. District Court for the Northern District of California;
that lawsuit resulted in a settlement requiring that defendants decide whether to propose a rule by
January 2007.  See Center for Biological Diversity, 2008 WL 1902703, at * 1.  However, even

12

after defendants issued a proposed rule, they failed to complete action on it within the time frame mandated by the ESA, thus necessitating another lawsuit and another Court order before final action was taken.  Id. at * 3 ("Defendants have been in violation of the law requiring them to publish the listing determination for nearly 120 days.  Other than the general complexity of finalizing the rule, Defendants offer no specific facts that would justify the existing delay, much less further delay.  To allow Defendants more time would violate the mandated listing deadlines under the ESA and congressional intent that time is of the essence in listing threatened species.").

Under these circumstances, and regardless of why federal defendants unlawfully delayed so long in protecting the polar bear, it is apparent that, at the very least, defendants' representation of the applicants' overarching interests in polar bear conservation "may be inadequate."  Trbovich, 404 U.S. at 538 n. 10 (emphasis added); see also Coalition of Arizona/New Mexico Counties For Stable Economic Growth v. Department of the Interior, 100 F.3d 837 (10th Cir. 1996); Idaho Farm Bureau Fed. v. Babbitt, 58 F.3d 1392 (9th Cir. 1995).  In any event, animal protection and conservation groups that have long battled to protect polar bears – including by limiting the sport hunting of these magnificent animals – can be expected to "mak[e] a more vigorous presentation" of the legal and factual arguments in support of a regulation that furthers those objectives than federal officials who, by all appearances, adopted the regulation reluctantly and only because they were compelled to do so by Court order.  Natural Resources Def. Council v. Costle, 561 F.2d 904, 912 (D.C. Cir. 1977) (internal citations omitted).

Moreover, as the Court of Appeals has instructed, even if there were a "shared general agreement" between the government and the applicants for intervention with regard to the challenges to the rule raised by plaintiffs now or in the future, this would not "necessarily ensure

13

agreement in all particular respects about what the law requires." Id. Accordingly, even putting aside the valid reasons to be skeptical about the vigorousness with which defendants will contest plaintiffs' challenges to the rule, it is apparent that the non-governmental organizations seeking to intervene may have "honest disagreements" with the government on important "legal . . . matters," id. – such as the precise interrelationship between the MMPA and the ESA – and that their "interests may diverge at points" throughout the course of this litigation. In Re Sierra Club, 945 F.2d 776, 780 (4th Cir. 1991); see also Neusse, 385 F.2d at 703 ("interests need not be wholly 'adverse' before there is a basis for concluding that existing representation of a 'different' interest may be inadequate"); Chiles v. Thornburgh, 865 F.2d 1197, 1214 (11th Cir. 1989) ("The fact that the interests are similar does not mean that approaches to litigation will be the same").

Accordingly, because the proposed intervenors meet all of the requirements for intervention as of right, they should be permitted to intervene as full parties here. Trbovich, 404 U.S. at 537 n.8; Neusse, 385 F2d at 701 (explaining that Rule 24(a), as amended in 1966, was "obviously designed to liberalize the right to intervene in federal actions").

## II.    IN THE ALTERNATIVE, THE PROPOSED INTERVENORS SHOULD BE GRANTED PERMISSIVE INTERVENTION.

Although the proposed intervenors amply satisfy the criteria for intervention as of right under Rule 24(a), in the alternative this Court should exercise its discretion by allowing the applicants to intervene in this action as a permissive matter under Rule 24(b). Rule 24(b)(2) provides that "[o]n timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact," Fed. R. Civ. P.

14

24(b)(1), and further provides that "[i]n exercising its discretion the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).  In determining whether to grant permissive intervention, courts also consider whether the prospective intervenors will "contribute to the full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented."  In Re Acushnet River & New Bedford Harbor, 712 F. Supp. 1019, 1023 (D. Mass. 1989); see also Neusse, 385 F.2d at 704 ("Rule 24(b) . . . provides basically that anyone may be permitted to intervene if his claim and the main claim have a common question of law or fact").  "As its name would suggest, permissive intervention is an inherently discretionary enterprise," EEOC v. Nat'l Children's Ctr., Inc., 146 F.3d 1042, 1046 (D.C. Cir. 1998), and hence district courts have "wide latitude" in determining whether to grant such status.  Id.; see also United States Postal System v. Brennan, 579 F.2d 188, 191-92 (2d Cir. 1978).

Here, the applicants for intervention clearly are pursuing "question[s] of fact or law in common" with the existing parties, Fed. R. Civ. P. 24(b).  In addition, because of their longstanding interests in polar bear conservation and their expertise in the interplay of the conservation laws that are pertinent to plaintiffs' claims, see, e.g., Rose Decl. ¶¶ 4-7; Pissot Decl. ¶¶ 2-7; Poulsen Decl. ¶ 2, the applicants' participation will contribute to the "just and equitable adjudication of the legal questions presented" without in any way prejudicing plaintiffs' interest in accomplishing an expeditious resolution of their claims.  In Re Acushnet River & New Bedford Harbor, 712 F. Supp. at 1023.  Accordingly, even if the Court concludes that the standards for intervention of right are not satisfied, the Court should nonetheless exercise its discretion to permit the applicants for intervention to intervene under Rule 24(b).

## **CONCLUSION**

For all of the foregoing reasons, the proposed intervenors' Motion to Intervene should be granted.

Respectfully Submitted,

_____/s/_____
Howard M. Crystal (D.C. Bar No. 446189)
Eric R. Glitzenstein (D.C. Bar No. 358287)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C. 20009
(202) 588-5206

June 16, 2008                Attorneys for Proposed-Intervenors

16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

SAFARI CLUB INTERNATIONAL, et al.  )
                                   )
        Plaintiffs,                )
                                   )
        v.                         )
                                   )
DIRK KEMPTHORNE, et al.,           )
                                   )        Civ. No. 08-0881 (EGS)
        Defendants,                )
                                   )
and                                )
                                   )
THE HUMANE SOCIETY OF THE          )
UNITED STATES, et al.,             )
                                   )
        Proposed-Intervenor-Defendants.  )
_____)

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2008 I caused copies of the foregoing Motion to

Intervene, Supporting Memorandum, Declarations and Exhibits, Proposed Answer and Proposed

Order via email and U.S mail to the following:

Douglas S. Burdin                    Kristen Byrnes Floom
Anna M. Seidman                      United States Department of Justice
Safari Club International             Environment and Natural Res. Div.
501 2nd Street N.E.                   Ben Franklin Station
Washington, D. C. 20002              P.O. Box 7369
dburdin@safariclub.org               Washington, D.C. 20044-7369
aseidman@safariclub.org              Kristen.Floom@usdoj.gov

Counsel for Safari Club International and    Counsel for the federal defendants
Safari Club International Foundation

                            _____
                                    /s/
                            Howard M. Crystal

PROPOSED ANSWER

Safari Club International v. Kempthorne,
No. 08-881 (EGS) (D.D.C.)

Humane Society of the United States <u>et al</u>.'s
Motion To Intervene

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                                )
SAFARI CLUB INTERNATIONAL,  et al.                )
                                                                )
          Plaintiffs,                                           )
                                                                )
          v.                                                    )
                                                                )
DIRK KEMPTHORNE, et al.,                             )
                                                                )
          Defendants,                                         )
                                                                )
and                                                             )
                                                                )
THE HUMANE SOCIETY OF THE                      )
UNITED STATES,                                          )
2100 L Street, N.W.                                         )
Washington, D.C. 20037,                                  )
                                                                )
INTERNATIONAL FUND FOR                          )
ANIMAL WELFARE,                                       )
1350 Connecticut Avenue N.W.,                         )
Washington, D.C. 20036                                   )
                                                                )
DEFENDERS OF WILDLIFE,                           )
1130 Seventeenth St., N.W.                               )
Washington, D.C.  20036,                                 )
                                                                )
          Proposed Intervenor Defendants.            )
_____)

**[PROPOSED] ANSWER**

          Intervenor-Defendants Humane Society of the United States, International Fund For

Animal Welfare, and Defenders of Wildlife hereby answer Plaintiff Safari Club International, et

al.'s Complaint as follows:

          1.          Admitted.

2.    This paragraph contains plaintiffs' characterizations of this action and legal conclusions to which no responses are required.

3.    The first two sentences in this paragraph contain legal conclusions as to which no response is required, and are denied on that basis. The last sentence is admitted.

4.    Intervenors lack information or knowledge sufficient to form a belief as to the truth of most of the averments in this Paragraph, and on that basis they are denied. The third sentence characterizes several Federal Register notices that speak for themselves and provide the best evidence of their content.

5.    This paragraph characterizes a Federal Register notice that speaks for itself and provides the best evidence of its content.

6.    Intervenors admit that the Fish and Wildlife Service ("FWS") has no "direct jurisdiction" to prohibit the taking of polar bears outside of the United States, but the remaining averments in this paragraph are denied.

7.    The averments in this paragraph are denied.

8-11.   These paragraphs contain plaintiffs' legal conclusions to which no responses are required.

12.    Intervenors lack information or knowledge sufficient to form a belief as to the truth of this paragraph.

13-14.   These paragraphs contain legal conclusions to which no response is required, and are which denied on that basis.

15-16.   Intervenors lack information or knowledge sufficient to form a belief as to the truth of these paragraphs.

17.    Intervenors lack information or knowledge sufficient to form a belief as to the truth of the first two sentences of this paragraph.  The third sentence contains a legal conclusion to which no response is required, and which is denied on that basis.

18-19.  Intervenors lack information or knowledge sufficient to form a belief as to the truth of these paragraphs.

20-22.  Admitted.

23-26.  These paragraphs contain plaintiffs' characterization of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, et seq., which speaks for itself and is the best evidence of its contents.  To the extent these paragraphs contain plaintiffs' legal conclusions no response is required, and on that basis they are denied.

27-29.  These paragraphs contain plaintiffs' characterization of the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1361, et seq., which speaks for itself and is the best evidence of its contents.  To the extent these paragraphs contain plaintiffs' legal conclusions no response is required, and on that basis they are denied.

30.    The first sentence of this Paragraph is admitted.  Intervenors deny that the money paid for permits has all been used for "polar bear research and management programs."

31.    This paragraph contains plaintiffs' characterization of the MMPA, which speaks for itself and is the best evidence of its contents.  To the extent the paragraph contains plaintiffs' legal conclusions no response is required, and on that basis they are denied.

32.    The first sentence of this Paragraph contains a legal conclusion to which no response is required, but is in any event denied.  The second and third sentences are denied.  The

3

final sentence quotes a Federal Register notice that speaks for itself and provides the best evidence of its content.

33.    The first sentence of this Paragraph quotes the MMPA, which speaks for itself and provides the best evidence of its content. The second sentence is denied.

34-37.  These paragraphs characterize and quote the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, <u>et seq.</u>, which speaks for itself and provides the best evidence of its content.

38-39.  Admitted.

40.    Intervenors lack information or knowledge sufficient to form a belief as to the truth of this paragraph.

41.    The first sentence of this paragraph is denied. The second sentence is admitted.

42.    Intervenors lack information or knowledge sufficient to form a belief as to the averments in this paragraph, but deny that killing polar bears furthers the conservation of the species.

43.    Intervenors lack information or knowledge sufficient to form a belief as to the averments in this paragraph, but deny that polar bear mortality and Canadian conservation efforts on behalf of polar bears will be unaffected by the ban on the import of polar bear body parts into the United States.

44.    Intervenors reallege and incorporate their responses to all the averments of the Complaint.

45-46.  The averments in these paragraphs contain plaintiffs' legal conclusions to which no response is required, and are denied on that basis.

4

47.     Admitted.

48.     Intervenors lack information or knowledge sufficient to form a belief as to the averments in the first sentence of this paragraph.  As to the second sentence, Intervenors deny that killing polar bears provides conservation benefits to the species.  The final sentence contains a conclusion of law as to which no response is required, and is denied on that basis.

49.     The averments in this Paragraph contain plaintiffs' legal conclusions to which no response is required, and are denied on that basis.

50.     Intervenors lack information or knowledge sufficient to form a belief as to the averments in this paragraph.

51.     Intervenors reallege and incorporate their responses to all the averments of the Complaint.

52.     The averments in this Paragraphs contain legal conclusions as to which no response is required, and are denied on that basis.

53.     Denied.

54.     The first four sentences of this Paragraph contain legal conclusions as to which no response is required, and are denied on that basis. The last sentence is admitted.

55.     The first two sentences of this paragraph contain plaintiffs' legal conclusions as to which no response is required, but are in any event denied.  The averments in the last sentence are denied.

56-59.  Intervenors incorporate their response to Paragraph 47-50, which contain the exact same averments.

60.    Intervenors reallege and incorporate their responses to all the averments of the Complaint.

61-63.  The averments in these paragraphs contain legal conclusions as to which no response in required, but which in any event are denied.

64-67.  Intervenors incorporate their response to Paragraph 47-50, which contain the exact same averments.

68.    Intervenors reallege and incorporate their responses to all the averments of the Complaint.

69-70.  The averments in these paragraphs contain legal conclusions as to which no response in required, but which in any event are denied.

71.    Intervenors lack information or knowledge sufficient to form a belief as to the averments in this paragraph.

72-75.  Intervenors incorporate their response to Paragraph 47-50, which contain the exact same averments.

## AFFIRMATIVE DEFENSES

1.    The Complaint fails to state claims upon which relief may be granted.

2.    This Court lacks subject matter jurisdiction over plaintiffs' claims because plaintiffs failed to provide sixty days notice, as required by 16 U.S.C. § 1540(g)(2).

3.    The Complaint fails to challenge a final agency action under the APA.

4.    Plaintiffs lack standing to pursue their claims, and/or the claims are not ripe for review at this time.

## **REQUEST FOR RELIEF**

WHEREFORE, Intervenor Defendants respectfully request that the Court grant the following relief:

A.    Enter Judgment in favor of defendants and intervenor defendants;

B.    Dismiss plaintiffs' claims;

C.    Award Intervenor Defendants' their costs and attorneys' fees; and

D.    Order such other relief that is just and proper.


Respectfully Submitted,


_____/s/_____
Howard M. Crystal (D.C. Bar No. 446189)


_____/s/_____
Eric R. Glitzenstein (D.C. Bar No. 358287)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C. 20009
(202) 588-5206

June 16, 2008                          Attorneys for Proposed-Intervenors

7

DECLARATION OF VICKI BURNS

Safari Club International v. Kempthorne,
No. 08-881 (EGS) (D.D.C.)

Humane Society of the United States <u>et al</u>.'s
Motion To Intervene

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**SAFARI CLUB INTERNATIONAL,**
**SAFARI CLUB INTERNATIONAL**
**FOUNDATION,**

Plaintiffs,

v.

**DIRK KEMPTHORNE, in his official**
**capacity, H. DALE HALL, in his**
**official capacity, UNITED STATES**
**FISH AND WILDLIFE SERVICE,**

Defendants.

Civ. No. 08-0881 (EGS)

### DECLARATION OF VICKI BURNS

I, Vicki Burns, hereby declare as follows:

1.      I reside at 440 Waverley St. Winnipeg, Manitoba R3M3L4. I have personal knowledge of the matters set forth herein.

2.      I am currently a member of the International Fund for Animal Welfare (IFAW).  I support and donate to IFAW because I am concerned about wildlife and animals in general. I have a particular interest in the protection of polar bears in the wild, and began supporting IFAW because of their efforts to protect polar bears in Canada.

3.      I am very interested in polar bear conservation and I rely upon IFAW to advocate for the survival of polar bears on my behalf. In addition, I expect IFAW to keep me informed of the status of polar bear conservation and of the current threats facing polar bears.

4.      I live in Manitoba, where polar bears are frequently seen.  Because of their unique place in the food chain, their health is very symbolic to me of the

planet's health.  While I have never seen a polar bear in the wild, I am active in conservation efforts directed at protecting these wild animals.  Over a decade ago, I traveled to Churchill, during the off-season for polar bear sightings, to encourage the discontinuation of capturing polar bears.  I traveled at this time because I expected less opposition because nobody would be there hunting, a factor which I believe might have distracted the locals from the true point of my arguments.  This willingness to travel to a locale known for polar bears when I knew they would not be present simply to argue for their rights is a clear indication of the esteem in which I hold these animals.

5.    I will return to Churchill in the next few years, this time during polar bear season. I look forward to seeing polar bears in their natural habitat during this and future visits to this area, which is one of the areas where U.S. sport hunters kill polar bears for import into the United States. While there, I intend not only to encourage safe hunting practices and discourage catching polar bears by the locals, but I would also like to engage other visitors in conversation.  I believe that spreading knowledge of the plight of polar bears is of the utmost importance.

6.    I believe that importing polar bears from Canada, when the U.S. government has made hunting these animals within its borders is ludicrous. Not only does it undermine the value of that government's conservation efforts, but it affects all people.  I believe that people benefit in general from respecting wildlife, and there is certainly no respect in killing polar bears in a nation which allows it so you can simply transport a "trophy" to your own nation, which does not.  I believe that this act also shows the lack of respect U.S. hunters have for

their own government, which is obviously a state of mind that the U.S. should not wish perpetuated.

7.    I am depressed and offended by the thought that human actions may contribute to the loss of an entire species, especially one as noble as the polar bear. If IFAW was to prevail in this suit, I would gain a sense of hope. A court finding that polar bear carcasses butchered for "sport" cannot be imported to the United States would show me that human beings are able to exhibit the self control critical to protecting our planet.

8.    While I have never seen polar bears in the wild, I am comforted knowing that they are out there, and have appreciated their contributions to arctic ecosystems. As I already stated, I plan on returning to Churchill during polar bear season in the near future to watch and enjoy these animals in their natural habitat. I am immensely comforted knowing that I will have the opportunity to see them. However, I would be irreparably harmed if that opportunity was denied to me.

9.    Because of my desire to one day view polar bears in the wild, and danger they are already enduring as their habitat is degraded by global warming, I rely upon IFAW to argue to protect these animals from other dangers, such as sport hunting. While the solution to the global warming threat must be thought out carefully due to its far-reaching effects, the importation of polar bear "trophies" has been made illegal within the United States, and that should help reduce the danger from American hunters. Such a simple measure could greatly improve the polar bear's chance at survival.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

*Vicki Burns*
Vicki Burns

June 11, 2008

-4-

# DECLARATION OF ROBERT LAIDLAW

Safari Club International v. Kempthorne,
No. 08-881 (EGS) (D.D.C.)

Humane Society of the United States <u>et al</u>.'s
Motion To Intervene

05/04/2008  11:24    4152354748            ZOOCHECK CANADA                    PAGE  02

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAFARI CLUB INTERNATIONAL,
SAFARI CLUB INTERNATIONAL
FOUNDATION,

Plaintiffs,

v.

DIRK KEMPTHORNE, in his official
capacity, H. DALE HALL, in his
official capacity, UNITED STATES
FISH AND WILDLIFE SERVICE,

Defendants.

Civ. No. 08-0881 (EGS)

### DECLARATION OF ROBERT LAIDLAW

I, Robert Laidlaw, hereby declare as follows:

1.    I reside at 19 Rednor Road, Toronto, Ontario M4C 4B3. I have personal knowledge of the matters set forth herein.

2.    I am currently a member of the International Fund for Animal Welfare (IFAW). I support and donate to IFAW because I rely on them to represent my interest in protecting polar bears from the cruel practice of trophy hunting. I have a particular interest in the protection of polar bears in the wild, and it is my belief that IFAW is best able to protect that interest.

3.    I am currently the Executive Director of Zoocheck Canada. I have also been a cruelty inspector for the Toronto Humane Society and was on the Board of Directors of the Canadian Federation of Humane Societies. While with organizations such as these, I was involved in several initiatives directed at improving the lives of polar bears in captivity and in the wild.

4.    I have visited the polar bear populations that until recently were hunted by U.S. hunters for import into the U.S., including those in Churchill, on two occasions in the past. On each visit I have enjoyed seeing polar bears and the natural habitat in which they live. In addition, despite much press to the contrary, during my last trip to Churchill, it became obvious to me that not all locals support sport hunting. In my discussions, it became apparent that many locals were aware of the withdrawing ice, and its impact on polar bear habitat. Several natives expressed worry over the sustainability of polar bear populations in the area if the ice continued to thaw and sport hunting was allowed. They also indicated that polar bear watching was becoming more popular and profitable, and it worries me that the increase in such an activity may be cut short because of hunting.

5.    I believe all animals, including polar bears, have a place in nature and that they should be allowed to live undisturbed in their natural environments. I also believe that certain animals, like polar bears, benefit us all in a non-religious spiritual or emotional way. Knowing that polar bears are alive and well is a benefit to my well-being that I hope not to lose.

6.    I am going to return to view polar bears in the wild within the next few years. Until that time comes, I feel a degree of peace-of-mind knowing that I will be able to someday soon visit the polar bears in their natural habitat. If they were to be harmed to such a degree that I may be unable to visit them, I would feel irreparably harmed.

7.    Because of IFAW protecting my interests in this suit, I would benefit from knowing that polar bears are being protected from hunting if they were successful. I would have a greater sense of confidence in the United States government and its concern for polar bears. In addition, I will be able to go see them

in the wild for enjoyment, after having fought to protect them for so long. I would very much like to know that they are thriving in their natural habitat.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Robert Laidlaw

June 13, 2008

DECLARATION OF ANDREW PAGE

Safari Club International v. Kempthorne,
No. 08-881 (EGS) (D.D.C.)

Humane Society of the United States <u>et al</u>.'s
Motion To Intervene

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SAFARI CLUB INTERNATIONAL**, **SAFARI CLUB INTERNATIONAL FOUNDATION**,<br><br>            Plaintiffs,<br><br>      v.<br><br>**DIRK KEMPTHORNE, in his official capacity**, **H. DALE HALL, in his official capacity**, **UNITED STATES FISH AND WILDLIFE SERVICE**,<br><br>            Defendants. | Civ. No. 08-0881 (EGS) |

## DECLARATION OF ANDREW PAGE

I, ANDREW PAGE, hereby declare as follows:

1.      I am the Director of the Wildlife Abuse Campaign at The Humane Society of the United States ("The HSUS") a non-profit membership organization with more than 10.5 million members and constituents.  The mission of The HSUS is to create a humane and sustainable world for all animals, through education, advocacy, and the promotion of respect and compassion.  The HSUS protects all animals through legislation, litigation, investigation, public education, special events, and field work.

2.      As Campaign Director, I oversee efforts to stop wildlife abuses such as captive hunting, killing contests, wildlife penning, and hunting of threatened and endangered species for sport and trophy collection.  The campaign works to educate The HSUS' constituents and the general public about the effects of egregious

hunting practices, and to mobilize The HSUS' constituents and the general public to take action on this issue.

3.     One of my primary job responsibilities is to campaign for regulatory and legislative changes in specific areas of hunting policy.  The HSUS focuses its efforts on particular issues pertaining to the welfare of animals targeted by or used in certain hunting activities, such as the imperiled species that are most desirable to, and therefore common targets of trophy hunters.  It is The HSUS' position that the demise of any species is an irreparable loss that deprives the world of a unique organism and the role that organism plays in its ecosystem.  The HSUS thus opposes the hunting of any living creature for purposes of recreation or trophy collection alone.  The HSUS also works to eliminate the most inhumane and unfair sport-hunting practices, including the stocking of animals for fee-hunting on enclosed properties.

4.     The HSUS also seeks to protect wild animals from unnecessary exploitation in light of the increasing number of threats from anthropogenic factors, including habitat loss and degradation, over-harvesting, and illegal trade in imperiled animals and their parts.  Thus, The HSUS is committed to protecting threatened and endangered species, such as polar bears and their habitats.

5.     The HSUS' international division, Humane Society International, works to eliminate illegal trade in wildlife and the promotion of sport hunting of threatened and endangered species, and to ensure that treaties and international agreements affecting wildlife conservation are fully implemented and continue to protect animals throughout the world.

6.     We have members who have joined our organization because of the services we provide in monitoring, investigating, reporting, and otherwise

endeavoring to conserve imperiled species, end unnecessary and inhumane hunting practices, and work internationally to protect wildlife, including polar bears. Our services include:

a. **Monitoring.** HSUS employees monitor proposed changes in the law at both the state and federal level regarding hunting, as well as press coverage of hunting issues. HSUS employees also regularly monitor the Federal Register to learn about federal government activities related to wildlife protection, including applications for import of wildlife specimens, proposals for and findings concerning listing wildlife species under the Endangered Species Act, and activities that may result in the taking of threatened and endangered species. Specifically, The HSUS' Wildlife Abuse Campaign regularly monitors the Federal Register for applications to import polar bear trophies. The HSUS also obtains information on wildlife protection under the Freedom of Information Act and state open government laws.

b. **Investigations.** The staff of HSUS' Investigative Services department works to expose organized or institutionalized abuses of animals. This department provides comprehensive, detailed investigative and research support for The HSUS. This valuable information is used to bring violators of animal protection laws to justice, educate the public about animal cruelty and exploitation, and demonstrate to legislators when there is need for stronger animal protection laws. By example, The HSUS' investigative work has been offered as assistance to law enforcement officials prosecuting cases of poaching and illegal wildlife trade.

c. **Reporting & Education.** The HSUS uses the information it obtains from various monitoring and investigative activities to update our website and to prepare detailed reports, action alerts, fact sheets, and press releases on important issues pertaining to animal welfare. The HSUS reports this information obtained to our members and other constituents, as well as the general public, the law enforcement community, legislators, and state and federal agency staff. The HSUS also maintains a website detailing our campaigns and programs and sends action alerts to our members to keep them informed about animal protection issues and how they can voice their own opinions and concerns in various forums on these issues. The HSUS also distributes a regular newsletter that includes updated information on our campaigns, including our Wildlife Abuse Campaign, and in depth reports on key issues.

d. **Advocacy Work.** The HSUS advocates for legal protection for all animals, including those who are threatened and endangered. This includes lobbying for the passage of legislation at both the federal and state levels; responding to requests for public comments, and filing petitions for rulemakings and other actions by government agencies; and filing as a party to, or submitting *amicus curiae* pleadings in lawsuits in which the protection of animals is at issue. HSUS employees provide information and testimony

to state and federal legislative bodies and administrative agencies with regard to wildlife protection issues, and have done so specifically on the issue of the import of sport-hunted polar bear trophies.

7.    The HSUS has devoted considerable resources to ending the unnecessary practice of trophy hunting of threatened and endangered species. Every year tens of thousands of wild animals, representing hundreds of different species, are killed by American trophy hunters in foreign countries. The heads, hides, tusks, and other body parts of most of these animals are imported to the United States by the hunters as trophies of their kills. Many animals imported as trophies are members of species protected under the Endangered Species Act ("ESA"), such as leopards and African elephants.

8.    Many trophy hunters belong to organizations that promote trophy hunting, such as Safari Club International ("SCI"). In addition to its lobbying and public relations endeavors, SCI conducts competitions that provide trophy hunters with the opportunity to compete with other hunters to kill the biggest or greatest number of animals – by example, SCI has created an award for any hunter that kills at least one member from all the bear species in the world.

9.    One example of The HSUS' efforts to end unnecessary trophy hunting of imperiled species is the organization's two-year undercover investigation into tax abuses by American trophy hunters.  The investigation revealed that trophy hunters were writing off all of the costs associated with trophy hunting, including the costs of trips to foreign countries and for safari and guide fees, by claiming that the trophies were donated to "museums."   In reality, trophy mounts were placed in private facilities or even on display in the hunter's home – one appraiser even promised that hunters could use the tax law loophole to "hunt for free" and setup a website telling hunters "how to set up your own museum." Appraisers were also grossly inflating

the value of appraisals of the trophy mounts to allow hunters to receive tax breaks in amounts far in excess of the actual value of the mounts.  A front page article in The Washington Post covered the investigation in April 2005, including information from The HSUS' own press releases on the issue.  The HSUS investigation also triggered Senate Finance Committee scrutiny of the taxidermy tax breaks, and Congress eventually legislated to close the loophole. (*See* HSUS, <u>Congress Tackles Trophy Hunting Tax Scam</u> (Nov. 18, 2005) *at* http://www.hsus.org/hunt/news/ congress_tackles_tax_scam.html; Marc Kaufman <u>Big Game Hunting Brings Big Tax Breaks</u>, WASH. POST, A1 (Apr. 5, 2005), *available at* http://www.washingtonpost.com/ wp-dyn/articles/A26324-2005Apr4.html.)

10.    Among The HSUS' recent activities to combat wildlife abuses is our specific campaign to halt the import of polar bear trophies taken by American hunters in sport hunts in Canada.  This effort has included proposing federal legislation to prohibit the import of polar bear trophies into the United States under the Marine Mammal Protection Act ("MMPA"); development of an advocacy video highlighting the plight of polar bears and the pressures created by trophy hunting; producing over a dozen website articles on the issue of polar bear sport hunting in Canada and other countries; as well as an email and letter-writing campaign whereby The HSUS and its members and constituents contacted the U.S. Fish and Wildlife Service, members of Congress, and the Canadian Wildlife Service and Department of Environment of Canada to encourage actions that will bring an end to hunting polar bears for sport.

11.    The HSUS helped develop proposed legislation entitled the Polar Bear Protection Act ("PBPA"), which would prohibit U.S. trophy hunters from importing polar bear specimens from Canada, which has been permitted since 1994. Prior to

the listing of polar bears as a threatened under the ESA, the PBPA was introduced in both houses of the 100th Congress (S. 1406/H.R. 2327), and had been reported to the Senate Committee on Commerce, Science and Transportation, and the House Subcommittee on Trade.

12.    In advocating for the enactment of the PBPA, The HSUS has spent considerable resources on drafting the proposed legislation, preparing fact sheets for discussions with legislators and other policymakers and professionals, running print ads encouraging the enactment of the bill, and direct outreach to specific members of Congress. These activities have involved over 168 hours of HSUS staff time, and the total cost to The HSUS of these efforts has been more than $6,273.

13.    The HSUS' campaign to end the needless trophy hunting of polar bears for sport also involved the production of a polar bear advocacy video, which was posted on The HSUS' website, included as part of The HSUS' web stories on polar bear conservation, and made available for use by media outlets. Production of this video involved over 10 hours of HSUS staff time, and the total cost to The HSUS in producing the video was approximately $2,500 (including staff time and equipment and production expenses).

14.    The polar bear trophy hunting campaign has also involved a large number of action alerts and other communications with HSUS members and constituents, production of web articles on protection of polar bears, and development of email and letter writing campaigns to legislators and other policymakers. The direct costs for the creation of these e-community and grassroots modules was approximately $930, which does not include overhead costs associated with maintaining the websites and other systems associated with these activities.

The HSUS also incurred significant costs associated with the amount of staff time required for these activities.

15.    In addition to these efforts, HSUS staff members engaged in countless hours of research in support of the campaign, gathering information from polar bear range states, the World Conservation Union ("IUCN") Polar Bear Specialist Group, and leading scientific researchers, as well as other activities in support of the campaign. However, without considering the costs of this research or other advocacy efforts concerning polar bear conservation, the aforementioned activities related to the import of spot-hunted polar bear trophies alone cost The HSUS over $10,000.

16.    While the PBPA was pending, and in the midst of The HSUS' campaign to end trophy hunting of polar bears, the U.S. Fish and Wildlife Service issued its final rulemaking listing the polar bear as threatened under the ESA.  As noted in The HSUS' web article and press release on the listing, "[t]his decision effectively accomplishes the same goal as the Polar Bear Protection Act, which The HSUS has aggressively advocated for in Congress." (*See* HSUS, Polar Bear Listed as Threatened Species; Trophy Hunting Imports Must Stop Immediately (May 14, 2008) *at* http://www.hsus.org/hunt/news/pr/polar_bear_listed_threatened_species_05 1408.html).

17.    All of the efforts of The HSUS' campaign to halt the import of polar bear trophies taken by American hunters in sport hunts in Canada have caused a consequent drain on the resources available for other organizational priorities, and specifically other work The HSUS undertakes to protect wildlife. Specifically, in expending resources on the polar bear trophy import issue, the Wildlife Abuse campaign has not been able to dedicate more resources to other campaign priorities such as ending captive hunting, poaching, and killing contests.  The ability to

provide our members with the services related to wildlife protection that they expect has been limited by the amount of resources dedicated to the polar bear trophy import issue.

18.    Now that the ESA-listing has been established and trophy imports have been prohibited under the MMPA, The HSUS' resources dedicated to this campaign, which were increased in recent years, can be distributed to other important programming issues related to wildlife protection.  If the ban on import of polar bear trophies is upheld, HSUS staff and funding will be used to address our primary organizational priorities in wildlife protection, including the most egregiously abusive hunting activities, such as captive hunts, poaching, and killing contests.

19.    By example, The HSUS may be able to further assist law enforcement entities to prevent and prosecute poaching cases and the illegal trade in wildlife parts.  Among other forms of assistance, The HSUS uses its financial resources to offer rewards for cooperation in identifying and prosecuting poachers and those who engage in the illegal trade of wildlife parts such as bear galls and paws.  The elimination of the polar bear trophy import exception will allow The HSUS to commit additional funds to this and other important wildlife protection activities.

20.    On the other hand, if SCI obtains the relief it seeks in this case, The HSUS' mission will once again be frustrated. Resources dedicated to important wildlife protection and other matters will be used to address the unnecessary pressures of trophy hunting on polar bears given the dire situation facing polar bears and their habitat   The HSUS will again have to divert substantial funds – surely more than previously spent on the issue – in order to push for the legislative, regulatory or other changes necessary to again end trophy imports of polar bears.

21.    Thus, The HSUS would be specifically harmed by the relief sought by SCI, and this harm would be prevented if the ban on importation of sport-hunted polar bear trophies, which became automatic upon listing, remains.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____

Andrew Page

June 11, 2008

-9-

DECLARATION OF JIM PISSOT

Safari Club International v. Kempthorne,
No. 08-881 (EGS) (D.D.C.)

Humane Society of the United States <u>et al</u>.'s
Motion To Intervene

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SAFARI CLUB INTERNATIONAL**, **SAFARI CLUB INTERNATIONAL FOUNDATION**, <br><br>        Plaintiffs, <br><br>    v. <br><br>**DIRK KEMPTHORNE, in his official capacity**, **H. DALE HALL, in his official capacity**, **UNITED STATES FISH AND WILDLIFE SERVICE**, <br><br>        Defendants. | Civ. No. 08-0881 (EGS) |

**DECLARATION OF JAMES PISSOT**

I, James Pissot, hereby declare as follows:

1.      I am the Canadian Field Representative for, and a member of, Defenders of Wildlife ("Defenders"). As the Canadian Field Representative, my responsibilities include: developing, coordinating and implementing Defenders' various programs in Canada; protecting large carnivores and their habitat; conserving species at risk; and protecting priority habitats and landscapes. I have been involved with Defenders as an employee or member since 2003.

2.      Defenders, a national non-profit charitable organization with its principal place of business in Washington, D.C., currently has more than one million members and supporters across the United States.  Defenders is dedicated to the protection of all native wild animals and plants in their natural communities, focusing its programs on two of the most serious environmental threats to the planet: the accelerating rate of extinction of

species and the associated loss of biological diversity, and habitat alteration and destruction. Defenders works to protect entire ecosystems and interconnected habitats while protecting predators, such as the polar bear, that serve as indicator species for ecosystem health. Indeed, Defenders has long worked for conservation of the polar bear and other top predators throughout North America. The polar bear plays a critical role in Arctic ecosystems, and its loss would threaten a "trophic cascade" similar to those observed when other top predators have been removed from ecosystems.

3.       Defenders intervenes here on its own behalf and on behalf of its members, many of whom enjoy, appreciate and benefit from the presence of the polar bear and have had a long-standing, interest in polar bear conservation. Many of Defenders' members also regularly enjoy and will continue to enjoy educational, recreational and scientific activities, including hiking, camping and observing wildlife in polar bear habitat. Consequently, the interests of Defenders and its members will be directly and indirectly harmed if as a result of this litigation, the importation into the United States of sport-hunted polar bear parts is allowed to resume once again.

4.       Conservation of polar bears is an organizational priority of Defenders. Defenders has long sought to increase protections for polar bears in the United States and abroad. For example, Defenders has written letters and comments to the U.S. Fish and Wildlife Service, including actively participating in the development of FWS's polar bear conservation plan and habitat conservation strategy for polar bears. Defenders is also working in Canada to ensure the Canadian government takes the steps necessary to protect and recover the polar bear populations there.

5.     Defenders also commented specifically on the listing of polar bears as threatened under the Endangered Species Act ("ESA"), describing that the best available science established that the bear is threatened with extinction in the foreseeable future. Defenders' comments specifically noted that, already under stress caused by loss of habitat due to climate change, the polar bear could ill afford the additional threat posed by the then-significant level of hunting and trade. Defenders concluded that the present and threatened destruction of polar bear habitat due to climate change and other causes, over-utilization of polar bears, and the inadequacy of existing regulatory mechanisms were all factors that warrant the listing of the polar bear and pressed for the expeditious listing of the polar bear as a threatened species.

6.     Defenders staff have also attended and participated in meetings of the Parties to the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), to which the United States is a Party, where the conservation of polar bears has been discussed.

7.     Defenders also has actively advocated for prohibiting the importation of polar bear trophies from Canada. Defenders' work has included supporting efforts to amend the MMPA through the Polar Bear Protection Act, which is currently pending in bills introduced in both houses of Congress. In addition, Defenders and Defenders' members last year petitioned FWS to halt granting polar bear trophy permits.

8.     Moreover, through its advocacy for the listing of the polar bear under the ESA, which automatically results in the polar bear being designated a "depleted" species under the MMPA, Defenders has supported the restriction on the importation of sport-hunted polar bear trophies. Notably, Defenders advocacy to protect marine mammals

relies on this precise operation of law. If the "depleted" species designation is declared unlawful in this case and is no longer automatic upon listing under the ESA, it will take additional resources to try to ensure that an ESA-listed marine mammal species receive the protections under the MMPA.

9.     Furthermore, the "depleted" species designation provides additional conservation benefits to polar bears. Not only are permits for the importation of polar bear trophies disallowed now that the species is designated as "depleted," but other permits are also disallowed, such as permits allowing polar bears to be imported for "public display" purposes. Also, the "depleted" species designation requires that a conservation plan be established for the polar bear. Like ESA recovery plans, MMPA conservation plans result in increased study and monitoring of marine mammal populations to ensure their sustainability. If the "depleted" species designation is declared unlawful in this case or otherwise removed, these conservation benefits would be lost.

10.     Defenders' organizational mission and its advocacy efforts for the conservation of polar bears would be frustrated if import of sport-hunted polar bear trophies is permitted notwithstanding the clear mandate of the MMPA. The relief sought in this case would allow trophy hunting of polar bears to continue, contrary to law, at previous levels and potentially expand, thus contributing to the decline of polar bear populations. This would harm Defenders' ongoing efforts to conserve polar bears that Defenders' members rely on the organization to undertake.

11.     Defenders' members' interests would undoubtedly be harmed by relief requested here and the United States Fish and Wild Service thus fails to comply with the MMPA. The benefits that Defenders members derive, and will continue to derive, from

the polar bear and its habitat, will be harmed, adversely affected and irreparably injured should the plaintiffs' relief be granted, and FWS is ordered to ignore the clear statutory obligations to ensure the survival and recovery of the polar bear. Such relief will lead to the continued decline of the polar bear in violation of the MMPA and ESA, thereby impeding the eventual recovery of the species. Thus, the relief sought will deprive Defenders' members of aesthetic, spiritual, and recreational benefits derived from the species and its habitat.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

June 13, 2008

_____
James Pissot, MSc

DECLARATION OF CAROLYN POTTS

Safari Club International v. Kempthorne,
No. 08-881 (EGS) (D.D.C.)

Humane Society of the United States <u>et al</u>.'s
Motion To Intervene

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SAFARI CLUB INTERNATIONAL, SAFARI CLUB INTERNATIONAL FOUNDATION,**<br><br>Plaintiffs,<br><br>v.<br><br>**DIRK KEMPTHORNE, in his official capacity, H. DALE HALL, in his official capacity, UNITED STATES FISH AND WILDLIFE SERVICE,**<br><br>Defendants. | Civ. No. 08-0881 (EGS) |

**DECLARATION OF CAROLYN POTTS**

I, Carolyn Potts, hereby declare as follows:

1.      I reside at 1340 North Morningside Drive, Atlanta, Georgia 30306. I have personal knowledge of the matters set forth herein.

2.      I am currently a member of the International Fund for Animal Welfare (IFAW) and have been a member since September 2006.  I support and donate to IFAW because I am concerned about wildlife and animals in general. I have a particular interest in the protection of bears in the wild, and first began supporting IFAW because of their efforts to protect brown bears in Russia.

3.      I am very interested in polar bear conservation and I rely upon IFAW to advocate for the survival of polar bears on my behalf. In addition, I expect IFAW to keep me informed of the status of polar bear conservation and of the current threats facing polar bears.

4.      I have taken two trips to Canada to observe polar bears. In November 2005, I traveled to Churchill, Manitoba, Canada to watch and enjoy

polar bears in the wild for five days. The trip was one of Frontier North's Tundra Buggy Adventures, in which I stayed in town at night and took trips out onto the tundra during the days. During this trip, I saw approximately 40 polar bears. I saw many large older males. I also remember seeing several mothers with more than one cub. I heard that bears sometimes came into town in search of food, but, despite staying in Churchill, I did not see any bears while I was there.

5.    In November 2007, I returned to Churchill on a trip once again organized by Frontier North. This trip was also for five days. This time, our group stayed in a Tundra Buggy lodge outside of town. While we saw more bears during this trip, the bears we saw were thinner and smaller. Even though we were not staying in town, when we did go into town, we saw bears that had come into town in search of food.

6.    I could definitely see a difference in the size of the bears I observed on the November 2007 trip compared to the bears I observed on my 2005 trip. The younger bears were so small that everyone was concerned as to whether they would have enough strength to break the ice to hunt for seals for food. I also saw fewer mothers with multiple cubs then I did in 2005. The ice hadn't frozen at this point, which our guide indicated was unusual. In fact, he indicated that patrons had once been able to come to Churchill in late September or early October for polar bear watching, but that sightings that early in the year were becoming increasingly rare. The whole experience was shocking and sobering

7.    Because I have enjoyed these trips so much, I have already made plans to return to Churchill to observe polar bears. The trip is scheduled for

November 12 to November 19, 2008. I will be joining the same group and I will be staying at the Tundra Buggy lodge. I have told one of my friends who is also interested in polar bear conservation about my trips and how much I benefit from these trips. Hopefully, this year she will be joining me.

8.      It is extremely important to me that I be able to visit and appreciate polar bears in the wild. I have many fond memories from my trips. It was wonderful to see the young males playfully wrestling or laying together to keep warm. These instances touched me deeply. Not only do I feel a strong connection to these majestic animals, but I feel strongly that they have as much a right to exist as humans. The fact that the human population is contributing to the demise of polar bears is heartbreaking.

9.      If Americans continue to import polar bear trophies from Canada, I would be harmed.   Because polar bears have been listed under the Endangered Species Act, it is evident to me that they are facing serious threats. Moreover, I have reviewed the declaration of Naomi Rose, a marine mammal biologist and Senior Scientist at The Humane Society of the United States and agree with her analyses and conclusions as to the peril facing polar bears, and the impact that U.S. trophy hunting has on polar bear populations in other countries.

10.     Since polar bear habitat is at risk from global warming, I believe people should reduce other stress factors, such as hunting, that the bears face. It isn't right to put more stress on polar bear populations by hunting. Adding extra stress to an already fragile species will only speed up their demise.

11.     Since hunting tags are issued for the Western Hudson Bay area where I go to see polar bears and where I have heard and seen that polar bears

are facing significant threats, continued importation of polar bear trophies would be of serious concern to me. My ability to visit, watch, photograph, and enjoy polar bears will be harmed if U.S. sport hunters are again permitted to import polar bear trophies and trophy hunting was to resume at the same level as occurred prior to the listing of the polar bears under the Endangered Species Act.

12.    Moreover, my ability to appreciate polar bears as an integral part of artic ecosystems would be harmed if U.S. trophy hunters are again able to import polar bear trophies from the Western Hudson Bay polar bear population, and other populations where the Canadian government has decided that hunting should be allowed.

13.    If polar bears were more likely to decline and become extinct, I would be heartbroken. For one thing, if the polar bear, one of the animals near the top of the food chain, is near extinction, that cannot bode well for the rest of the earth and its creatures. We should not perpetuate such deterioration.  It does not make sense that somebody would want to hunt polar bears when they are already threatened.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

14.    If IFAW prevails in this lawsuit, I would benefit from knowing that polar bears are being protected from hunting. I would have a greater sense of confidence in our government and its concern for polar bears. In addition, I would be able to continue to go see them in Churchill. I would very much like for my nieces and nephews to one day go to see polar bears alive in the wild, especially as I have seen them, and to know that they are thriving in their natural habitat.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Carolyn Potts

June 12, 2008

DECLARATION OF ELSE POULSEN

Safari Club International v. Kempthorne,
No. 08-881 (EGS) (D.D.C.)

Humane Society of the United States <u>et al</u>.'s
Motion To Intervene

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **SAFARI CLUB INTERNATIONAL,**<br>**SAFARI CLUB INTERNATIONAL**<br>**FOUNDATION,**<br><br>Plaintiffs,<br><br>v.<br><br>**DIRK KEMPTHORNE, in his official**<br>**capacity, H. DALE HALL, in his**<br>**official capacity, UNITED STATES**<br>**FISH AND WILDLIFE SERVICE,**<br><br>Defendants. |

Civ. No. 08-0881 (EGS)

**DECLARATION OF ELSE M. B. POULSEN**

I, Else M. B. Poulsen, hereby declares as follows:

1.      My address is Behavioral & Environmental Solutions, Unit 2, 126 Main St. West, Grimsby, Ontario L3M1R8.

2.      I became a member of the International Fund for Animal Welfare (IFAW) specifically because I believed they would best represent my interests in polar bear conservation.  I support IFAW because I have worked with them for 5 or 6 years on various projects and issues, and I admire and respect their work. IFAW is dedicated to wildlife protection (*or humane treatment of wildlife, etc*) and finding practical solutions that benefit both animals and people. I believe the practical approach to wildlife protection that IFAW takes makes it an effective advocate for the welfare of animals like polar bears.  I believe that, because their work is animal welfare related, IFAW is less political than other environmental organizations.  I have a particular interest in the protection of

bears in the wild because I study polar bears in captivity, and believe study of wild bears is critical to understanding and safely maintaining captive bears.

3.    I have studied captive polar bears for over 25 years, and now work to protect the mental and physical health of these bears.  Being able to observe and enjoy these creatures in the wild, and knowing that others may do so as well, is critical to my work and well-being.  I have also published a book about bears, and am working on two more.  One of these is about all species of bears, but one is specifically about Canadian bears, including the polar bear.

4.    I am very interested in polar bear conservation and I rely upon IFAW to advocate for the survival of polar bears on my behalf. In addition, I expect IFAW to keep me informed of the status of polar bear conservation and of the current threats facing polar bears.

5.    I have been to Churchill once to study and photograph polar bears in the wild.  While the trip was ostensibly taken to study wild bears to better understand how to create healthy habitats for captive bears, I took many photographs because of the pleasure I derived from viewing the bears in their natural habitat.  Not only did this trip leave me feeling more attached to the bears, but my observations helped illuminate certain behavioral problems that captive bears exhibit.

6.    For example, biologists refer to polar bear behavior in the summer as a "walking hibernation".  A wild polar bear's biggest problem in the summer is staying cool. So they make day beds for themselves by digging into the permafrost and sleeping in this cool 'refrigerated' pit. Captive polar bears have been observed to try to dig into the ground in their enclosures. After realizing how important this behavior is to the bear in the wild we learned to provide

woodchip beds for our captive bears to dig into and rest in. By applying wild bear environmental land use behavioral needs to captive bear environments , I was able to fully rehabilitate two bears who exhibited severe behavioral stereotypies.

7.    At present, I am in the process of developing a nonprofit organization called the Bear Care Group.  The objective of this international group consisting of professional bear keepers and caregivers, which meets every two years, is to study wild bears to improve the lives of captive bears in zoos, sanctuaries and rehabilitation facilities.  It is important to the organization that people be able to observe and learn from wild bears in order to transfer that knowledge to the handling and care of captive bears.  Without wild polar bears to study, we would have no basis from which to improve the quality of life of the captive animals.

8.    While the importance of being able to watch these bears in the wild is critical to all members of the Bear Care Group, the ability to watch them is also very important to me personally.  I will be returning to wild polar bear habitat within the next two years, including to visit one or more populations where U.S. hunters have been killing polar bears and importing their body parts into the U.S.  While some of the photographs I take on this trip will be used in one of my books, most will be kept as a reminder of these majestic creatures in their natural habitat.  This reminder is of inestimable value to me because I feel a sense of ease just knowing that polar bears are out in the wild.

9.    I believe I would feel an overwhelming sense of loss if polar bears were to decline or become extinct.  Because I believe that polar bears need protection, and I strongly agree with the declaration of Ms. Naomi Rose, I rely

upon IFAW to protect my interests in polar bears. Because of the risk of polar bear habitat decay that global warming has created, it is my sincere belief that people should reduce any other stress factors upon polar bear populations. Increasing stress upon an already fragile population is not in the species' or humanity's best interests.

10. Because not only my livelihood but my emotional well-being are closely related to the welfare of polar bears, I believe something must be done to protect these beautiful creatures in their native habitat. My ability to study, observe, photograph, and enjoy polar bears will be harmed if U.S. sport hunters are again permitted to import polar bear trophies and trophy hunting was to resume at the same level as occurred prior to the listing of the polar bears under the Endangered Species Act.

12. Moreover, my ability to appreciate polar bears as an integral part of artic ecosystems would be harmed if U.S. trophy hunters are again able to import polar bear trophies from the Western Hudson Bay polar bear population, and other populations where the Canadian government has decided that hunting should be allowed.

13. Because polar bears are an indicator species, and I view their decline as a human-created waste, I commend the American government for listing them as threatened. Because so many nations respect American opinion, I believed that the listing would lead to better days for the polar bear. However, if the challenge to their protection is allowed, I fear that later generations will not be able to enjoy these majestic creatures in the wild, if at all. I do not want the generations to come to look at what we did and wonder how we could let such a catastrophe occur. I want them to be able to feel the

same sense of awe I feel upon seeing these creatures in the wild. I also want them to experience the feeling of well-being I feel just knowing that polar bears are out there, safe.

14. If IFAW prevails in this lawsuit, I would benefit both at work and personally. Not only would the Bear Care Group have less worry over the safety of polar bears, but I would feel better knowing that the U.S. government has done something to protect these creatures so we can continue to learn from and enjoy them in the wild. I also hope that, at some point, the polar bear population and habitat becomes stable enough that my work in caring for captive bears in proper enclosures may lead to the ability to release some of these bears back into the wild, where they belong.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Else M. B. Poulsen

June 11, 2008

DECLARATION OF NAOMI ROSE

Safari Club International v. Kempthorne,
No. 08-881 (EGS) (D.D.C.)

Humane Society of the United States <u>et al</u>.'s
Motion To Intervene

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SAFARI CLUB INTERNATIONAL**, **SAFARI CLUB INTERNATIONAL FOUNDATION**, <br><br> Plaintiffs, <br><br> v. <br><br> **DIRK KEMPTHORNE, in his official capacity**, **H. DALE HALL, in his official capacity**, **UNITED STATES FISH AND WILDLIFE SERVICE**, <br><br> Defendants. | Civ. No. 08-0881 (EGS) |

**DECLARATION OF NAOMI A. ROSE**

I, Naomi A. Rose, hereby declare as follows:

1.     I am the Senior Scientist for the International Policy division of Humane Society International, the international arm of The Humane Society of the United States ("The HSUS"). I received a Bachelor of Arts degree in biology in 1984 from Mount Holyoke College and my Ph.D. in biology from the University of California at Santa Cruz in 1992.  My dissertation was on the social dynamics of killer whales (orcas).

2.     As Senior Scientist, my job functions include: reviewing and evaluating scientific literature related to marine mammals and their protection under foreign and domestic conservation regimes; reviewing and evaluating proposed legislation and regulations and writing comments on proposed administrative agency rulemakings relating to marine mammals on behalf of The HSUS; participating in conferences, task forces, committees, work groups, and

1

planning meetings relating to the conservation and protection of marine mammals; and testifying before legislative and administrative governmental entities.

3.    By example, I regularly review and evaluate information published by the World Conservation Union's (IUCN) Polar Bear Specialist Group, the U.S. Fish and Wildlife Service and its Polar Bear Program, and other sources on trends in polar bear population data, threats and risks faced by polar bear populations, and polar bear management and conservation measures.    I have written several comments to the U.S. Fish and Wildlife Service on proposed rulemakings concerning polar bears, including comments for The HSUS on the listing of the polar bear as a threatened species under the ESA. I have also provided testimony in congressional and agency hearings on polar bear conservation.

4.    The HSUS is a non-profit membership organization with more than 10.5 million members and constituents.    The mission of The HSUS is to create a humane and sustainable world for all animals, through education, advocacy, and the promotion of respect and compassion.    The HSUS protects all animals through legislation, litigation, investigation, public education, special events, and field work.

5.    The HSUS intervenes here on its own behalf and on behalf of its members, many of whom enjoy, appreciate and benefit from the presence of the polar bear and have had a long-standing interest in polar bear conservation. The HSUS has long worked for conservation of the polar bear and other top predators that play a critical role in their ecosystems and are indicator species for ecosystem health. Many of The HSUS' members regularly enjoy and will continue to enjoy educational, recreational and scientific activities dependent on healthy and sustainable polar bear populations, including observing and photographing polar bears, and learning about polar bear behavior, habitat and conservation efforts in

guided eco-tourist activities.  Consequently, the interests of The HSUS and its members will be directly and indirectly harmed if as a result of this litigation, the importation into the United States of sport-hunted polar bear trophies is allowed to resume once again.

6.      Conservation of polar bears is an organizational priority of The HSUS. The HSUS and Humane Society International have sought to increase protections for polar bears not only in the United States but also internationally.  The HSUS has written letters and comments to the U.S. Fish and Wildlife Service, including comments on the listing of polar bears as threatened under the Endangered Species Act ("ESA"), detailing the need to examine more closely trends in and reasons for polar bear population declines, uncertainty in available data, and for a more precautionary approach to conserving polar bears.  HSUS staff have also attended and participated in meetings of the Parties to the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), to which the United States is a Party, where the conservation of polar bears has been discussed.

7.      The HSUS has written extensively to the Canadian government and officials from the Nunavut territory in northern Canada in an effort to address misconceptions about the degree and sources of threats and risks, and concerns over the management of, polar bear populations. The HSUS also wrote to the government of Greenland in 2005 criticizing its lack of quotas to limit the number of polar bears killed by native hunters, and a proposal – ultimately abandoned – to issue permits to foreign sport hunters for the first time.

8.      When the United States was considering entering into a bilateral agreement with Russia concerning cooperative efforts to conserve polar bears, The HSUS was one of only a few non-governmental organizations to consult with the

U.S. Fish and Wildlife Service on the matter. Upon negotiation of the agreement in 2000, The HSUS lobbied for ratification of the agreement by the Senate once it was completed. The Senate ratified the agreement in 2003, and it became effective in September 2007.

9. The HSUS' advocacy has also included specific efforts to end the hunting of polar bears for sport and trophy collection. The HSUS specifically seeks to educate its members, the greater conservation community, the general public, and governmental officials in the United States and across the globe as to the deleterious effects that sport hunting can have on threatened populations – particularly polar bear populations.

10. Prior to the enactment of the Marine Mammal Protection Act ("MMPA") in 1972, sport hunting of polar bears was a primary cause of the dramatic decline of polar bear populations. Even as late as 1984, the Department of Renewable Resources of the Northwest Territories of Canada, in which the majority of the world's polar bear populations are found, recognized hunting as the primary factor for the decline in polar bear populations, stating in its Report on the Life History and Known Distribution of Polar Bear in the Northwest Territories up to 1981 ("Northwest Territories Report") that: "Polar bears have few enemies apart from man. Of all the mortality factors affecting this species, hunting is by far the most important."

11. Polar bears rely on high adult survivorship to maintain their population numbers. Prime age adults, between the ages of 5 and 20 years, have survival rates that can exceed 90%. Juveniles and subadults are more susceptible than are prime age adults to all sources of mortality and thus appear to be affected

to a greater extent by the hardships of degraded habitat, reduced foraging opportunities, and disappearing ice.

12.    By example, data provided in the U.S. Fish and Wildlife Service's proposed rulemaking to list the polar bear as threatened under the ESA showed that anomalous ice conditions can have a greater affect on juvenile and subadult bears than prime age adults. (72 Fed.Reg. 1067, 1073). The data indicate that survival of prime age adults in Western Hudson Bay was steady during a time of overall population decline due to early onset of sea ice break-up, whereas similar conditions in the Southern Beaufort Sea resulted in the decline of prey species, fewer polar bear cub births, and a decline in the survival of subadults.

13.    Despite polar bears' reliance on high adult survivorship, trophy hunters seek to kill the largest adult animals – generally, the strongest, most genetically robust male bears – which are the most likely to set records.  Thus the most desirable sport hunting targets are the very bears, if left unmolested, most likely to survive.

14.    Of the 19 populations of polar bears, 12 populations – and more than half of all polar bears left in the wild – are found entirely or partially within Nunavut in Canada. Unfortunately, the large sums paid for sport hunts by trophy hunters are an incentive, unrelated to sustainability or science, to set unrealistically high hunting quotas.  In 2004, Nunavut increased its polar bear hunt quotas by almost 30% without scientific basis and without coordinating this management action with neighboring jurisdictions.  This caused the U.S. Fish and Wildlife Service to undertake a review of Nunavut's management regime for polar bears –

including the effects on polar bear populations of increasing quotas for trophy hunting.

15.     Trophy hunters argue that sport hunting for the purpose of producing a trophy is consistent with sound conservation principles, because only adult males are taken instead of females or cubs.  This is simply untrue for several reasons. First, according to data presented by the U.S. Fish and Wildlife Service in its proposed rulemaking, well more than half of the polar bears in the world are either of unknown, severely reduced, or declining status. (72 Fed.Reg. 1070). In October 2005, the Service announced findings that the Western Hudson Bay polar bear population – one that many tourists visit to watch and photograph the bears – had decreased by over 16% in only a few years.  The World Conservation Union (IUCN) has recently listed the polar bear as "vulnerable" on its Red List, and its Polar Bear Specialist Group has determined that polar bear populations are projected to decline by more than 30 percent in the next 35-50 years and may disappear from most of their range within 100 years.  The removal of any reproductively viable member of this species offers no conservation benefit to the species.

16.     Second, unlike other sources of polar bear mortality, trophy hunters target the largest and fittest bears – the animals who may be critical to ensuring the survival of polar bear populations. Male polar bears compete for access to females – the largest bears tend to win these fights and thus contribute their genes to the next generation. Indeed, even the Safari Club International ("SCI"), an organization dedicated to promoting trophy hunting, has previously admitted that the largest adult males are crucial to the stability of polar bear populations in its 1993 Report on its Polar Bear Initiative to amend the MMPA.  In this document, SCI argued that

17.    Unlike trophy hunting, subsistence hunters do not necessarily target the largest or fittest bears.  Moreover, other sources of polar bear mortality generally affect younger, smaller, weaker, or less fit bears.  By example, the Northwest Territories Report indicated that starvation or drowning of weak, emaciated and inexperienced bears is common, and weaker bears may also die in mating fights.

18.    The targeting of robust males by trophy hunting will affect the genetic viability of the polar bear population in more ways than simply removing the most viable reproducing males.  Polar bears are polygynous, and even though polar bears are not gregarious and social interactions are limited, successful conception may depend on multiple breeding encounters during estrus.  In its proposal to list the polar bear as a threatened species under the ESA, the U.S. Fish and Wildlife Service noted that ovulation in polar bears is understood to be induced by mating behavior.

19.    Thus, as noted in The HSUS' comments on the proposed listing, this life history characteristic may, when combined with the results of continued selective take of robust males through trophy hunting, further increase the negative trend in overall reproductive rates in polar bear populations. Not only will declining population numbers cause individuals to become increasingly isolated from one another, resulting in fewer male/female encounters, but fewer females will meet a sufficient number of males to induce ovulation and thus pregnancies and the population may continue to decline.

20.    The reduction or elimination of trophy hunting of polar bears would remove a unique and artificial source of mortality that targets the most reproductively viable members of the species.  Conversely, if trophy hunting is allowed to continue at previous levels, it is highly likely to contribute to the decline in polar bear populations, and may actually accelerate this problem.

21.    Shortly after enactment of the MMPA, the five polar bear range states (the United States, Canada, Greenland, Norway, and Russia) entered into a treaty – the International Agreement on the Conservation of Polar Bears ("Agreement").  The United States' enactment of the MMPA was a factor helping to influence the negotiation of the Agreement.

22.    Among other restrictions, the Agreement prohibits any "taking of polar bears" except "for *bona fide* scientific purposes;" "by [a] Party for conservation purposes;" "to prevent serious disturbance of the management of other living resources;" "by local people using traditional methods in the exercise of traditional rights;" or "wherever polar bears have or might have been subject to taking by traditional means by [a Party's] nationals." Through the beginning of 2008, one or more of the Parties to the Agreement has consistently interpreted its provisions as prohibiting the hunting of polar bears for sport.  Since the ratification of the Agreement, none of the range states except Canada have permitted sport hunting of their polar bear populations, only allowing takes by native communities for traditional cultural and subsistence purposes and by others for defense of life.

23.    Since the import of sport-hunted polar bear trophies was permitted in 1994, The HSUS has spent considerable resources – especially in the last several years as more evidence of the impacts of climate change on polar bear habitat has become available – to reestablish the polar bear trophy import ban.  The HSUS has

supported the listing of the polar bear under the Endangered Species Act ("ESA") in significant part because the conservation benefits of listing include designation of the polar bear as "depleted" under the MMPA and an end to the importation of polar bear trophies under the 1994 amendment.

24.    Since import of polar bear trophies was permitted 14 years ago, a large number of polar bear tags issued by the Canadian government have been sold to trophy hunters. Moreover, the number of tags issued to the Nunavut and other native Canadian communities have been inflated in response to the existence of the trophy hunting industry dominated by U.S. hunters.  By example, in 2004 the Nunavut territory in northern Canada increased its hunting quotas by almost 30% based solely on local reports that more bears were being seen near villages. This increased sighting rate near villages was more likely due to a redistribution of bears due to receding sea ice than any increase in numbers. Subsequently, Nunavut reduced some of these quotas as scientific observation clarified this situation.

25.    Thus, if the ban on polar bear trophy imports established as a result of the listing of polar bears as threatened under the ESA is maintained, some of the hunting tags given to native communities and previously sold to American trophy hunters may go unused and/or the number of hunting tags authorized by the Canadian government may be reduced. Further, of those hunting tags that are used, most of the tags currently sold to U.S. trophy hunters are unlikely to go to other trophy hunters, and native communities who hunt the polar bears for subsistence and cultural purposes do not take the largest and most fit polar bears like trophy hunters do.

26.    The HSUS has actively advocated for prohibiting the importation of polar bear trophies from Canada.  This campaign has not only included efforts to

9

amend the MMPA directly (e.g., the introduction of the Polar Bear Protection Act, proposed legislation that The HSUS assisted in drafting and which is currently pending in bills introduced in both houses of Congress), but also to advocate for the listing of the polar bear under the ESA, which automatically results in the polar bear being designated a "depleted" species under the MMPA, at which point importation of sport-hunted polar bear trophies is no longer be allowed.

27.    The "depleted" species designation provides additional conservation benefits to polar bears.  Not only are permits for the importation of polar bear trophies disallowed now that the species is designated as "depleted," but other permits are also disallowed, such as permits allowing polar bears to be imported for "public display" purposes.  Also, the "depleted" species designation requires that a conservation plan be established for the polar bear. Like ESA recovery plans, MMPA conservation plans result in increased study and monitoring of marine mammal populations to ensure their sustainability. If the "depleted" species designation is declared unlawful in this case or otherwise removed, these conservation benefits would be lost.

28.    In advocating for the listing of polar bears under the ESA, The HSUS relied on the fact that such listing would result in a prohibition on imports of sport-hunted polar bear trophies by virtue of the automatic "depleted" designation under the MMPA. In fact, The HSUS' comments on the proposed listing specifically indicated support for the listing for this reason, among others.  The HSUS' comments note that a special rule allowing sport-hunted trophy imports under the ESA need not be considered by the U.S. Fish and Wildlife Service, because the listing would automatically trigger a prohibition on the same under the MMPA:

> "*Polar bears will automatically be designated depleted under the Marine Mammal Protection Act when they are listed as threatened under the ESA. The import of trophies could be allowed under a special rule of the ESA, should the Service successfully promulgate one, but would regardless be prohibited under the Marine Mammal Protection Act. The point, it seems to us, is moot – no reevaluation will be needed. The imports will de facto be prohibited upon listing.*"

The HSUS' advocacy to protect marine mammals relies on this operation of law. If the "depleted" species designation is declared unlawful in this case and is no longer automatic upon listing under the ESA, it will take additional resources to try to ensure that an ESA-listed marine mammal species receives the protections it previously would have had under the MMPA.

29.    The United States has been a leader in wildlife conservation worldwide, and decisions by the United States to protect animals under our domestic laws have spurred international response in the past. The listing of polar bears as threatened under the ESA and the consequent ban on importation of sport-hunted polar bear trophies have already triggered further international conservation measures for polar bears – for which The HSUS has been an active advocate – and can be anticipated to continue to do so in the future.

30.    Polar bear range states have taken action in response to United States decisions and criticism from the international conservation community (including non-governmental organizations like The HSUS) in the past. By example, The HSUS has been an outspoken critic of management of the M'Clintock Channel polar bear population in Canada, especially after independent scientific evidence from a 3-year study (1998-2000) revealed that there were far fewer bears in the M'Clintock population than Canada's quotas for hunting of the bears could sustain. In early 2001, the U.S. Fish and Wildlife Service reacted to the findings of the study and

drafted a rulemaking to remove the M'Clintock Channel population from the list of populations from which U.S. trophy hunters could import polar bear trophies.

31.    Even though both of the first two years of the study indicated that the population estimate for M'Clintock Channel was "poor," and the data indicated that hunting had significantly reduced population of male bears creating an artificially female-biased sex ratio, the Canadian government did not reduce the hunting quotas for this population.  It was not until the United States decided to take action to ban the import of sport-hunted polar bear trophies from the M'Clintock Channel population that Canada began to take remedial efforts, including reducing the number of tags authorized for hunting of the bears.

32.    By further example, in 2005, when Greenland considered issuing permits to foreign sport hunters for the first time, The HSUS wrote to the government of Greenland criticizing the proposal, especially in light of its lack of quotas to limit the number of polar bears killed by native hunters.  In response to criticism from many sources, including the decision from the United States to disallow sport-hunted trophies from three polar bear populations shared by Greenland and Canada, the government of Greenland ultimately abandoned the sport hunting proposal, and issued quotas for the first time to limit hunting by native communities.

33.    Notably, Canada has already taken action in response to the United States' listing of polar bears as threatened under the ESA. Canada's Dept of Environment has long claimed that polar bears need not be elevated from a "species of concern" (a status the polar bear was given in 1991) to "threatened" under Canadian law, a claim repeated by Canadian Environment Minister John Baird earlier this year.  However, after the United States listed the polar as threatened

under the ESA, banning U.S. sport hunters from importing polar bear trophies from Canada, Minister Baird indicated that the Canadian government was considering "changing the status for selected bear populations." (*See* U.S. Lists Polar Bears as Threatened Species, CBC NEWS (May 14, 2008), *available at* http://www.cbc.ca/world/story/2008/05/14/polar-bear.html#).

34.    In September 2007 the Nunavut government – which as recently as 2005 increased polar bear hunting quotas by nearly 30% in Nunavut without any scientific basis – reduced hunting quotas from 56 to 38 for the Western Hudson Bay polar bear population.  This change appears to have been influenced by the United States' ESA listing deliberations, as well as emerging scientific data on changing polar bear body conditions and populations declines. (*See* Nunavut Slashes Western Hudson Bay Polar Bear Hunt, CBC NEWS (Sept. 21, 2007), *available at* http://www.cbc.ca/canada/north/story/2007/09/21/bear-quota.html).

35.    In April of this year, territorial government officials in Canada recommended to the Nunavut Wildlife Management Board that the Baffin Bay polar bear quota be reduced by 40%. Wildlife scientists relying on the same types of computer modeling as the U.S. Fish and Wildlife Service relied on when listing the polar bear under the ESA indicated that this quota reduction was necessary to respond to population declines caused by years of overhunting, and that the issuance of tags may even need to be eliminated as a result.  (*See* Hunters, Scientists to Square Off Over Polar Bear Quotas, THE CANADIAN PRESS (Apr. 20, 2008), *available at* http://cnews.canoe.ca/CNEWS/Science/2008/04/20/5340091-cp.html).

36.    Further, shortly after the ruling by the U.S. District Court for the Northern District of California that the U.S. Fish and Wildlife Service must publish its rulemaking on the proposed listing by May 15, 2008, the government of Canada

entered into a Memorandum of Understanding ("MOU") with the United States to facilitate enhanced efforts to conserve polar bears.  The MOU established a Bilateral Oversight Group that will develop a cooperative polar bear conservation action plan.

37.    In early 2008, Parties to the 1973 Agreement met for the first time in over 25 years at the request of the United States to discuss the Agreement and collaboration on meeting polar bear conservation challenges. The issue of sport hunting was discussed at this meeting, and Norway, Russia and the United States indicated that they do not anticipate allowing sport hunting of their polar bear populations in the foreseeable future. Another meeting of the Parties was tentatively planned for 2009 in Norway.  Thus, the United States' decision to list the polar bear as threatened under the ESA has already resulted in greater engagement on conserving polar bears at an international level.  This will facilitate The HSUS' ongoing advocacy for greater international protections for polar bears.

38.    By example, just prior to last year's CITES meeting, two Parties to CITES that are also Parties to the Agreement – Russia and Norway – were considering making a formal recommendation to accord greater protection to polar bears by listing them on Appendix I of the Convention. Although this proposal was not formally recommended, the recent change in United States policy may influence whether CITES Parties make such a recommendation at the next meeting.

39.    Moreover, the United States' ban on imports of sport-hunted polar bear trophies would be particularly important, because CITES Parties may decide for themselves whether to accept export quotas for sport-hunted specimens from Canada, and the United States' decision not to do so would likely be a factor in this decision.  The HSUS and other non-governmental organizations concerned about conservation of polar bears will be able to use the United States' listing of the polar

bear under the ESA and ban on import of sport-hunted polar bear trophies to advocate for greater protections for polar bears by CITES Parties.

40.     The relief sought in this case would allow trophy hunting of polar bears to continue at previous levels and potentially expand, continuing a unique and artificial source of mortality that is highly likely to contribute to the decline of polar bear populations. This would harm The HSUS' efforts to conserve polar bears, which The HSUS' members rely on the organization to undertake. It would also reduce HSUS members' opportunity to visit, watch, enjoy and appreciate polar bears and all that they contribute to Arctic ecosystems.

41.     The HSUS' organizational mission and its advocacy efforts for the conservation of polar bears would be frustrated if import of sport-hunted polar bear trophies is again permitted. Moreover, The HSUS' substantial efforts already undertaken advocating for increased polar bear conservation measures would be undermined by the relief sought in this case.  The HSUS relied on the fact that marine mammals listed under the ESA are automatically afforded additional protections under the MMPA – and specifically that import of polar bear trophies would be prohibited – when expending resources to advocate for the ESA listing of polar bears and other threatened or endangered animals.

42.     Further, the United States' decision to ban the import of sport-hunted polar bear trophies will be used by The HSUS and other organizations seeking to conserve polar bears to advocate for similar proscriptions in other countries. Additional conservation measures in Canada have already been triggered by the ESA listing, and particularly by the United States' decision not to permit imports of polar bear trophies, and additional measures will certainly be considered by all polar bear range states and the international community.  A reversal of the United States'

current policy on import of sport-hunted polar bear trophies would harm The HSUS'

efforts to secure additional international conservation measures for polar bears.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

foregoing is true and correct.

_____
Naomi A. Rose, Ph.D.

June 11, 2008

# DECLARATION OF LORIE ZERWECK

## Safari Club International v. Kempthorne,
## No. 08-881 (EGS) (D.D.C.)

## Humane Society of the United States <u>et al</u>.'s
## Motion To Intervene

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAFARI CLUB INTERNATIONAL,
SAFARI CLUB INTERNATIONAL
FOUNDATION,

           Plaintiffs,

       v.

DIRK KEMPTHORNE, in his official
capacity, H. DALE HALL, in his
official capacity, UNITED STATES
FISH AND WILDLIFE SERVICE,

           Defendants.

Civ. No. 08-0881 (EGS)

## DECLARATION OF LORIE ZERWECK

I, Lorie Zerweck, hereby declare as follows:

    1.    I reside at 449 Gentry Street, Hermosa Beach, California 90254. I have personal knowledge of the matters set forth herein.

    2.    I am currently a member of The Humane Society of the United States ("The HSUS") and have been a member for at least five years. I support and donate to The HSUS because I am concerned about wildlife protection and animal welfare in general. I have a particular interest in the protection of polar bears in the wild, and I support The HSUS, in part, because of their efforts to conserve polar bears in the United States and around the world.

    3.    I rely upon The HSUS to advocate for the survival of polar bears on my behalf. In addition, I expect The HSUS to keep me informed of the status of polar bear conservation and of the current threats facing polar bears. By example, it is through information collected and provided to me by The HSUS that I am aware that certain populations of polar bears in Canada were hunted

by U.S. sport hunters and the carcasses of these bears are imported into the United States as trophies until the U.S. Fish and Wildlife Service listed the polar bear as threatened under the Endangered Species Act.

4.      I am currently employed in the television and film media industries.  I also publish an animal interest oriented periodical, The Pet Gazette, which is produced bi-monthly in three editions – one for the Southern California region, one for the Northern California Region, and one for Florida.  The Pet Gazette has a readership of approximately 75,000 people.  Since becoming active in polar bear conservation efforts, I have dedicated several articles and editorial pieces in The Pet Gazette to polar bear conservation.  In fact, the current issue of the newspaper has an article in it "Alarmed Polar Bear Chooses Adaptation!" regarding the dire consequences facing polar bears today.

5.      In November 2007, I took a trip to Canada to observe polar bears in their natural habitat.  The trip was guided by Polar Bears International and Frontier North's Tundra Buggy Adventures, in Churchill, Manitoba.  I stayed at the Tundra Buggy Lodge at night and took trips out onto the tundra during the days to watch and enjoy polar bears from the Western Hudson Bay population in the wild.

6.      During this trip, I saw approximately 25-30 polar bears, but only one cub.  I saw many large older males.  I was able to watch the bears engage in natural behaviors, see them up close, and photograph them.  On occasion, a bear would approach the buggy and stand up to curiously explore the buggy and the people on it.  When standing, the bears were about seven feet tall; it was wonderful to watch such a magnificent and powerful creature.

7.    The Frontier North employee that took my party out to see the bears had been a wildlife photographer and biologist, and he taught me about polar bear habitat and behavior.  In addition, a staff member of Polar Bears International ("PBI") accompanied my party on this trip, and she showed me models of a polar bear claw and skull.  I learned a lot about the perils facing polar bears and efforts underway and still needed to ensure their survival.

8.    I am now an active member of PBI, which promotes polar bear conservation through education and research.  I currently serve on PBI's media committee.  I am scheduled to again travel to Churchill in November 2008, at which time I will again be staying at the Tundra Buggy Lodge with Frontier North.  I will be staying for at least a week, and perhaps more.  Although I am primarily going to observe polar bears again, because I enjoyed my prior trip so much, I will also be accompanied in my upcoming trip by an actor and spokesperson for PBI in order to shoot a media piece for PBI.

9.    It is extremely important to me that I am able to visit and appreciate polar bears in the wild. I am not very fond of visiting zoos or seeing animals confined in captivity.  I have many fond memories from my trip, and I am excited to have the opportunity to travel to see polar bears again.  I feel a strong connection to these majestic animals, and I feel strongly that they have as much a right to exist as humans.  The fact that the human population is contributing to the demise of polar bears in the wild is devastating to me.

10.    If American hunters are permitted to resume importing polar bear trophies from Canada, I would be harmed.  I have learned from my own experiences from in my trip to Churchill that polar bears are facing serious threats to their survival.  Moreover, I have reviewed the declaration of Naomi

-3-

Rose, a marine mammal biologist and Senior Scientist at The Humane Society of the United States and agree with her analyses and conclusions as to the peril facing polar bears, and the impact that U.S. trophy hunting has on polar bear populations in Canada and other countries.

11.    My own polar bear conservation efforts in providing assistance to PBI, and the efforts of The HSUS on my behalf will be frustrated if U.S. sport hunters are again able to import polar bear trophies from Canada and trophy hunting resumes at the same level as occurred prior to the listing of the polar bears under the Endangered Species Act. Moreover, because hunting tags are issued for the Western Hudson Bay area where I have gone and plan to go again to see polar bears, and where I have heard and seen that polar bears are facing significant threats to their survival, continued importation of polar bear trophies would be of serious damage to my interests. My ability to visit, watch, photograph, and enjoy polar bears will be harmed if U.S. sport hunters are again permitted to import polar bear trophies.

12.    Moreover, my ability to appreciate polar bears as an integral part of arctic ecosystems would be harmed if U.S. trophy hunters are again able to import polar bear trophies from the Western Hudson Bay polar bear population, and other populations where the Canadian government has decided that hunting should be allowed. That the polar bear, a top predator and indicator species of environmental health, is threatened with extinction, cannot bode well for humans and the rest of the Earth. The depletion of polar bear populations will negatively affect the arctic environment that I have come to enjoy and appreciate.

13.    If The HSUS prevails in this lawsuit, I would benefit because polar bears will be protected from the trophy hunting pressures they faced prior to the Endangered Species Act listing.  Further, I would be able to continue to go watch polar bears in Churchill without fear that hunting pressures will reduces polar bear populations or prevent the bears from thriving in their natural habitat.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Lorie Zerweck

.June 12, 2008

EXHIBIT 1

Safari Club International v. Kempthorne,
No. 08-881 (EGS) (D.D.C.)

Humane Society of the United States <u>et al</u>.'s
Motion To Intervene

THE HUMANE SOCIETY
OF THE UNITED STATES

April 9, 2007

Supervisor
U.S. Fish and Wildlife Service
Marine Mammals Management Office
1011 East Tudor Road
Anchorage, AK 99503
Polar_Bear_Finding@fws.gov

Re: *72 FR 1064*

Dear Supervisor:

On behalf of the more than 10 million members and constituents of The Humane
Society of the United States (HSUS), I am submitting comments on the U.S. Fish and
Wildlife Service's (the Service) 12-month petition finding and proposed rule to list the
polar bear (*Ursus maritimus*) as threatened throughout its range under the Endangered
Species Act (ESA), as published in *72 FR 1064* on January 9, 2007.  Overall, The
HSUS strongly supports the proposal to list the polar bear as threatened.  We believe
the proposed rule clearly and succinctly outlines the overwhelming evidence that
supports such a listing.  We believe that there is no other conclusion the Service or
others could reach after evaluating the scientific and other evidence, including
traditional knowledge.  The ESA's definition and criteria of "threatened" have clearly
been met in this case and we urge the Service to issue a final rule that lists the polar
bear as threatened throughout its range, and also to produce a recovery plan, as soon as
possible.

Despite our overall strong support for the proposed rule and its discussion, The HSUS
disagrees with several decisions and conclusions found in the proposed rule.  First and
foremost, we disagree with the Service's decision not to designate critical habitat at
this time.  We also believe the Service has underestimated the impact of hunting –
particularly of trophy hunting.  In addition, we believe the Service has chosen an
insufficient time period as a definition of "the foreseeable future" for the purposes of
this rule.  Further, we find the discussion of oil and gas activities and its impacts on
polar bear habitat to be oddly lacking in coherence.  Finally, we have several
comments on various other specific sections and text in the proposed rule.

### The Designation of Critical Habitat

The proposed rule states that "A careful assessment of the designation of critical
marine areas will require additional time and evaluation" and "the designation of

Supervisor
April 9, 2007
Page Two

critical habitat for the polar bear is not determinable at this time" (p. 1096). The HSUS disagrees with this conclusion – we feel that the proposed rule and the status assessment (as well as the original petition from the Center for Biological Diversity) offer more than sufficient information right now to identify at least some critical habitat, including certain denning areas and perhaps the entire Arctic National Wildlife Refuge. We fear that political considerations alone are preventing the Service from designating critical habitat simultaneously with the proposal for listing, as is usually done. We urge the Service, regarding this and all other issues related to this proposed rule, not to bow to political pressures. There are many special interests focused on this listing proposal – if they have objections to it, they should offer solid evidence for their concerns and claims, not just rhetoric, and *economic* concerns cannot (as a legal matter) be among them.

On p. 1096, the Service states "... certain areas in northern Alaska such as barrier island [sic], river bank drainages, much of the North Slope coastal plain, including the Arctic NWR, and coastal bluffs that occur at the interface of mainland and marine habitat receive proportionally greater use for denning than other areas..." This seems to be an excellent starting point for determining at least some critical habitat. Even if critical habitat designation is incomplete, the sooner some areas are identified, the better for the protection of polar bears. The HSUS urges the Service to immediately identify important denning sites at the very least as critical habitat.

### Sport Hunting as a Significant Factor Affecting the Polar Bear

The Service offers a discussion of hunting under the heading "overutilization for commercial, recreational, scientific, or educational purposes", one of the five factors that may lead to an ESA listing. The discussion concludes, *inter alia*, that hunting does not threaten the species throughout all or a significant portion of its range. The HSUS disagrees with this conclusion. Twelve of the 19 populations of polar bears – more than half of all polar bears – are found entirely or partially within Nunavut in Canada and Nunavut has recently increased its polar bear hunt quotas almost 30% without scientific basis and without coordinating this management action with neighboring jurisdictions (see p. 1082 for a discussion of this recent action). We strongly believe that the motivation for this quota increase was the income from selling subsistence permits to trophy hunters; in short, the large sums paid for permits by trophy hunters are an incentive, unrelated to sustainability or science, to set unrealistically high quotas. It happened historically (pre-Marine Mammal Protection Act) and it has happened more recently (with the M'Clintock Channel population, which, after a decline brought about by too-high quotas, was disapproved by the Service for imports). The HSUS considers this quota increase to pose a very real threat to the polar bears in Nunavut, which clearly encompasses a significant portion of the polar bear's range.

It is clear that the Service finds it expedient not to confront the management regime in Canada, having previously accepted its adequacy through approving imports from several populations.

Supervisor
April 9, 2007
Page Three

Nevertheless, it is also clear that the Service *does* have serious concerns with the recent quota increase in Nunavut, as evidenced by the discussion on p. 1082. It is simply a fact that Nunavut represents a significant portion of the polar bear's range. And it is a fact that the increase in quotas was not based on scientific information but rather on traditional knowledge, which in turn appears to be a misinterpretation of anecdotal observations. Therefore, the Service should reverse its previous decision to accept Canada's management regime as sufficiently rigorous, a decision made obsolete by subsequent action on the part of Nunavut's management authority. The Service should now conclude that hunting, particularly trophy hunting, does pose a threat to the species throughout a significant portion of its range.

In addition, the quota increase in Nunavut is not the only argument in favor of this conclusion. The HSUS reminds the Service that prime age adults, between the ages of 5 and 20 years, have survival rates that can exceed 90% (see p. 1067). Yet trophy hunters seek the largest adult animals (the strongest, most genetically robust bears), the ones most likely to set records. Thus the most desirable hunting targets are the very bears, if left unmolested, most likely to survive the hardships of degraded habitat, reduced foraging opportunities, and disappearing ice. When previous anomalous ice conditions in the Southern Beaufort Sea resulted in the decline of prey species, fewer polar bear cubs were born and survival of subadults declined (p. 1067) – again, this highlights that prime age adults are a population's buffer against hard times. In Western Hudson Bay, survival of prime age adults was steady during a time of general population decline due to earlier sea ice break-up (p. 1073 and see below) – yet again, the age class most likely to withstand environmental stressors is the one facing mortality from trophy hunters. We consider the species' reliance on high adult survivorship to maintain population numbers to be another reason for concluding that hunting, particularly trophy hunting of the largest prime age adults, poses a threat to the polar bear throughout all or a significant portion of its range.

Furthermore, the proposed rule acknowledges that five polar bear populations, of which four are hunted, have poor and/or inadequate information on population statistics. It admits that four populations are possibly being overharvested. At least two more allow substantial harvest "in the absence of scientifically-derived population estimates" (p. 1083). And Russia has an acknowledged poaching problem. We also note that on p. 1073, the proposed rule states that in Western Hudson Bay, "the population began to decline [due to earlier ice break-up and then] existing harvest rates… contributed to the reduction in the size of the population."

We note the following from the discussion on p. 1070: Of the 19 polar bear populations, 1) seven are of *unknown* status or trend; 2) five are believed to be *declining* and/or reduced in number; 3) two are believed to be increasing, but from *severely reduced* numbers; and 4) *only five* are considered to be stable or increasing. In sum, only five of 19 populations are believed to be stable or increasing *and* not reduced in numbers – these populations comprise about 8400 bears. This number represents only 33% - 42% of the global bear population. Thus well more than half of the polar bears in the world are either of unknown, severely reduced, or declining status.

Supervisor
April 9, 2007
Page Four

Under these circumstances, The HSUS believes it is inappropriate in the extreme to consider any hunting beyond the minimum required for subsistence to be responsible or sustainable.

The previous paragraphs present a number of facts that when combined certainly seem to The HSUS to cast considerable doubt on the sustainability of polar bear hunting. The HSUS feels that the Service was in error to conclude that overutilization for commercial and recreational purposes (*i.e.*, trophy hunting) is not a serious threat, especially given that unsustainable trophy hunting historically caused population declines (see p. 1081). (see p. 1081). The HSUS is not alone in this position – Norway not only does not allow any hunting of its polar bear populations, but it holds that the International Agreement on the Conservation of Polar Bears actually prohibits trophy hunting[1].

We are aware that trophy hunters and local communities in Nunavut and elsewhere, as well as the wildlife management agencies in Canada, claim that trophy hunting is a boon to local communities and actively benefits conservation. The money, it is said, stays within local communities to improve standards of living and also contributes to conservation programs and regulatory enforcement. The HSUS challenges these assertions and insists that the Service require the submission of hard evidence of such benefits, rather than merely accepting their existence as a given. As an example of a counter-argument to the claim that trophy hunting benefits local communities, an August 2005 article in the Nunatsiaq News, a Nunavut newspaper, concluded that "most of the [financial benefits from sport hunts] never reach Inuit hands, and when they do, those earnings vary substantially from community to community"[2]. Indeed, The HSUS has long maintained that far from being a conservation tool or a benefit of any kind, trophy hunting is an incentive to managers to increase quotas beyond sustainability – what has happened in Nunavut, where quotas have been increased without scientific support, is difficult to interpret in any other way.

*Foreseeable Future*

The HSUS disagrees with the Service's conclusion that 45 years is a reasonable time frame for the "foreseeable future". Given the difficulties inherent in studying polar bears, including the remoteness of their habitat and the very large home ranges they inhabit, the likelihood that a change in status or trend will not be detected for many years is quite high. In fact, for the more remote bear populations, such as the Arctic Basin or Laptev Sea, a decline may be irreversible before it is detected – this is a common feature of many marine mammal population studies. Under these circumstances, population projections are usually made on the scale of centuries, not

---

[1] Prestrud, P. and I. Stirling. 1994. The International Polar Bear Agreement and the current status of polar bear conservation. Aquatic Mammals 20:113-121.
[2] http://www.nunatsiaq.com/archives/50826/news/nunavut/50826_12.html

Supervisor
April 9, 2007
Page Five

decades, to allow sufficient time to pass in the modeling runs to ensure the detection of a trend. A 100-year cycle is typically used for large whales, for example[3].

The use of 45 years as the "foreseeable future" raises the risk that an insufficient amount of time will pass for any trends to be detected. This could lead to a false conclusion at the end of this period that the polar bear population is stable. For species that are difficult to study, let alone those that live as long as the polar bear does, time frames on the order of a century or more must be used when making population projections.

### Oil and Gas Exploration, Development, and Production

The proposed rule discusses this factor only in terms of proximate impacts (*e.g.*, from oil spills, drilling, other extraction activities). The conclusion that these activities are at the moment adequately mitigated under the Marine Mammal Protection Act because no polar bear mortalities have ever been observed from proximate impacts ignores the obvious point that these activities lead to the very phenomenon – emission of greenhouse gases – that is the primary threat to polar bears. The proposed rule does not in fact offer a substantial discussion of the *ultimate consequence* of oil and gas extraction in Alaska and elsewhere – the emission of greenhouse gases and subsequent climate change, whose impacts, isolated from causation, are discussed at great length in a previous section of the proposed rule. In short, the proposed rule demonstrates an incoherence or disconnect, no doubt politically motivated, between the cause and effect of the proximate (oil and gas related activities) and the ultimate (loss of polar bear sea ice habitat due to global warming).

This disconnect reaches surreal proportions at the end of the proposed rule. The Service must consider Executive Order 13211, the requirement to produce a Statement of Energy Effects if a proposed action will significantly affect energy supplies, distribution, and use (see p. 1098). The Service concludes that the rule is "not expected to significantly affect energy supplies, distribution, or use" and bases this conclusion once again very narrowly on the fact that the proximate impacts to polar bears from oil and gas related activities have, over the years, apparently been adequately mitigated through the Marine Mammal Protection Act and therefore no curtailment of oil and gas related activities in Alaska need be contemplated or required. However, *clearly* if the primary threat to polar bears is the loss of sea ice habitat resulting from climate change – a direct consequence of greenhouse emissions – then *clearly* the listing *must* address "energy supplies, distribution, and use"! If it does not, then global warming will continue, sea ice will recede farther, polar bear habitat will eventually disappear, and the polar bear will move from threatened to endangered to extinct in fairly predictable order.

---

[3] See the International Whaling Commission, http://www.iwcoffice.org/conservation/rmp.htm

Promoting the protection of all animals

2100 L Street, NW, Washington, DC 20037 • 202-452-1100 • Fax: 202-778-6132 • www.hsus.org

Supervisor
April 9, 2007
Page Six

As noted earlier, the Service must not bow to political pressures in fashioning this rule or in the pursuit of any actions it must undertake after a listing. The final rule should include a detailed discussion of the *direct connection* between oil and gas exploration, development, and production and greenhouse emissions. If a Statement of Energy Effects is required, then one should be prepared. To conclude that oil and gas related activities in Alaska (and everywhere else, for that matter) are not a threat to polar bears is a politically motivated side-step that is a disservice to the polar bears.

It is also arguably a violation of ESA requirements. The ESA provides that an agency must make its listing determination "solely on the basis of the best scientific and commercial data available."[4] "The obvious purpose of [this] requirement . . . is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise."[5]  In meeting this standard, the Service must not ignore known and documented impacts in its listing decision, whether to avoid a contentious issue or for any other purpose[6]. This decision also noted that failure to use all available data may "cause[ ] the agency to erroneously evaluate" a factor or factors required in the listing determination.

The best available science standard gives "the benefit of the doubt to the species."[7] The Service cannot simply ignore the effects of emission of greenhouse gases caused by oil and gas exploration, development, and production, in favor of looking only at the more readily available data on the proximate impacts of extraction activities. "To deny listing of a species simply because one scientific field has not caught up with the knowledge in other fields does not give the benefit of the doubt to the species and fails to meet the best available science requirement."[8]

### *Specific Comments*

#### Reproduction

Fewer robust males will affect the genetic viability of the polar bear population in more ways than simply removing the most [viable] reproducing males. In its proposed rule, the USFWS noted that ovulation in polar bears is understood to be induced by mating behavior. Thus, as

---

[4] 16 U.S.C. § 1533(b)(1)(A)

[5] See Bennett v. Spear, 520 U.S. 154, 176 (1997).

[6] See Center for Biological Diversity v. Lohn, 296 F.Supp.2d 1223 (W.D. Wash. 2003), which set aside a determination by the National Marine Fisheries Service not to list the Southern Resident killer whale, because the agency failed to use available and commonly accepted scientific data on the taxonomy of the whale populations at issue.

[7] See Conner v. Burford, 848 F.2d 1441, 1454 (9th Cir.1988), which rejected a Service claim that there was "insufficient information" available to prepare a more comprehensive biological opinion concerning oil and gas leases.

[8] See Lohn at 1239.

noted in our comments on the proposed listing, this life history characteristic may, when combined with the results of continued selective take of viable males through trophy hunting, negatively affect overall reproductive rates in polar bear populations. With fewer bears in a population, individuals will become increasingly isolated from one another. Fewer females will meet a sufficient number of males to induce ovulation – fewer male/female encounters will result in pregnancies and the population will continue to decline.

Sea ice changes

The principal comment The HSUS wishes to make here is that the discussion of the changes already detected in the Arctic sea ice environment due to global warming (and predicted to continue in a direction detrimental to the polar bear) and the impact that these changes are likely to have on polar bears is exemplary and clear – and the Service rightfully concludes that a threatened listing is warranted for the polar bear based on this factor.

On p. 1081, the proposed rule briefly addresses the argument (most frequently heard from user groups) that polar bears have survived previous interglacial periods, some of long duration, without going extinct. The HSUS counters with two points: the first the Service itself makes earlier, when it states that there is no paleoclimatic evidence that there have been ice-free summers in the Arctic at any time in the past 800,000 years (p. 1071). Ice-free summers during the present "super interglacial" period may occur as early as 2040, according to some models. To argue that this period of global warming is comparable to previous such periods thus ignores the whole problem – that the production by humans of greenhouse gases and the destruction of natural sinks for these gases (*e.g.*, rainforests) have created a situation well off the bell curve of natural climatic fluctuations.

The second point is that, in previous interglacial periods, polar bears did not *also* have to contend with anthropogenic stressors, such as chemical contamination, increased vessel traffic as sea ice recedes (see p. 1092), oil and gas related activities, or persistent hunting (prehistorically, access to certain areas by humans would have been limited). Synergistic interactions among all of these factors may have already weakened the species' ability to survive a climate shift, but even if not, they are highly likely to do so in the future.

Existing regulatory mechanisms

The proposed rule concludes that, along with habitat changes related to global warming, the inadequacy of regulatory mechanisms that address reductions in sea ice habitat – that is, that address climate change – is sufficient basis for listing the polar bear. The HSUS concurs and we urge the Service to include a discussion in the final rule of how reduction in sea ice habitat is directly linked to oil and gas related activities.

As the United States Supreme Court recognized in its recent opinion, issued April 2, 2007, "[t]he harms associated with climate change are serious and well recognized . . . [and include] "'the global retreat of mountain glaciers, reduction in snow-cover extent, the earlier spring melting of Supervisor
April 9, 2007

Promoting the protection of all animals
2100 L Street, NW, Washington, DC 20037 • 202-452-1100 • Fax: 202-778-6132 • www.hsus.org

Page Eight

rivers and lakes, [and] the accelerated rate of rise of sea levels during the 20th century relative to the past few thousand years...."[9]  The Court noted that a "refusal to regulate greenhouse gas emissions presents a risk of harm . . . that is both "actual" and "imminent."[10]

Although many sources of greenhouse gas emissions exist, "[c]onsidering just emissions from the transportation sector, which represent less than one-third of this country's total carbon dioxide emissions, the United States would still rank as the third-largest emitter of carbon dioxide in the world," behind only China and the entire European Union.[11]  This statistic does not account for the contribution from other emissions sources, including, *inter alia*, oil and gas exploration, development and production.  The Service's identification of an insufficient regulatory framework for addressing climate change sources is apposite, and the agency's final rule should expand upon this finding by addressing the relationships between oil and gas related activities, climate change, and sea ice habitat reduction.

Other natural or man-made factors

The HSUS believes the Service has placed inadequate emphasis on the synergistic and cumulative impacts on polar bears from various anthropogenic factors.  For example, in the discussion of other natural or man-made factors that may pose a threat, including contaminants of various types, the Service concludes that, at the present time, none are having population-level impacts, although individuals are clearly being negatively affected.  The discussion does acknowledge that these factors "may become a [sic] more significant in the future for polar bear populations experiencing nutritional stress or declining population levels" (p. 1094).  We urge the Service to emphasize the likelihood of such synergy and cumulative impact in the final rule.  The repeated conclusion that these factors *may* become significant threats only in the future deemphasizes the serious risk they pose, in synergy with all the other factors, if their presence in polar bear habitat is not addressed *now*.

Finding

Under this section, the proposed rule concludes that, for Factor B (overutilization), "If overharvest were to occur in the future and theaten [sic] populations the ability to recover populations through harvest reductions and the likely efforts of management entities to do so and to prevent the species from becoming endangered or threatened is highly probable" (p. 1094).  We find this conclusion inexplicable, given that at the present moment, the management authorities in Nunavut and associations representing hunters are actively opposing the proposed rule, claiming that polar bear populations are at "historic highs".  In short, they are actively Supervisor
April 9, 2007

---

[9] See Massachusetts v. EPA, 2007 WL 957332, *15 (internal citations omitted).

[10] See Id. at *14, which rejects an EPA argument that the Clean Air Act does not authorize it to issue mandatory regulations to address global climate change.

[11] See Id. at *16.

Promoting the protection of all animals

2100 L Street, NW, Washington, DC 20037 • 202-452-1100 • Fax: 202-778-6132 • www.hsus.org

Page Nine

opposing management actions necessary to prevent endangerment, in ways that virtually guarantee the eventual endangerment of the species. Clearly Canadian management entities cannot be relied upon to prevent overharvest – the response of Nunavut's authorities to information from scientists that population declines may already be happening has been to increase quotas. In addition, overharvest is suspected to be occurring in several populations, yet no quota adjustments downward have been made. We urge the Service to draw a more realistic conclusion in the final rule – if overharvest should occur in the future, current management regimes would be inadequate to address the problem, because they already *are*.

We also consider the discussion of the potential impacts from increased shipping traffic, should the Arctic sea ice recede to the point where shipping lanes are shifted to take advantage of thin ice or ice free passages, to be weak. We urge the Service to examine this potential threat in greater detail in the final rule and, should this re-evaluation warrant, reconsider its proposal merely to monitor the potential risk from the likelihood of increased shipping in the Arctic.

<u>Available conservation measures</u>

The HSUS notes that the Service acknowledges the prohibition on depleted species and their parts found in the Marine Mammal Protection Act, Section 102. We therefore do not understand the Service's statement that it "anticipate[s] conducting an evaluation of the merits of continuing the presently authorized imports" of trophies (p. 1098). While we certainly concur that the Service should reevaluate these approvals *now*, before listing (and disapprove the currently approved populations, particularly those in Nunavut), we fail to understand why this would even be necessary *after* listing if the statute prohibits the import of depleted species. The HSUS' advocacy efforts on behalf of polar bears – as well as other marine mammals – would be substantially altered if the Safari Club were to be granted the relief sought in this case. The HSUS has relied upon the existing legal framework in which ESA-listed species are automatically designated as "depleted" under the MMPA in its wildlife protection advocacy efforts. By example, [another animal example] The HSUS' strong support for the ESA listing of the polar bear was based in part upon the fact that the listing would bring an end to the import of sport-hunted specimens, which was only added as an exception to the MMPA moratorium on taking and import of marine mammal species at the behest of the sport hunting lobby in 1994. In its comments on the proposed listing of polar bears as threatened with extinction under the ESA, The HSUS addressed the threats to polar bears from trophy hunting, and specifically stated: "Polar bears will automatically be designated depleted under the Marine Mammal Protection Act when they are listed as threatened under the ESA. The import of trophies could be allowed under a special rule of the ESA, should the Service successfully promulgate one, but would regardless be prohibited under the Marine Mammal Protection Act. The point, it seems to us, is moot – no reevaluation will be needed. The imports will *de facto* be prohibited upon listing."

*Conclusion*

Overall, The HSUS strongly supports the proposed rule, its discussion, and the conclusion that listing the polar bear as threatened is warranted. However, we disagree with several decisions and conclusions found in the proposed rule. We urge the Service to designate at least some critical habitat in the final rule, particularly identified denning sites. We believe the Service has underestimated the impact of hunting – particularly of trophy hunting – and should reevaluate this activity as a factor for listing in the final rule. We recommend that the Service choose a 100-year time period (rather than a 45-year period) to represent "the foreseeable future" for the

Supervisor
April 9, 2007
Page Ten

purposes of this rule. And we strongly urge the Service to revise its discussion of oil and gas related activities and their effects, proximate *and* ultimate, on polar bear habitat.

The proposed rule reaches the correct conclusion, but in a manner that clearly seeks, for political reasons, to avoid confrontations with special interests. This avoidance results in discussions that are at times incoherent and illogical and, in the end, damaging to the prospects for polar bear protection. We urge the Service to revise the discussion in the final rule in a manner that faces up to unpleasant realities, regardless of the political implications. If a political decision on listing the polar bear is eventually made, it should not be because of an inadequate or timid evaluation in the Service's final rule of the factors affecting polar bear survival.

Thank you for the opportunity to comment on this important matter.

Sincerely,

Naomi A. Rose, Ph.D.
Marine Mammal Scientist
Treaty Law, Oceans and Wildlife Protection

Cc:     Tim Ragen, Ph.D., Executive Director, Marine Mammal Commission
        The Honorable Jay Inslee, U.S. House of Representatives
        The Honorable John Kerry, U.S. Senate

EXHIBIT 2

Safari Club International v. Kempthorne,
No. 08-881 (EGS) (D.D.C.)

Humane Society of the United States <u>et al</u>.'s
Motion To Intervene



National Headquarters
1130 17th Street, N.W.  |  Washington, D.C. 10036-4604  |  tel 202.682.9400  |  fax 202.682.1331
www.defenders.org

October 17, 2007

Supervisor
Marine Mammals Management Office
U.S. Fish and Wildlife Service
1011 East Tudor Road
Anchorage, AK 99503

Via email to: Polar_Bear_Finding@fws.gov

**Re:     Comments by Defenders of Wildlife in Support of Listing the Polar Bear (*Ursus maritimus*) as Threatened under the U.S. Endangered Species Act**

Dear Supervisor:

Defenders of Wildlife ("Defenders") is a non-profit conservation organization with over 490,000 members dedicated to the protection of wildlife in its native habitat.  Since it was founded in 1947, Defenders has been an advocate for the conservation of wolves, bears, and other predators in North America.  Defenders also works to protect Arctic ecosystems, such as the Arctic National Wildlife Refuge in Alaska, from harmful development by the oil and gas industry, the effects of climate change, and other threats.  Arctic ecosystems provide the only habitat for polar bears.

On February 9, 2006, the U.S. Fish and Wildlife Service ("Service") published notice in the *Federal Register* soliciting information relevant to whether listing the polar bear as a threatened species under the U.S. Endangered Species Act ("ESA") is warranted.[1]  In the *Federal Register* of January 8, 2007, the Service filed a twelve-month petition finding and proposed rule to list the polar bear as a threatened species under the ESA.[2]  On September 20, 2007, the Service re-opened the request for comments to allow consideration of new data and research completed by the U.S. Geological Survey ("USGS").[3]  Defenders provides the information below in support of a final rule listing the polar bear as a "threatened" species.

---

[1] Petition to List the Polar Bear as Threatened, 71 Fed. Reg. 6745 (Feb. 9, 2006).
[2] 12-Month Petition and Proposed Rule to List the Polar Bear as Threatened Throughout its Range, 72 Fed. Reg., Part II (Jan. 8, 2007)
[3] Reopening of Comment Period on Proposed rule to List the Polar Bear as Threatened, 72 Fed. Reg. 182 (Sept. 20, 2007); United States Geological Society "Information from 9 recent studies presents relationships of polar bears to present and future sea ice environments" (2007), http://www.usgs.gov/newsroom/special/polar_bears (last visited Oct. 3, 2007).[hereinafter USGS]

I. STATUS OF POLAR BEAR POPULATIONS

The total polar bear population is distributed among 19 subpopulations in the Arctic region, of which two—the Chukchi and the Southern Beaufort Sea subpopulations—are located within the jurisdiction of the U.S.[4] Information about several of the subpopulations is poor or lacking and, where data do exist, over 50 percent of the subpopulations are believed to be in decline.[5] The Polar Bear Specialist Group of the World Conservation Union ("IUCN") recently upgraded the status of the polar bear on the Red List from "Least Concerned" to "Vulnerable" due to the likelihood of a decline in the size of the total population of more than 30 percent within the next 35 to 50 years.[6] Loss of polar bear habitat attributed to the effects of climate change in the Arctic is the primary reason for this change in status.[7] However, the polar bear is also experiencing pressure due to over-hunting and contamination from polychlorinated biphenyls ("PCBs") and other pollutants.

II. FACTORS THAT THREATEN THE SURVIVAL OF THE POLAR BEAR

Under the ESA, the Service is required to determine whether any species is an endangered species or a threatened species because of any of the following factors: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence.[8] Our comments addressing each of these listing factors support the listing of the polar bear under the ESA and include references to the latest scientific data recently released by USGS.

FWS LISTING FACTOR A. PRESENT AND THREATENED DESTRUCTION OF POLAR BEAR HABITAT FROM CLIMATE CHANGE WARRANTS LISTING

The health and survival of the polar bear is tied directly to the extent and thickness of sea ice, which is the species' preferred hunting and breeding habitat.[9] The southern limit of the polar bear's range is determined by the distribution of the sea ice.[10] The petition from the Center for Biological Diversity ("CBD") thoroughly discussed the threat posed to the polar bear by climate change.[11] We do not duplicate their work here, but instead highlight some recent studies that provide further evidence of the threat to polar bear habitat from climate change. The CBD petition cites references to the early break-up of sea ice in Western Hudson Bay, but more recent studies have found that the total amount of sea ice throughout the Arctic is shrinking.

---

[4] IUCN/SSC Polar Bear Specialist Group, Population Status, *at* http://pbsg.npolar.no/ (updated Apr. 23, 2007; last visited October 5, 2007).
[5] Proceedings of the 14th Working Meeting of the IUCN/SSC Polar Bear Specialist Group, (June 2005) *at* http://pbsg.npolar.no/docs/PBSG14proc.pdf (updated Dec. 15, 2006; last visited Oct. 1, 2007).
[6] *Id.*
[7] *Id.*
[8] 16 U.S.C. § 1533(a)(1).
[9] RONALD M. NOWAK, WALKER'S CARNIVORES OF THE WORLD 124 (2005).
[10] *Id.*
[11] CENTER FOR BIOLOGICAL DIVERSITY, PETITION TO LIST THE POLAR BEAR (*URSUS MARITIMUS*) AS A THREATENED SPECIES UNDER THE ENDANGERED SPECIES ACT vi (2005) [hereinafter CBD].

Specifically, research conducted by experts at the U.S. National Snow and Ice Data Centre in Colorado show that for the second year in a row Arctic sea ice has failed to re-form after the summer melt.[12]   Last September, satellite images showed ice cover to be at its lowest extent since monitoring began in 1978, a reduction of 8.7 percent per decade.[13]   Scientists confirmed that summer sea ice retreated even more during summer 2007.[14]

The extent of sea ice on the Arctic Ocean fluctuates with season.  The ice melts during the six months of daylight, reaching its minimum point in September.  Normally, during the winter, sea ice forms to compensate for what was lost over the summer, but last winter the Arctic experienced warmer than usual temperatures preventing ice from forming and causing the ice that did form to be thinner.[15]   Reduction of the extent of sea ice in both the winter and summer is an indicator that the Arctic is experiencing a positive feedback effect whereby warmer temperatures melt sea ice causing more open water that absorbs sunlight, which, in turn, causes more ice to melt.  In addition, emissions of black carbon, or soot, also may be accelerating the melting of sea ice by reducing its reflectivity.[16]   If this cycle continues as predicted, models indicate that there will be no sea ice left by 2070 or earlier.  Already parts of the Arctic Ocean remain ice-free year round, such as a large area in the Barents Sea, home to an estimated 2,000-5,000 polar bears.[17]

As documented in CBD's petition, loss of sea ice results in dire consequences for the polar bear.  Sea ice provides a platform from which polar bears hunt for ringed seals and other prey.  As seals follow the receding sea ice, they may be too far from land for polar bears to reach them.[18]   Polar bears, though good swimmers for short distances, are not able to traverse large open expanses of water.  In 2004, The U.S. Minerals Management Service (MMS) found four bears that had drowned off the northern coast of Alaska where the ice cap had retreated 160 miles north of land.[19]   Unable to reach the sea ice, the polar bears that remain on land will come into conflict with humans, leading to killing of so-called nuisance bears.[20]

In particular, lack of sea ice will have a negative impact on female bears.  In the last ten years, the MMS found that 60 percent of female polar bears were denning on land and 40 percent were denning on ice, where previously the percentage was reversed.[21]   Polar bears that den on land

---

[12] Andrew C. Revkin, *Climate Data Hint at Irreversible Rise in Seas*, N.Y. TIMES, Mar. 24, 2006.

[13] *Satellites Continue to See Decline in Arctic Sea Ice in 2005*, EARTH OBSERVATORY, NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, Sept. 28, 2005, *at* http://earthobservatory.nasa.gov/Newsroom/NasaNews/2005/2005092820527.html (last visited Mar. 27, 2006).

[14] Steve Connor, *Climate Change 'Irreversible' as Arctic Sea Ice Fails to Re-Form*, INDEP., Mar. 14, 2006.

[15] *Id.*

[16] *NASA Study Finds Soot May be Changing the Arctic Environment*, EARTH OBSERVATORY, NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, Mar. 23, 2005, *at* http://earthobservatory.nasa.gov/Newsroom/NasaNews/2005/2005032318608.html (last visited Mar. 27, 2006).

[17] Connor, *supra* note 14.

[18] CBD, *supra* note 11.

[19] Jim Carlton, *Is Global Warming Killing Polar Bears?* WALL ST. J., Dec. 14, 2005, at B1.

[20] CBD, *supra* note 11, at vi.  *See also* Doug Struck, *Inuit See Signs in Arctic Thaw: String of Warm Winters Alarms 'Sentries for the Rest of the World'*, WASH. POST, Mar. 22, 2006, at A01 (A woman in a Hudson Bay village charged a polar bear that was stalking her seven-year-old son.  To defend the woman, the bear was shot by a hunter.); NOWAK, *supra* note 9, at 126.

[21] Proposed Rule, Incidental Take During Specified Activities, 71 Fed. Reg. 14,451 (Mar. 22, 2006).

have more difficulty traveling between land and ice, forcing them to leave the ice and stop hunting earlier before the ice has retreated too far for them to find their preferred denning areas on land.[22]  Less and thinner ice may also disrupt the rearing of polar bear cubs for those populations that den on the ice.

Two other recent studies published in the journal *Science* indicate that Arctic warming may be occurring at a much faster pace than originally thought.  Researchers at the Jet Propulsion Laboratory and the University of Kansas found that Greenland's glaciers were losing ice at a rate that has doubled in the last five years.[23]  In the second study, scientists from Harvard and Columbia Universities documented earthquakes in Greenland caused by glaciers that "lurch" forward as they melt.[24]  The earthquakes, which occur more often in summer, have increased in frequency and intensity over the last five years.[25]

Given what is known about the polar bears' dependence upon sea ice for access to marine prey[26] and direct observations of population declines associated with reduced sea ice (i.e., correlated with reduced body condition, reproduction, survival, and population size[27]), the most recent series of reports released by the USGS present a synthesis of the current scientific data and predictions in relation to polar bear populations that supports listing the polar bear as a threatened species under the ESA.[28]  The USGS studies were able to estimate maximum carrying capacity and population persistence based on predicted climate change impacts and sea ice declines[29].  Using a direct linear relationship between bear density and annual average sea ice extent, the USGS reports predict that the U.S. polar bear populations (in the Polar Basin Divergent Ecoregion[30]) "will most likely be extirpated by mid century" (emphasis added).[31]  To

---

[22] CBD, *supra* note 11, at v.

[23] Rignot, E. and P. Kanagaratnam, *Changes in the Velocity Structure of the Greenland Ice Sheet*, 311 SCIENCE 986 (2006).  *See also* Alan Boyle, *Greenland's Glaciers Losing Ice at Faster Rate: Satellite Observations Add New Factor to Global Warming Debate*, MSNBC, Feb. 16, 2006, *at* www.msnbc.msn.com/id/11385475/ (last visited Apr. 3, 2006).

[24] G. Ekström et al., *Seasonality and Increasing Frequency of Greenland Glacial Earthquakes*, 311 SCIENCE 1756 (2006).  *See also* Revkin, *supra* note 12.

[25] Ekström et al., *supra* note 25.

[26] Stirling and Oritsland (1995); Stirling and Lunn (1997); Amstrup (2003) as cited in Amstrup et al., *Forecasting the Range-wide Status of Polar Bears at Selected Times in the 21st Century* (2007); USGS, *supra* note 3 (2007)

[27] Stirling et al., (1999); Obbard et al, (2006); Stirling and Parkinson (2006); Regehr et al (2007b) as cited in Amstrup et al., *supra* note 27 (2007).

[28] USGS, *supra* note 3 (2007).

[29] The cumulative works clearly demonstrate a linkage between declines in sea ice as predicted by general circulation models (GCMs) and climate change due to global warming. The USGS study used 10 GCM models based on an emissions scenario identified in the IPCC Special Report on Emissions Scenarios (A1B) which assumes global greenhouse gas emissions in the future based on very rapid economic growth, global population peaks in the mid-century and declines thereafter, and the rapid introductions of new and more efficient technologies, with a substantial reduction in regional differences in per capita income, and a balance across the energy system between technological fossil intensive and non-fossil energy sources.

[30] USGS study Ecoregions: (1) Polar Basin Divergent Ice Ecoregion includes the Southern Beaufort Sea, Chukchi Sea, Laptev Sea, Kara Sea, and the Barents Sea populations; (2) Polar Basin Convergent Ice Ecoregion includes East Greenland, Queen Elizabeth, Northern Beaufort Sea populations; (3) Seasonal Ice Ecoregion included Southern Hudson Bay, Western Hudson Bay, Foxe Basin, Davis Strait, and Baffin Bay populations;

further reinforce this grim reality, the authors stressed that because their deterministic modeling approach "did not include seasonal changes in ice availability or other possible population stressors, it provided an optimistic view of the potential magnitude of and change in population carrying capacity" (emphasis added).[32]

Clearly, based on the listing factor of "present or threatened destruction, modification, or curtailment of its habitat or range," predictions by the government's own scientists and leading researchers in the field provide ample scientific support to the FWS decision to list the polar bear as a threatened species under the ESA.

FWS LISTING FACTOR B. OVER-UTILIZATION OF THE POLAR BEAR FOR COMMERCIAL AND RECREATIONAL PURPOSES WARRANTS LISTING

Already under stress caused by loss of habitat due to climate change, the polar bear can ill afford the additional threat posed by hunting and trade. Though not as rampant as in the 1960s and 1970s, international trade in polar bear trophies and parts remains significant, according to data reported by the Parties to the Convention on International Trade in Endangered Species ("CITES")[33] and a brief internet search conducted by Defenders.

1. Convention on International Trade in Endangered Species

The polar bear was one of the first species listed on Appendix II of CITES, which requires each exporting country to issue a permit certifying that the specimen was harvested in accordance with its laws, and that the export will not be to the detriment of the species.[34] The protection provided by CITES curbed the most egregious trade in the species. However, continued harvest prompted the CITES Animals Committee at its twentieth meeting to consider the inclusion of the polar bear in the Review of Significant Trade. At that time the United Nations Environment Programme World Conservation Monitoring Centre ("UNEP-WCMC"), which collects data on CITES-listed species, recommended that it not be included in the Review.

However, it appears that a discrepancy in reporting may have obscured the total number of polar bears in trade. UNEP-WCMC, in its report to the Animals Committee, only looked at exports from countries—not Parties—with native populations of polar bears. Thus, it examined Greenland's exports, home to several populations of polar bears, but not exports from Denmark, which has none. But Greenland, as an autonomous region of Denmark, is not a Party to CITES in its own right. In theory, Denmark should be reporting all of Greenland's exports, but UNEP-WCMC's database contains records for both countries. Furthermore, trade between Greenland and Denmark would be considered internal and not require the issuance of CITES export permits and, as a result, trade between the two could be occurring unseen.

---

and (4) Archipelago Ecoregion includes Gulf of Boothis, M'Clintock Channel, Lancaster Sound, Viscount-Melville Sound, Norwegian Bay, and Kane Basin populations.
[31] Amstrup et al., *supra* note 27 (2007); page 36.
[32] *Id.* at pg 1.
[33] Convention on International Trade in Endangered Species of Wild Fauna and Flora, Mar. 3, 1973, 993 U.N.T.S. 243 [hereinafter CITES].
[34] *Id.* at art. IV.

Table 1 shows the international trade in polar bear bodies and parts between 2001 and 2005. The data demonstrate that there is a consistent trade in bodies and parts.

**TABLE 1: GROSS EXPORTS OF POLAR BEAR PARTS FROM CANADA, DENMARK, GREENLAND, NORWAY, THE RUSSIAN FEDERATION, AND THE UNITED STATES[35]**

| Category | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|----------|------|------|------|------|------|-------|
| Bodies   | 42   | 35   | 27   | 27   | 33   | 164   |
| Skins    | 253  | 290  | 615  | 369  | 683  | 2210  |
| Skulls   | 128  | 126  | 128  | 156  | 143  | 681   |
| Trophies | 82   | 96   | 83   | 135  | 92   | 488   |

*Source:* CITES trade statistics derived from the *CITES Trade Database*
UNEP World Conservation Monitoring Centre, Cambridge, UK.

In addition to exporting polar bear parts and products, the U.S. also imports a significant number of skins, skulls, and trophies. The number of trophy imports shown in Table 2 differs somewhat from the number of issued import permits for trophies reported by the Marine Mammal Commission ("MMC"): 71 in 2001, 48 in 2002, 68 in 2003, 108 in 2004, and 61 in 2005.[36] The discrepancy between the data notwithstanding, it is unclear how the skulls and skins are being imported into the U.S. when the Marine Mammal Protection Act ("MMPA")[37] prohibits the import of marine mammals or their parts and products without a permit, which in the case of polar bears could only be issued for sport-hunted trophies from Canada or for scientific research, public display, or enhancing survival or recovery of the species.[38]

**TABLE 2: U.S. GROSS IMPORTS OF POLAR BEAR PARTS[39]**

| Category | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|----------|------|------|------|------|------|-------|
| Bodies   | 35   | 27   | 18   | 15   | 25   | 120   |
| Skins    | 62   | 40   | 44   | 97   | 49   | 292   |
| Skulls   | 84   | 61   | 54   | 93   | 66   | 358   |
| Trophies | 65   | 64   | 49   | 98   | 69   | 345   |

*Source:* CITES trade statistics derived from the *CITES Trade Database*
UNEP World Conservation Monitoring Centre, Cambridge, UK.

At the very least, the inconsistencies and irregularities in the trade data show that the reporting guidelines need to be clarified. However, the data we have show that the legal trade in polar bear trophies and parts is significant.

---

[35] CITES Trade Database, UNEP World Conservation Monitoring Center (last visited October 10, 2007 [hereinafter CITES]
[36] MARINE MAMMAL COMMISSION, 2005 ANNUAL REPORT TO CONGRESS 278 (2006), *available at* http://www.mmc.gov/reports/annual/pdf/2005annualreport.pdf.
[37] Marine Mammal Protection Act, 16 U.S.C. §§ 1361-1421h (2002).
[38] 16 U.S.C. 1371(a), 1374(c).
[39] CITES, *supra* note 43

## 2. Internet Trade in Polar Bear Trophies and Parts

Several environmental NGOs have recently highlighted the extent of the trade in wildlife products over the internet.[40]  Polar bears are no exception.  A very brief internet search conducted by Defenders found several websites in the U.S. and Canada where polar bear trophies and mounts could be purchased.  Copies of those websites are attached in the Annex.

U.S. regulations allow the import of polar bear trophies from Canada for "personal, noncommercial use."[41]  As such, the trophies are not to be transferred except by inheritance, and only with legal documentation showing that the transferee is the legal heir.[42]  The MMPA prohibits the purchase, sale, and offer for sale of any marine mammal or product, taken after December 21, 1972,[43] that is not for the purpose of public display, scientific research, or enhancement of the survival of the species.[44]  By prohibiting the sale of polar bears, the law reduces the market demand and, consequently, limits the incentive to hunt.  Unfortunately, the lax enforcement of the sale of wildlife over the internet provides an opportunity for the trade in polar bears to continue, reaching people who would otherwise not have easy access to vendors.

Indeed, the internet search Defenders conducted demonstrates that there is still a demand for polar bear rugs and mounts.  In the classifieds of Simpson Taxidermy, located in Wisconsin, there were four ads looking to buy polar bear mounts.  Western Canadian Raw Fur Auction Sales Ltd. reports a good demand for polar bear skins, estimating a nine-foot skin would sell for $1,400 Canadian dollars.

Defenders also found several polar bear mounts offered for sale.  In the Simpson Taxidermy Classifieds, there were five mounts or rugs for sale ranging in price from $7,500 to $10,000.  Though several of the items listed were located in Canada, there was no mention that the sellers could not or would not ship the products to the U.S.  In addition, we found a polar bear, mounted on its hind legs, to be auctioned on April 6, 2006, by Lolli Brothers Livestock Market in Macon, Missouri.

As polar bear populations decline due to loss of sea ice habitat, mortality due to illegal take becomes an increasingly significant risk factor to the species' continued existence.

---

[40] *See e.g.* INTERNATIONAL FUND FOR ANIMAL WELFARE, CAUGHT IN THE WEB (2005);  INTERNATIONAL FUND FOR ANIMAL WELFARE, ELEPHANTS ON THE HIGH STREET (2004);  THE HUMANE SOCIETY OF THE UNITED STATES, AN INVESTIGATION OF IVORY MARKETS IN THE UNITED STATES (2002);  DOUGLAS F. WILLIAMSON, TRAFFIC NORTH AMERICA, TACKLING THE IVORIES: THE STATUS OF THE US TRADE IN ELEPHANT AND HIPPO IVORY (2004); COMMISSION FOR ENVIRONMENTAL COOPERATION & NORTH AMERICAN WILDLIFE ENFORCEMENT GROUP, ILLEGAL TRADE IN WILDLIFE: A NORTH AMERICAN PERSPECTIVE (2005).
[41] 50 C.F.R. 18.30(b)(1).
[42] 50 C.F.R. 18.30(a)(3).
[43] 50 C.F.R. 18.25(a).
[44] 16 U.S.C. 1372(a)(4)(B).

FWS LISTING FACTOR C.  DISEASE AND PREDATION

Disease is a listing criterion under which additional risks of endangerment can be identified for the polar bear.  A heightened risk from disease can manifest itself in two ways: 1) more *Trichinella* infection via cannibalism, and 2) exposure to new diseases from contact with other bear species acting as vectors to polar bears, which are naïve to parasites and diseases prevalent in other ursids.

Normally there is a low incidence of disease and ectoparasitism among wild polar bears.  A comprehensive review of parasite loads[45] indicated that only one endoparasite, *Trichinella* spp., had been reported in wild polar bears.  Currently *Trichinella* is reported as common and widespread but rarely fatal and not a threat to the species as a whole; cannibalism is the main route of transmission.[46]  However, there is anecdotal evidence that cannibalism is already increasing among polar bears, and greater infection of *Trichinella* may not be as innocuous for bears weakened by starvation and other environmental stressors.

A low incidence of disease observed to date raises the possibility that Alaska's polar bears may be naïve to many strains of parasites and diseases common in other ursids.  Therefore, if climate change results in range and habitat shifts among polar bears, leading to greater contact with grizzly and black bears, disease transmission between ursids may be an additional risk factor. Polar bears and grizzlies already have hybridized, so the means of contact for disease transmission is no longer hypothetical.

A wide variety of diseases and parasites have been recorded from grizzly bears in Alaska and Canada.  *Trichinella* roundworm, the single endoparasite found in polar bears, is present in grizzlies as well.[47]  *Toxoplasma gondii*, a protozoan parasite, infects Alaskan grizzlies with the highest rates of infection in the northern region, especially north of the Arctic circle.[48]  Bacterial diseases of Alaskan grizzlies include: Brucellosis, a bacterial disease of the joints and reproductive tract;[49] the sprirochete bacteria *Leptospira*;[50] and tularaemia[51].  Viral diseases of

[45] Rogers, L and S. Rogers, *Parasites of bears: A review*, INTERNATIONAL CONFERENCE ON BEAR RESEARCH AND MANAGEMENT 3: 411–430 (1976).

[46] Forbes, L.,*The occurrence and ecology of Trichinella in marine mammals*. VETERINARY PARASITOLOGY 93: 321–334 (2000).

[47] Zarnke et al., *Serologic survey for Trichinella spp. in grizzly bears from Alaska*. JOURNAL OF WILDLIFE DISEASES 33(3): 474–479 (1997b).

[48] Chomel et al, *Serologic survey of Toxoplasma gondii in grizzly bears (Ursus arctos) and black bears (Ursus americanus), from Alaska, 1988 to 1991*. JOURNAL OF WILDLIFE DISEASES 31(4): 472–479 (1995); Chomel et al., *Serological survey of selected canine viral pathogens and zoonoses in grizzly bears (Ursus arctos horribilis) and black bears (Ursus americanus) from Alaska*. REV SCI TECH. 17(3): 756–766 (1998); Zarnke et al., *Serologic survey for Toxoplasma gondii in grizzly bears from Alaska*. JOURNAL OF WILDLIFE DISEASES 33(2): 267–270 (1997a.).

[49] Zarnke, R. L., Serologic survey of Alaska wildlife for microbial pathogens. Alaska Department of Fish and Game. Federal aid in wildlife restoration research performance report 1 July 2000–30 June 2001, grant W-27-4, study 18.71. Juneau, Alaska, 8 pp. (2001); Zarnke et al., *Geographic pattern of serum antibody prevalence for Brucella spp. in caribou, grizzly bears, and wolves from Alaska, 1975-1998*. JOURNAL OF WILDLIFE DISEASES 42(3):570–7 (2006).

[50] Zarnke, R. L., *Serologic survey for selected microbial pathogens in Alaska wildlife*. JOURNAL OF WILDLIFE DISEASES 19(4): 324–329 (1983).

grizzlies in Alaska include the arthropod-borne Northway virus,[52] canine distemper,[53] and the infectious canine hepatitis,[54] which can cause clinical disease and mortality in young bears. Gastrointestinal parasites *Nematodirus, Diphyllobothrium* and *Baylisascaris* and an unidentified first stage protostrongylid larva have also been collected from grizzlies in the Central Canadian Arctic.[55] Their presence in Alaska and their potential to impact polar bears are unknown.

Diseases of black bears may also have the potential to impact polar bears if the two species come into contact with each other. Several diseases found in grizzlies, including *Trichinella*,[56] *Toxoplasma gondii*,[57] brucellosis and tularaemia,[58] and *Leptospira*,[59] occur in Alaskan black bears as well.

Interactions among individual endangerment risks might also make polar bears more susceptible to disease. In particular, stresses from food shortages might interact with exposure to persistent organic pollutants to suppress immune system function (Derocher et al. 2004).[60] Food stress also may lead to behaviors that increase the possibility of disease transmission, such as consumption of the intestines of seals and other prey animals[61] and cannibalism, which are associated with increased risk of *Trichinella* exposure[62].

FWS LISTING FACTOR D.  CURRENT INTERNATIONAL AND NATIONAL LAW IS INADEQUATE TO PROTECT POLAR BEARS

When the Agreement on Conservation of Polar Bears ("Treaty") was negotiated in 1973, climate change had only begun to receive public attention. However, the language of the treaty is broad enough to encompass threats to polar bear habitat caused by climate change: "Each Contracting Party shall take appropriate action to protect the ecosystems of which polar bears are a part."[63] The U.S. regards the MMPA as the implementing law for the treaty, but the MMPA primarily governs the take, import, export and sale of polar bears, and does not adequately protect its

[51] Chomel et al, *supra* note 56 (1998).

[52] Zarnke et al., *Serologic evidence of arbovirus infections in humans and wild animals in Alaska*. JOURNAL OF WILDLIFE DISEASES 19(3): 175–179 (1983).

[53] Chomel et al, *supra* note 56 (1998).

[54] Zarnke, R. L. and M. B. Evans, *Serologic survey for infectious canine hepatitis virus in grizzly bears (Ursus arctos) from Alaska, 1973 to 1987*. JOURNAL OF WILDLIFE DISEASES 25(4): 568–573 (1989); Chomel et al, *supra* note 56 (1998).

[55] Gau et al., Parasites *in grizzly bears from the central Canadian Arctic*. JOURNAL OF WILDLIFE DISEASES 35(3): 618–621 (1999).

[56] Chomel et al, *supra* note 56 (1998)

[57] Chomel et al, *supra* note 56 (1995); Zarnke et al. 2000. *Serologic survey for Toxoplasma gondii in selected wildlife species from Alaska*. JOURNAL OF WILDLIFE DISEASES 36(2): 219–24.

[58] Chomel et al, *supra* note 56 (1998)

[59] Zarnke, R. L., *Serologic survey for selected microbial pathogens in Alaska wildlife*. JOURNAL OF WILDLIFE DISEASES 19(4): 324–329 (1983).

[60] Derocher et al., *Polar bears in a warming climate*. INTEGRATIVE AND COMPARATIVE BIOLOGY 44: 163–176 (2004).

[61] *Id.*

[62] Forbes, *supra* note 54.

[63] Agreement on the Conservation of Polar Bears, Nov. 15, 1973, art. III, 13 I.L.M. 13.

habitat. Listing the polar bear under the ESA would provide habitat protection that is lacking under current law.

Article IV of the Agreement between the U.S. Government and the Government of the Russian Federation on the Conservation and Management of the Alaska-Chukotka Polar Bear Population ("the Agreement")[64] negotiated in 2000, and ratified by the U.S. in 2003, contains stronger language than the Treaty to require the U.S. to prevent the loss or degradation of polar bear habitat:

> The Contracting Parties **shall undertake all efforts necessary** to conserve polar bear habitats, with particular attention to denning areas and areas of concentration of polar bears during feeding and migration. To this end, they **shall take steps necessary to prevent loss or degradation of such habitats** that results in, or is likely to result in, mortality to polar bears or reduced productivity or long-term decline in the Alaska-Chukotka polar bear population.[65]

As documented in CBD's petition and section A above, climate change is the biggest threat to the polar bear's habitat. Because of warming temperatures in the Arctic, combined with industrial pollution that accelerates the ice melt by decreasing its reflectivity, polar bear habitat is literally disappearing. Notwithstanding this threat and despite the language of the Agreement, there is nothing in the implementing legislation currently pending before the Senate that addresses this issue.[66] Instead, the bill provides only for the establishment of the U.S.-Russia Polar Bear Commission described in article VIII of the Agreement and for the implementation of the take restrictions agreed to by the Commission. The ESA would further implement the Agreement, if the polar bear were to be listed, by requiring the designation of critical habitat,[67] prohibiting the take of polar bears, which may include significant habitat destruction which actually kills or injures polar bears,[68] and the implementation of habitat conservation plans should incidental take permits be issued.[69]

Climate change also has the effect of reducing the size of the area to which the Agreement applies. Article III of the Agreement describes its jurisdiction according to geographic reference points, the southern border of which is demarcated by "a line describing the southernmost annual formation of drift ice."[70] As the consequences of climate change become more pronounced in the Arctic, the retreat of the sea ice will result in a shrinking area to which the Agreement applies. Such a modification might require notification to the Senate. As a condition of ratification, the Senate stipulated that the Secretary of State notify the Senate Committee on

---

[64] U.S.-Russ. Agreement on the Conservation and Management of the Alaska-Chukotka Polar Bear Population, Oct. 16, 2000, 40 I.L.M. 397 [hereinafter U.S.-Russ. Polar Bear Agreement].

[65] *Id.* at art. IV (emphasis added).

[66] United States-Russia Polar Bear Conservation and Management Act of 2005, S. 2013, 109th Cong. (2006).

[67] 16 U.S.C. 1533(b)(2).

[68] 16 U.S.C. 1538(a)(1)(B). *See also* 50 C.F.R. 17.3 (definition of "harm").

[69] 16 U.S.C. 1539(a)(2)(A).

[70] U.S.-Russ. Polar Bear Agreement, *supra* note 72, at art. III.

Environment and Public Works and the Committee on Foreign Relations if, pursuant to article III, the Contracting Parties modify the area to which the Agreement applies.[71]

Despite the obligation the U.S. has under international treaties to protect polar bear habitat from degradation or destruction caused by climate change, the Service, even while it considers listing the polar bear as threatened under the ESA, published a proposed rule in the *Federal Register* on March 22, 2006, for incidental take of polar bears on the northern coast of Alaska by the oil and gas industry.[72]   Though not mentioning climate change by name, the Service recognized that "environmental conditions" were causing the sea ice to retreat from the northern coast of Alaska, trapping an increasing number of polar bears on land.  But despite finding more polar bears competing for land occupied by the oil and gas industry, including denning females, the Service concluded that the industry's activities would have a minimal impact on the bears' habitat.   The Service also concluded that onshore oil spills would have "little impact" on polar bear populations because of the "small volume of oil associated with onshore spills."[73]   However, in March 2006, it was discovered that 267,000 gallons of oil had spilled on the tundra from a leak in a corroded pipe leading to the Trans-Alaska Pipeline.[74]  Moreover, the Service's analysis completely failed to consider that it is the very activities conducted by the oil and gas industry that is the root cause of the polar bear's melting habitat.[75]  Emissions from the use of oil and gas extracted from, among other places, the North Slope of Alaska are contributing to the build up of carbon dioxide in the atmosphere, causing an increase in global average temperature, with the most extreme effects felt at the poles.[76]

FWS LISTING FACTOR E.  NATURAL OR MANMADE FACTORS AFFECTING SPECIES CONTINUED EXISTENCE

The 2007 USGS reports[77] have made an important first step in considering additional factors that may affect polar bear populations. These include an increase in bear-human interactions as larger numbers of bears remain on land during the summer and as bears in poorer condition due to food deprivation come into human settlements to scavenge refuse; an increase in human disturbances associated with greater oil and gas exploration and development in many northern areas as the sea ice disappears; an increase in disturbance in the marine environment due to higher levels of shipping and marine traffic as the northern passage become navigable throughout the year; and an increase in exposure to contaminants due to increased rainfall and terrestrial run-off that drains into rivers and discharge into the arctic seas. The USGS tried to model impacts and relative influence of these other stressors on polar bear survival using a new prototype model referred to as a Bayesian network (BN) model that relies on expert opinion to set model parameters and probabilities.  According to the BN model predictions and sensitivity

---

[71] S. Ex. Rept. 108-7, 108th Cong. (2003) (enacted).

[72] Proposed Rule, Incidental Take During Specified Activities, 71 Fed. Reg. 14,446 (Mar. 22, 2006).

[73] Proposed Rule, Incidental Take During Specified Activities, 71 Fed. Reg. 14,460.

[74] Felicity Barringer, *Large Oil Spill in Alaska Went Undetected for Days*, N.Y. TIMES, Mar. 15, 2006.

[75] INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, CLIMATE CHANGE 2001: THE SCIENTIFIC BASIS (SUMMARY FOR POLICYMAKERS) 7 ("About three-quarters of the anthropogenic emissions of $CO_2$ to the atmosphere during the past 20 years is due to fossil fuel burning.") (2001)

[76] ARCTIC CLIMATE IMPACT ASSESSMENT, IMPACTS OF A WARMING ARCTIC 8 (2004) *available at* http://amap.no/acia/ (last visited Apr. 5, 2006).

[77] Amstrup et al., *supra* note 27 (2007)

analysis, efforts to manage these other human-influenced factors will have little impact in altering the polar bear population trajectory toward extirpation in the U.S. But given the novel nature of this modeling approach, the limited number of experts consulted[78] in assigning model parameters and probabilities, and the need for further refinement based on better population estimates, we nevertheless believe that potential benefits on the local level in managing these human activities to minimize stresses on the U.S. polar bear population should not be ignored.

III.  CONCLUSION

The information provided above by Defenders clearly demonstrates that listing of the polar bear as a threatened species under the ESA is warranted. Present and threatened destruction of polar bear habitat due to climate change and other causes, over-utilization of polar bears, increased susceptibility of polar bears to disease, inadequacy of existing regulatory mechanisms, and cumulative impacts from natural and human-cause stressors are all factors that warrant protection of the polar bear under the ESA. Accordingly, Defenders urges the Service to move expeditiously to list the polar bear as a threatened species.

Defenders of Wildlife will continue to work with the Service to protect the polar bear and its Arctic habitat. If you have any questions regarding these comments, please contact Heidi Ruffler, International Associate, at (202) 772-3234 or HRuffler@defenders.org.

Sincerely,

Wm. Robert Irvin
Senior Vice President, Conservation Programs

Enclosure

---

[78] According to the USGS report, only one expert could be included in this modeling exercise due to time constraints.

PROPOSED ORDER

Safari Club International v. Kempthorne,
No. 08-881 (EGS) (D.D.C.)


Humane Society of the United States et al.'s
Motion To Intervene

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
SAFARI CLUB INTERNATIONAL,  et al.                  )
                                                    )
        Plaintiffs,                                 )
                                                    )
        v.                                          )
                                                    )
DIRK KEMPTHORNE, et al.,                            )
                                                    )        Civ. No. 08-0881 (EGS)
        Defendants,                                 )
                                                    )
and                                                 )
                                                    )
THE HUMANE SOCIETY OF THE                           )
UNITED STATES, et al.,                              )
                                                    )
        Proposed-Intervenor-Defendants.             )
_____)

## **ORDER**

Upon consideration of the motion to intervene by The Humane Society of the United

States ("HSUS"), International Fund for Animal Welfare ("IFAW"), and Defenders of Wildlife

("Defenders"), any responses thereto, and the entire record herein, it is hereby on this __ day of

_____, 2008 ORDERED that the motion to intervene is hereby GRANTED; and it is further

ORDERED that HSUS, IFAW and Defenders are hereby granted intervention as of right

under Rule 24(a) of the Federal Rules of Civil Procedure and party status as defendant-

intervenors; and it is further

ORDERED that the Proposed Answer attached to the HSUS et al. motion to intervene

shall be deemed filed as of the date of this Order.

_____
United States District Judge