**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SAFARI CLUB INTERNATIONAL, et al.,** | Civil Action No. 1:08-cv-00881 EGS |
| **Plaintiffs,** | |
| **vs.** | |
| **DIRK KEMPTHORNE, et al.,** | |
| **Defendants,** | |
| **and** | |
| **CENTER FOR BIOLOGICAL DIVERSITY,**<br>1333 N. Oracle Rd.<br>Tucson, AZ 85705 | |
| **NATURAL RESOURCES DEFENSE COUNCIL,**<br>40 West 20th Street<br>New York, NY 10011 | |
| **GREENPEACE, Inc.,**<br>75 Arkansas St.<br>San Francisco, CA 94107 | |
| **Intervenor-Defendant –Applicants.** | |

**INTERVENOR-CONSERVATION GROUPS' MOTION TO INTERVENE AS
DEFENDANTS AND MEMORANDUM IN SUPPORT**

Pursuant to Federal Rule of Civil Procedure 24 and Local Civil Rule 7(j), the

Center for Biological Diversity ("Center"), Natural Resources Defense Council

("NRDC") and Greenpeace, Inc. ("Greenpeace") (collectively, "Conservation Groups")

hereby move this Court to intervene as of right as Defendants in this case, or, in the

alternative, for permissive intervention.  Counsel consulted with counsel for Defendants

and Plaintiffs and determined that Defendants take no position on Conservation Groups'

motion and counsel for Plaintiffs indicated that they will take no position on Conservation Groups' motion pending review of this motion and memorandum.

## BACKGROUND

The road to protection for the polar bear under the Endangered Species Act has been a long one. The Conservation Groups seeking intervention in this case set the polar bear on that road beginning in February 2005, with the filing of a scientific petition before the U.S. Secretary of Interior and the U.S. Fish and Wildlife Service (collectively, "the Secretary") to list the polar bear under the Endangered Species Act, 15 U.S.C. §§ 1531 et seq., due to global warming, overhunting, oil development, pollution, and other threats. The Conservation Groups were subsequently forced to file two lawsuits to compel the Secretary to comply with the mandatory deadlines for action set forth by the Endangered Species Act listing process. The second of these two cases, Center for Biological Diversity v. Kempthorne, 2008 WL 1902703 (N.D. Cal. Apr. 28, 2008) (No. 08-1339) ("Center for Biological Diversity II"), resulted in the Court Order which compelled the Secretary to issue the final listing rule for the polar bear challenged here. Moreover, Center for Biological Diversity II is ongoing in the Northern District of California, with the Conservation Groups challenging those aspects of the final listing rule which unlawfully reduce protection to the species.

In this case, Plaintiffs Safari Club International and Safari Club International Foundation ("Safari Club") challenge the final listing rule for the polar bear which the Conservation Groups have worked for the past four years to obtain. As detailed below, Conservation Groups meet the four-part test for intervention as of right in this action, and

should be granted intervention in order to protect their interests in the survival and recovery of the polar bear and its habitat.

### A.    Events Leading to the Listing of the Polar Bear

In 2005, Conservation Groups petitioned the Secretary to list the polar bear as a threatened or endangered species throughout its range.  Endangered and Threatened Wildlife and Plants; 12-Month Petition Finding and Proposed Rule To List the Polar Bear (Ursus maritimus) as Threatened Throughout Its Range Proposed Rule and Notice of 12-month Finding, 72 Fed. Reg. 1064 (Jan. 9, 2007).  The polar bear, a marine mammal completely dependent on the Arctic sea ice for survival, is poised to become one of the first species to fall victim to global warming.  Arctic sea ice is the polar bear's primary habitat, the platform from which they hunt and on which they breed.  Endangered and Threatened Wildlife and Plants, Determination of Threatened Status for the Polar Bear (*Ursus maritimus*) Throughout its Range, 73 Fed. Reg. 28,212, 28,214 (May 15, 2008) ("Final Listing Rule").  The polar bear's Arctic sea-ice habitat is quite literally melting away.  Even under relatively optimistic scenarios, scientists expect that the Arctic's summer sea ice will largely vanish by mid-century; under increasingly likely scenarios, the seasonal ice upon which the polar bear depends will be gone in less than a decade.  73 Fed. Reg. 28,233.  Without sea ice, polar bears cannot survive.  73 Fed. Reg. 28,262

Under the Endangered Species Act, the Secretary of the Interior has 90 days "to the maximum extent practicable," to make a finding as to whether a petition to list a species "presents substantial scientific or commercial information indicating that the petitioned action may be warranted."  16 U.S.C § 1533(b)(3)(A); 50 C.F.R. § 424.14(b)(1).  If the Secretary answers this question in the affirmative, he then has 12

months from the date the petition was filed to decide whether to grant the petition and, if so, issue a proposed rule listing the species.  16 U.S.C. § 1533(b).

In the case of the polar bear, however, the Secretary did not make any findings in responding to Conservation Groups' petition to list the bear ten months after it had been filed.  Accordingly, on December 15, 2005, Conservation Groups filed suit to compel action.  Complaint for Declaratory and Injunctive Relief, Center for Biological Diversity v. Kempthorne, No. 05-5191 (N.D. Cal. dismissed Jan. 11, 2007) ("Center for Biological Diversity I"); 72 Fed. Reg. 1065.

In response to Conservation Groups' suit, on February 9, 2006, the Secretary issued a 90-day finding on the Petition to list the polar bear.  Endangered and Threatened Wildlife and Plants; Petition To List the Polar Bear as Threatened Notice of 90-day Petition Finding and Initiation of Status Review, 71 Fed. Reg. 6745 (Feb. 9, 2006).  The Secretary found that the Petition presented substantial information showing that listing of the polar bear may be warranted under the ESA, initiated a status review for the species, and solicited public comment for a period of 60 days.  Id.

Because the Secretary delayed the 90-day finding until nearly one year had passed from receipt of the Petition, the Secretary also failed to meet the deadline for issuance of the 12-month finding.  As a result, a consent decree was entered in Center for Biological Diversity I, No. 05-5191, that required the Secretary to issue the required 12-month finding by December 27, 2006.

On December 27, 2006, the Secretary announced a proposed rule to list the polar bear throughout its range as a threatened species.  The proposed rule was published in the Federal Register on January 9, 2007.  72 Fed. Reg. 1064.  After a species is formally

proposed for addition to the list of threatened and endangered species, the ESA requires, except in narrow circumstances not present here, that the Secretary make a final decision on the proposed listing within a year. 16 U.S.C. § 1533(b)(6).  Thus, under the ESA, the Secretary was required to publish his final listing determination and critical habitat designation by January 9, 2008.  However, the Secretary missed this deadline as well.  As a result, Conservation Groups again filed suit on March 10, 2008 to compel the issuance of a final rule.  Complaint for Declaratory and Injunctive Relief, Center for Biological Diversity II (No. 08-1339, Dkt. # 1).  Conservation Groups moved for summary judgment on April 2, 2008, and requested that the Court order a final determination to be made no later than May 15, 2008 and, if that determination was positive, that the listing of the polar bear become immediately effective.    In response to Conservation Groups' motion for summary judgment, the Safari Club filed a proposed amicus brief in support of the government and another hunting organization, Conservation Force, moved to intervene as a Defendant.  The Safari Club, stating that it wished to protect its members' interests in continuing to trophy hunt polar bears and continue to import those trophies into the United States, argued that the Secretary should be given additional time beyond that requested by the Conservation Groups to make a final ESA listing decision for the polar bear.  Amici Curiae Brief of Safari Club International and Safari Club International Foundation, Center for Biological Diversity II (No. 08-1339, Dkt. # 23).

On April 28, 2008, the District Court for the Northern District of California granted Conservation Groups' Motion for Summary Judgment, finding the Secretary and the Service in violation of the ESA for failing to publish a final listing decision for the polar bear by January 9, 2008.  Center for Biological Diversity II, WL 1902703, at *2.

The Court ordered the Secretary and the Service to publish a final listing determination for the polar bear by May 15, 2008, and to make any final regulation effective upon publication pursuant to 5 U.S.C. § 553(d)(3).  Center for Biological Diversity II, 2008 WL 1902703, at *3-*4.  The Court denied Safari Club's request to file an amicus brief and Conservation Force's motion intervene as moot.  Id. at *5.

Shortly after the Court issued its ruling, both Safari Club and Conservation Force separately moved for reconsideration of the Court's order and Safari Club lodged another proposed amicus brief.  Second Amici Curiae Brief of Safari Club International and Safari Club International Foundation on Issue of Reconsideration of Remedy Order, Center for Biological Diversity II (No. 08-1339, Dkt. # 42).  Specifically, the Safari Club requested that the Court reconsider its decision to order that the listing decision be made effective immediately in order to allow the importation of polar bear trophies by its members.  Id. at 2.  Conservation Force also filed a brief requesting that the Court extend the period in which hunting trophies could be imported.  See Intervenor's Notice of Motion and Motion for Leave to File Motion for Reconsideration of April 28, 2008 Order for the Limited Purpose of Allowing Continued Import of Lawfully Acquired Hunting Trophies; Memorandum of Points and Authorities in Support Thereof, Center for Biological Diversity II (No. 08-1339, Dkt. # 56).

On May 13, 2008 the Court denied the request to reconsider its order but granted Safari Club's motion to file its amicus brief and Conservation Force's motion to intervene.  See Amended Order Granting Motions to Shorten Time, Granting Safari Club's Motion for Leave to File an Amicus Brief and Granting for Limited Purposes Conservation Force's Motion to Intervene, Center for Biological Diversity II (No. 08-

1339, Dkt. # 69).  The Court also ordered that the parties provide the Court with further briefing on the effect that listing the polar bear under the ESA would have on the ability of Safari Club's members to import polar bear trophies into the United States.

**B.      The Final Listing Rule Challenged in this Action**

On May 15, 2008, the Secretary published the Final Listing Rule, listing the polar bear as a threatened species throughout its range due to the rapid warming of the Arctic and melting of the bear's sea-ice habitat.  73 Fed. Reg. 28,212.  The Secretary found

> Polar bears have evolved in a sea ice environment that serves as an essential platform from which they meet life functions. Polar bears currently are exposed to a rapidly changing sea ice platform, and in many regions of the Arctic already are being affected by these changes. Sea ice changes are projected to continue and positive feedbacks are  expected to amplify changes in the arctic which will hasten sea ice retreat. These factors will likely negatively impact  polar bears by increasing energetic demands of seeking prey. Remaining members of many populations will be redistributed, at least seasonally, into terrestrial or offshore habitats with marginal values for feeding, and increasing levels of negative bear-human interactions. Increasing nutritional stress will coincide with exposure to numerous other potential stressors. Polar bears in some regions already are demonstrating reduced physical condition, reduced reproductive success, and increased mortality. As changes in habitat become more severe and seasonal rates of change more rapid, catastrophic mortality events that have yet to be realized on a large scale are expected to occur. Observations of drownings and starved animals may be a prelude to such events. These changes will in time occur throughout the world-wide range of polar bears. Ultimately, these interrelated factors will result in range-wide population declines.

73 Fed. Reg. 28,275.

Government scientists project that two third of the world's bears will be gone by the middle of this century, and caution that this projection may be overly optimistic due to the more rapid than predicted melting of the sea ice.  73 Fed. Reg. 28,274.  The Secretary further concluded "polar bears today contend with harvest, contaminants, oil and gas development, and additional interactions with humans that they did not experience in [the

past]….Thus, both the cumulative effects of multiple stressors and the rapid rate of climate change today create a unique and unprecedented challenge for present-day polar bears…" 73 Fed. Reg. 28256.

Concurrently with the final listing rule, the Secretary then issued a regulation pursuant to Section 4(d) of ESA, which authorizes activities that harm polar bears and would otherwise be prohibited by Section 9 of the ESA and its implementing regulations. Endangered and Threatened Wildlife and Plants, Special Rule for the Polar Bear, 73 Fed. Reg. 28,306 (May 15, 2008) ("4(d) Rule"); 40 C.F.R. § 17.40(q).

### C.    Current and Prospective Litigation Over the Polar Bear Listing Rule and 4(d) Regulation

As discussed above, before commencing the present action in this Court, the Safari Club filed an amicus brief and motion for reconsideration of the Northern District of California's order in Center For Biological Diversity II.  In response to the Court's May 13 Order, the Service and Conservation Groups both filed briefs regarding the hunting issue, as did Conservation Force and the Safari Club.  Having filed this action on May 23, 2008, the Safari Club submitted a two-page brief primarily concerned with arguing that the Safari Club is not bound by the Court's ruling on this issue in Center for Biological Diversity II in the Northern District of California.  Response and Clarification of Safari Club International et al. to Briefs on Importation of Polar Bear Trophies, Center for Biological Diversity II (No. 08-1339, Dkt. # 91).

Immediately following the listing decision, the Conservation Groups also filed an amended Complaint in the Northern District of California, adding challenges to the legal validity of the 4(d) Rule under the Administrative Procedures Act ("APA") and the National Environmental Protection Act ("NEPA").  The court in California is currently

considering motions related to Conservation Groups' amended complaint and has not yet issued any ruling in response to the further briefing it requested on the hunting issue raised by Safari Club.

In addition, on May 15, 2008, the Conservation Groups filed a notice of intent to sue pursuant to the citizen suit provisions of the ESA, 16 U.S.C. § 1540(g), which details the Secretary's violations of the ESA by failing to use the best available science in determining that polar bears were "threatened" rather than "endangered" in all or parts of their range; failing to designate critical habitat for the polar bear concurrently with the Final Listing Rule, 16 U.S.C. § 1533(a)(3)(A)(i); and issuing the 4(d) Rule in contravention of ESA requirements, 16 U.S.C. § 1533(d). In the Joint Case Management Statement filed in Center for Biological Diversity II, the Parties agree that the Conservation Groups shall file a Second Amended Complaint incorporating these claims no later than July 25, 2008, and that the case shall be resolved on cross motions for summary judgment. Joint Case Management Statement, Center for Biological Diversity II (No. 08-1339, Dkt. # 102).

On May 23, 2008, the Safari Club filed this action. The Safari Club's case currently consists of four claims for relief, challenging the fact that the listing of the polar bear as threatened under the ESA creates a ban on the import of trophy-hunted polar bear parts under the Marine Mammal Protection Act, 16 U.S.C. §§ 1361 et seq. ("MMPA"). Complaint, Dkt. # 1. The Safari Club's current claims are brought pursuant to Administrative Procedure Act, 5 U.S.C. §§ 551 et seq. and the MMPA. However the Safari Club intends to bring additional claims pursuant to the ESA:

> SCI and SCIF intend, shortly after the filing of this Complaint, to submit a 60-day notice letter to the Secretary and the Service regarding violations

of the ESA in adopting the Final Rule, as required by the citizen suit
provision of the ESA. 16 U.S.C. § 1540(g). After expiration of the 60
days, if the Secretary and the FWS have not remedied the violations, SCI
and SCIF may bring an action in this Court through the supplementation
of this Complaint.

Id. ¶ 19.

### D.    The Movant Conservation Organizations

The Center for Biological Diversity is a national nonprofit conservation
organization with 160,000 members and supporting online activists. Declaration of
Kieran Suckling in Support of Motion to Intervene ("Suckling Decl.") ¶ 9 (attached
hereto as Exhibit A). The Center's primary mission is the protection of imperiled
species, such as the polar bear, and their habitats. Id. ¶ 2.

The Natural Resources Defense Council ("NRDC") is a national nonprofit
environmental organization with approximately 421,550 members nationwide. NRDC
uses law, science and the support of its members to ensure a safe and healthy
environment for all living things. Declaration of Linda Lopez in Support of Motion to
Intervene ("Lopez Decl.") ¶ 4 (attached hereto as Exhibit B). One of NRDC's top
priorities is the protection of  threatened and endangered species such as the polar bear.
Id. ¶ 9.

Greenpeace, Inc. is an international nonprofit environmental organization with
about 250,000 members in the United States. Declaration of Melanie Duchin in Support
of Motion to Intervene ("Duchin Decl.") ¶ 2 (attached hereto as Exhibit C).
Greenpeace's mission is to raise public awareness of environmental problems and
promote changes that are essential to a green and peaceful future. Id. For the past
decade, Greenpeace has worked to raise awareness of the effects of global warming in the

Arctic, including the impacts on polar bears and other species who are threatened by continued global warming.  Id.

As discussed further below, the Conservation Groups and their members have significant professional and personal interests in the polar bear, its habitat, and its protection. Suckling Decl., Lopez Decl., Duchin Decl., Declaration of  Jack Lentfer in Support of Motion to Intervene (attached hereto as Exhibit D).

**ARGUMENT**

## I.     CONSERVATION GROUPS ARE ENTITLED TO INTERVENE AS OF RIGHT

The D.C. Circuit uses the following four-part test to evaluate motions to intervene as of right: "(1) the application to intervene must be timely; (2) the applicant must demonstrate a legally protected interest in the action; (3) the action must threaten to impair that interest; and (4) no party to the action can be an adequate representative of the applicant's interests."  S.E.C. v. Prudential Sec., Inc., 136 F.3d 153, 156 (D.C. Cir. 1998); see also Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1074 (D.C. Cir. 1998).  Rule 24(a) is construed liberally in favor of granting intervention. Nuesse v. Camp, 385 F.2d 694, 702 (D.C. Cir. 1967); see also The Wilderness Soc'y v. Babbitt, 104 F. Supp.2d 10, 18 (D.D.C. 2000) (noting that "the D.C. Circuit has taken a liberal approach to intervention") (citing NRDC v. Costle, 561 F.2d 904, 910-911 (D.C. Cir. 1977)). Following its liberal application of Rule 24, this Court and the D.C. Circuit routinely grant conservation organizations' motions to intervene where they have an interest in pending litigation.[1]

---

[1] See, e.g. George E. Warren Corp. v. EPA, 159 F.3d 616 (D.C. Cir. 1998), as amended by 164 F.3d 676 (D.C. Cir. 1999) (three environmental groups authorized to intervene on EPA's behalf in industry challenge to EPA air rules); Wilderness Soc'y v. Morton, 463 F.2d 1261 (D.C. Cir. 1972) (Canadian environmental

Conservation Groups' Motion should be granted because they clearly meet the standard set forth in Federal Rule of Civil Procedure 24(a)(2), and the D.C. Circuit's test for intervention as reviewed below.

### A.    The Motion to Intervene is Timely

The timeliness of a motion to intervene depends on "consideration of all of the circumstances, especially weighing the factors of time elapsed since the inception of the suit, the purpose for which intervention is sought, the need for intervention as a means of preserving the applicant's rights, and the probability of prejudice to those already parties to the case." United States v. AT&T Co., 642 F.2d 1285, 1295 (D.C. Cir. 1980).

Here, the Safari Club filed its complaint on May 23, 2008.  Only approximately three weeks have elapsed,  Defendants have not yet answered Plaintiffs' Complaint, no dispositive motions have been filed, and no discovery has been taken.  Because Conservation Groups have filed at the very inception of the case, their motion is clearly timely.  Fund for Animals, Inc. v. Norton, 322 F.3d 728, 735 (D.C. Cir. 2003) (finding motion timely where it was filed "less than two months after plaintiffs filed their complaint and before the defendant's answer was filed").

### B.    Conservation Groups Have a Significant Protected Interest in the Polar Bear

Conservation Groups satisfy the second requirement on Fed. R. Civ. P. 24(a) because they have a significant protected interest in the polar bear, the subject matter of this litigation.  Rule 24(a)(2) requires that an intervenor have an interest that is related "to

---

group allowed to intervene in U.S. environmental group's challenge to Interior Department's compliance with environmental procedures); Nat'l Coal Ass'n v. Uram, 39 Env't Rep. Cas. (BNA) 1624 & n.2, 1994 U.S. Dist. LEXIS 16404, * 1 & n.2 (D.D.C. 1994) (environmental group authorized to intervene in industry challenge to environmental rules, and to act as plaintiff in challenging other aspects of those rules); Kerr-McGee Corp. v. Hodel, 630 F. Supp. 621 (D.D.C. 1986), vacated as moot on other grounds 840 F.2d 68 (D.C. Cir. 1988) (environmental group authorized to intervene in industry litigation challenged alleged government inaction on mining leases).

the property or transaction which is the subject of the action."  When assessing the interest requirement, the D.C. Circuit has adopted a liberal approach, looking to the "policies behind the 'interest' requirement" in the rule, and viewing the rule as a "practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process."  Nuesse v. Camp, 385 F.2d at 700; see also Foster v. Gueory, 655 F.2d 1319, 1324 (D.C. Cir. 1981).  This Circuit has observed that "[t]he right of intervention conferred by Rule 24 implements the basic jurisprudential assumption that the interest of justice is best served when all parties with a real stake in a controversy are afforded an opportunity to be heard."  Hodgson v. United Mine Workers of America, 473 F.2d 118, 130 (D.C. Cir. 1972).

As is apparent from the procedural history described above, Conservation Groups and their members have a clear and legally cognizable interest in this action.  It was Conservation Groups' initial petition to the Secretary that commenced the polar bear listing process.  72 Fed. Reg. at 1065.  Conservation Groups were required to commence two lawsuits to compel the Secretary to follow his obligations under the ESA after he missed the ESA's mandatory deadlines.  Id., 73 Fed. Reg. 28,212.  In addition, during the administrative process, Conservation Groups submitted extensive comments presenting scientific evidence regarding the urgent need to protect the polar bear.  Suckling Decl. ¶ 5.  The original petition and comments focused not just on the threat to polar bears from global warming, but also from other threats including oil and gas development, pollution, and overhunting.  Id.

Conservation Groups also have a substantial interest because their missions encompass the protection of imperiled species and their members have an interest in the

survival and conservation of the polar bear.  The organizational mission of the Center for

Biological Diversity is to "to secure a future for animals and plants hovering on the brink

of extinction, for the wilderness they need to survive, and by extension, for the spiritual

welfare of generations to come."  Suckling Decl. ¶ 2.  One organizational purpose of

NRDC is "[t]o preserve, protect, and defend natural resources, wildlife and the

environment against encroachment, misuse and destruction."  Lopez Decl. ¶ 4.  The

organizational purpose of Greenpeace is to raise public awareness of environmental

problems and promote changes that are essential to a green and peaceful future, and

Greenpeace has campaigned for the protection of the Arctic and Arctic wildlife like the

polar bear for many years.  Duchin Decl. ¶ 2.

      Individual members of the Conservation Groups also have diverse personal and

professional interests in the protection of polar bears and their habitat.  <u>See</u> Suckling,

Lentfer, and Duchin Decls.  Moreover, in <u>Center for Biological Diversity II</u>, no party

questioned Conservation Groups' standing and, in ruling in Conservation Groups' favor,

the Court implicitly affirmed Conservation Groups' standing.  <u>See</u> <u>Fund For Animals</u>,

322 F.3d at 735 (holding that finding of constitutional standing "is alone sufficient to

establish that" intervenor satisfies Rule 24's interest requirement).

      In sum, the Conservation Groups and their members have demonstrated a long-

standing interest in the protection of the polar bear, which easily provides a basis for

intervention in this case.  <u>See</u>, <u>e.g.</u>, <u>Idaho Farm Bureau Fed'n. v. Babbitt</u>, 58 F.3d 1392,

1397 (9th Cir. 1995) ("[a] public interest group is entitled as a matter of right to intervene

in an action challenging the legality of a measure it had supported."); <u>Coalition of</u>

<u>Arizona/New Mexico Counties for Stable Econ. Growth v. Dep't of the Interior</u>, 100 F.3d

837, 841-44 (10th Cir. 1996) (individual's involvement with a species through his activities as a photographer, amateur biologist, naturalist, and conservation advocate amounted to sufficient interest for purpose of intervention in litigation covering the species' listing under the ESA); Sagebrush Rebellion, Inc. v. Watt, 713 F.2d 525, 526 (9th Cir. 1983) (environmental groups' "environmental, conservation and wildlife interests" were sufficient for intervention as a matter of right).

In addition to satisfying the "protected interest" and "impairment" prongs of Rule 24(a), the foregoing discussion shows that Conservation Groups also have standing to defend the final polar bear listing decision from Plaintiffs' challenge. Specifically, Conservation Groups and members can demonstrate injury-in-fact, causation, and redressability. See Fund For Animals, 322 F.3d at 733 (requiring that prospective intervenors demonstrate standing).

As noted, Conservation Groups are environmental organizations whose missions include the protection of imperiled species. Suckling Decl. ¶¶ 1-2; Duchin Decl. ¶; Lopez Decl. ¶¶ 4, 9. Likewise, Conservation Groups' members have significant professional and personal interests in the polar bear, its habitat, and its protection. See Duchin, Lentfer, and Suckling Decls. Conservation Groups' interests are among those interests that the Supreme Court has found sufficient to establish standing. See, e.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 181-82 (2000) (harm to recreation opportunities constitutes injury in fact for purposes of standing); Lujan v. Defenders of Wildlife, 504 U.S. 555, 562-63 (1992) ("desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing"). Indeed, Conservation Groups' standing was not challenged

by the government in either of their prior polar bear cases and was implicitly affirmed by the favorable decisions Conservation Groups obtained from the Court in each case.

The Safari Club's case threatens to harm Conservation Groups' interest because Plaintiffs seek to remove protections currently afforded to this gravely imperiled species. If Plaintiffs are successful, additional polar bears may be killed through trophy hunting. In addition, if the Safari Club were to obtain a favorable decision, that decision may make it harder for Conservation Groups to achieve their objective of providing the polar bear a stronger level of protection, such as being listed as endangered. In addition, a ruling in Safari Club's favor could set a precedent that prevents other species from being automatically considered depleted under the MMPA when those species are listed under the ESA, harming Conservation Groups' interests in protecting other marine mammals. Finally, the harm Conservation Groups face can be redressed by a decision that does not compromise either the protections currently afforded the polar bear or Conservation Groups' claims that the species requires additional protections. Accordingly, Conservation Groups have standing in this case.

**C.    This Action Threatens to Impair Conservation Groups' Interests**

Rule 24(a)'s "impairment" requirement concerns whether, as a practical matter, the denial of intervention will impede the prospective intervenor's ability to protect its interests in the subject of the action. As the Advisory Committee Notes for the 1966 amendments to Rule 24(a) explain, "[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." In keeping with this directive, the D.C. Circuit has observed that

the rule's emphasis on "practical disadvantage" was "designed to liberalize the right to intervene in federal actions." Nuesse, 385 F.2d at 701-02.

There is no question that the disposition of Plaintiffs' claims has the potential to impair Conservation Groups' interests. Plaintiffs challenge the ban on importation of polar bear trophies, which the Secretary put in place as a result of his decision to list the polar bear as threatened under the ESA. Compl. ¶¶ 44-75. Overhunting is currently contributing to the decline of the polar bear, and impairing the Conservations Groups' interest in the protection of the species. In the final listing decision, the Secretary concluded:

> …harvest is likely exacerbating the effects of habitat loss in several populations. In addition, polar bear mortality from harvest and negative bear-human interactions may in the future approach unsustainable levels for several populations, especially those experiencing nutritional stress or declining population numbers as a consequence of habitat change.

73 Fed. Reg. at 28,280; see also 73 Fed. Reg. 28257 ("Once the [Western Hudson Bay] population began to decline, existing harvest rates contributed to the reduction in the size of the population") (internal citation omitted). Prior to the May 15, 2008 ESA listing, polar bears shot from the following populations could be imported into the United States: Southern Beaufort Sea, Northern Beaufort Sea, Viscount Melville Sound (when Canadian harvest moratorium is lifted), Western Hudson Bay, Lancaster Sound, and Norwegian Bay. 50 C.F.R. § 18.30(i)(1). If Plaintiffs are successful in lifting the import ban, polar bears in these populations will once again be more vulnerable to trophy hunting from U.S. trophy hunters, and ultimately, more bears will be killed. Suckling Decl. ¶ 13, Duchin Decl. ¶ 20.

Controlling trophy hunting in Canada is particularly important to the conservation of the polar bear in a rapidly warming Arctic, because scientists expect the high Canadian Arctic to provide a refuge for polar bears as the ice continues to melt. Lentfer Decl. ¶ 14. It is critically important to keep the Canadian archipelago populations as healthy as possible, including protecting them from trophy hunting. Id. Populations in the Canadian archipelago region which would be directly impacted by Plaintiffs' claims include Viscount-Melville Sound, Norwegian Bay, and Lancaster Sound. 73 Fed. Reg. 28,218; 50 C.F.R. § 18.30(i)(1).

A court ruling in Plaintiffs' favor would also harm the procedural and informational interests of the Conservation Groups and their members, who have an interest in seeing the protections of the ESA and MMPA properly applied. Suckling Decl. ¶ 15, Lentfer Decl. ¶ 17. The Conservation Groups interests' would also be harmed should Plaintiffs succeed in forcing a separate rulemaking procedure under the MMPA for polar bears to obtain the same level of protection that they currently enjoy, because the results of such a rulemaking are uncertain, and potentially less protective of the polar bear. Suckling Decl. ¶ 15. A finding in Safari Club's favor could set a precedent reducing the protection available not just to polar bears, but to all other marine mammals treated as "depleted" under the Marine Mammal Protection Act by virtue of being listed as endangered or threatened under the ESA. Suckling Decl. ¶ 14; see Nuesse, 385 F.2d at 319 (recognizing that "*stare decisis* principles may in some cases supply the practical disadvantage that warrants intervention as of right").

Plaintiffs also indicate that they intend to submit a sixty-day notice letter under the ESA "regarding violations of the ESA in adopting the Final Rule" and may bring an

action in this Court through the supplementation of this Complaint."  Compl. ¶ 19.  If Plaintiffs are successful in overturning or weakening the final listing rule, polar bears will be far more vulnerable to further decline and extinction, which clearly harms the Conservation Groups' interest in protecting the species.  Suckling Decl. ¶ 16, Lentfer Decl. ¶ 18.  Finally, any decision in Plaintiffs' favor could also set a precedent that would lead to further weakening of the existing protections the Secretary has put in place for the polar bear and make it harder to establish the additional protections Conservation Groups are working to secure for the species.

Courts have repeatedly found environmental organizations' interests of sufficient risk of impairment to sustain intervention for environmental groups in suits such as this.  In Idaho Farm Bureau Federation, the Ninth Circuit held that a disposition of the action in favor of plaintiffs resulting in the delisting of the Bruneau Hot Springs Snail "would impair [intervenor's] ability to protect their interest in the Springs Snail and its habitat."  58 F.3d at 1398.  In Coalition of Arizona/New Mexico Counties for Stable Economic Growth, the Tenth Circuit held that intervenor's interest in the protection of the Mexican spotted-owl would, "as a practical matter," be impaired by a ruling in favor of the plaintiffs to delist the owl "by the stare decisis effect of the district court's decision, not to mention the direct effect of a possible permanent injunction."  100 F.3d at 844; see also Nuesse, 385 F.2d at 319 (recognizing "stare decisis principles" as basis for intervention).

**D.    Conservation Groups' Interests Are Not Adequately Represented by the Existing Parties**

The Supreme Court has explained that the "inadequate representation" requirement of Rule 24(a) "is satisfied if the applicant shows that representation of his

interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." Trbovich v. United Mine Workers of America, 404 U.S. 528, 538 n.10 and acc. text (1972) (citation omitted).  Under this lenient approach, representation may be inadequate where the interests of the party seeking intervention and those of the existing party are "different," even if they are not "wholly 'adverse,'" Nuesse, 385 F.2d at 703, or where they are "similar but not identical." American Tel. & Tel. Co., 642 F.2d 1285, 1293 (D.C. Cir. 1980).  Indeed, "the [D.C. Circuit] Court of Appeals has stated that 'the burden is on those opposing intervention to show that representation for the absentee will be adequate.'" Alexander v. FBI, 186 F.R.D. 21, 31 (D.D.C. 1998) (quoting American Tel. & Tel., 642 F.2d at 1293).

This standard is met here because the Defendants do not represent Conservation Groups' interests in this case.  The D.C. Circuit has frequently recognized that governmental representation of private intervenors may be inadequate, particularly where the private intervenors can be expected to make different arguments from their governmental counter-parts.  Fund for Animals, 322 F.3d at 736; Dimond, 792 F.2d at 193.  In this case, there can be little doubt that that government will not represent Conservation Groups interests given the past and continuing litigation between Conservation Groups and the Defendants over the polar bear listing.  See, e.g., Idaho Farm Bureau Fed'n, 58 F.3d at 1398 (noting that the FWS was unlikely to adequately represent Conservation Groups who had "compelled FWS to make a final decision by filing a lawsuit").

For these reasons, this Court should not hesitate to grant intervention as of right pursuant Rule 24(a).

## II. IN THE ALTERNATIVE TO INTERVENTION OF RIGHT, PERMISSIVE INTERVENTION IS WARRANTED

Should this Court find that Conservation Groups are not entitled to intervene as of right under Rule 24(a), Conservation Groups move that this Court grant permission to intervene pursuant to Federal Rule of Civil Procedure 24(b). Rule 24(b)(2) provides that:

> Upon timely application anyone may be permitted to intervene in an action . . . when an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

The D.C. Circuit has stated that permissive intervention may be granted in the court's discretion if the proposed Intervenor presents "(1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action." E.E.O.C. v. Nat'l Children's Ctr., Inc., 146 F.3d 1042, 1046 (D.C. Cir. 1998). Additionally, permissive intervention must not "delay or prejudice the adjudication of the rights of the original parties." Fed. R. Civ. P. 24(b)(2). Like intervention of right, permissive intervention is to be granted liberally. E.E.O.C., 146 F.3d at 1045 (permissive intervention granted where intervenor has substantial interest at stake even if no common claim or defense claimed; "flexible interpretations" of rule appropriate in favor of intervention); Nuesse, 385 F.2d at 704-06 (D.C. Circuit eschews strict reading of rules to advance policy favoring liberal allowance of permissive intervention).

Conservation Groups easily meet all of these requirements. As discussed above in the context of intervention as of right, Conservation Groups' motion is timely and existing parties will not be prejudiced. The Court has jurisdiction over Conservation Groups and their defenses, as they all involve issues of federal law in defending against

the Plaintiffs' claims under federal law.  Lastly, Conservation Groups' defenses are in

common with Plaintiffs' claims both in law and fact, as they address the exact matter

raised by Plaintiffs – the implications of listing of the polar bear under the ESA.

## CONCLUSION

For the reasons set forth above, Conservation Groups respectfully request that this

Court grant their motion to intervene as of right or, in the alternative, permissive

intervention.

Respectfully submitted,

_____/s/  Benjamin Longstreth_____
Benjamin Longstreth (DC Bar # 974015)
Andrew Wetzler
Natural Resources Defense Council
1200 New York Ave., N.W. Suite 400
Washington, D.C. 20005
Telephone: 202-289-6868
Facsimile: 202-289-1060
blongstreth@nrdc.org
awetzler@nrdc.org

Michael Senatore (DC Bar # 453116)
Center for Biological Diversity
1601 Connecticut Avenue, N.W., Suite 701
Washington, D.C.  20009
Telephone:  202-232-1216
Facsimile:  202-232-1217
msenatore@biologicaldiversity.org

Brendan Cummings
Kassia Siegel
Center for Biological Diversity
P.O. Box 549
Joshua Tree, CA 92252
Telephone:  760-366-2232
Facsimile:  760-366-2669
bcummings@biologicaldiversity.org
ksiegel@biologicaldiversity.org

Dated: June 16, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on this date, June 16, 2008, I caused to be served a true and correct copy of the following documents:

**Intervenor-Conservation Groups' Motion to Intervene as Defendants and Memorandum in Support**

**[Proposed] Answer of Intervenor Defendants Center for Biological Diversity, Natural Resources Defense Council, and Greenpeace, Inc. to Plaintiffs' Complaint**

**Corporate Disclosure Statement**

by first-class mail on the following counsel:

Douglas Scott Burdin
Safari Club International
501 2nd Street, NE
Washington, DC 20002

Kristen Byrnes Floom
U.S. DEPARTMENT OF JUSTICE
601 D Street, NW
3rd Floor
Washington, DC 20004

_____*/s/ Benjamin Longstreth*_____
Benjamin Longstreth

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**Civil Action No. 1:08-cv-00881 EGS**

# EXHIBIT A

# Declaration of Kieran Suckling in Support of Motion to Intervene

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SAFARI CLUB INTERNATIONAL, et al.,**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**DIRK KEMPTHORNE, et al.,**<br><br>**Defendants,**<br><br>**and**<br><br>**CENTER FOR BIOLOGICAL DIVERSITY,**<br>**1333 N. Oracle Rd.**<br>**Tucson, AZ 85705**<br><br>**NATURAL RESOURCES DEFENSE COUNCIL,**<br>**40 West 20th Street**<br>**New York, NY 10011**<br><br>**GREENPEACE, Inc.,**<br>**75 Arkansas St.**<br>**San Francisco, CA 94107**<br><br>**Intervenor-Defendant –Applicants.** | **Civil Action No. 1:08-cv-00881 EGS** |

## DECLARATION OF KIERAN SUCKLING IN SUPPORT OF
## MOTION TO INTERVENE

I, KIERAN SUCKLING, declare as follows:

1.      I am the Executive Director and founder of the Center for Biological Diversity (the "Center").  This declaration is made in support of the Motion to Intervene in this action filed by the Center for Biological Diversity, Natural Resources Defense Council, and Greenpeace.  I have personal knowledge of the facts and statements contained herein and, if called as a witness, could and would competently testify thereto.

2.      The Center is a non-profit corporation with offices in San Francisco, Joshua Tree, Sacramento and Los Angeles, California; Tucson and Phoenix, Arizona;

1

Silver City and Pinos Altos, New Mexico; Portland, Oregon; Chicago, Illinois; Las Vegas, Nevada; Duluth, Minnesota; Richmond, Vermont; and Washington, DC. The Center works to protect wild places and their inhabitants, including the polar bear. The Center believes that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked. Combining conservation biology with litigation, policy advocacy, and strategic vision, the Center is working to secure a future for animals and plants hovering on the brink of extinction, for the wilderness they need to survive, and by extension, for the spiritual welfare of generations to come. In my role as Executive Director, I oversee all aspects of the Center's conservation work.

3.      Since I helped found the organization in 1989, the Center has grown significantly in staff and members. It has also developed several different practice areas and programs. One such program is the "Climate, Air and Energy Program ("Climate Program"), a program with the primary mission of curbing global warming and sharply limiting its damaging effects on endangered species and their habitats.

4.      One of the Climate Program's core strategies is to protect species most imperiled by global warming and work to encourage management agencies such as the Department of Interior to improve management for these species and take global warming impacts into account when making decisions affecting species. Advocating for the protection of the polar bear has been a focal point of these efforts.

5.      The Center has worked extensively on protecting the polar bear and its Arctic sea-ice habitat, which is quickly disappearing due to greenhouse gases and global warming. In February 2005, the Center petitioned the Secretary of Interior and U.S. Fish and Wildlife Service to list the polar bear as a threatened species under the Endangered Species Act ("ESA"). The petition contained extensive information on the threat to polar bears from global warming, overhunting, oil and gas development, pollution, and other threats. The Natural Resources Defense Council and Greenpeace joined the petition in July 2005, and since then our three organizations have filed several lawsuits to compel

2

the U.S. Fish and Wildlife Service ("FWS") to comply with the ESA and protect the polar bear to the fullest extent possible under the law. We have submitted comments and additional information in support of listing the polar bear on numerous occasions, including on July 5, 2005, October 12, 2005, December 22, 2005, March 24, 2006, June 15, 2006, April 6, 2007, and October 19, 2008. Our campaign to save the polar bear also includes extensive public outreach and education by writing, posting and disseminating information through our website, opinion editorials, and other outlets on the plight of the polar bear and global warming's dire impact on the Arctic. The Climate Program director and lead author of the polar bear petition has also testified several times before Congressional committees on global warming and its impact on the Arctic ecosystem and the polar bear.

6.     Our efforts to protect the polar bear under the law have proven successful, culminating in the listing of the polar bear as a threatened species on May 15, 2008. This was an important victory for the Center and is a necessary first step in protecting the polar bear and its habitat. The ESA listing provides strong and broad protections that increase the chances that the polar bear and its habitat will survive in the wild.

7.     While the recent listing of the polar bear provides important and necessary protections for the species, we are also working to ensure that the species receives the full protections to which it is entitled under the ESA. These efforts include a legal challenge to FWS' rule promulgated under Section 4(d) of the ESA, 16 U.S.C. § 1533(d), which purports to reduce the protections afforded the polar bear under the ESA. See Center for Biological Diversity v. Kempthorne, Case No. C-08-1339-CW (N.D. Cal.). We have also submitted a 60-day notice of intent to sue as required by the ESA before bringing additional challenges regarding FWS's failure to fully protect the polar bear under the ESA. These claims include challenges to the substance of the 4(d) rule, as well as regarding FWS's failure to designate critical habitat for the polar bear and failure to list

the polar bear as "endangered" rather than the less-protective "threatened" status they currently have.

8.      Having initiated the ESA listing process for the polar bear in 2005, we have dedicated substantial organization resources toward seeking full protection for the species under the ESA.  Any legal challenge to the protections we have helped obtain for the polar bear, threatens to undo or undermine these protections, and consequently threatens our organizational interests in the polar bear, and the interests of our members.

9.      The Center advocates for the protection of polar bears on behalf of itself and its more than 160,000 members and supporting online activists  The Center members and supporting activists throughout North America, including in Alaska and Canada, are vitally concerned with polar bear conservation.  The Center has members who have viewed and plan to view polar bears in the future, and who have educational, moral, spiritual, scientific, ecological and/or recreational interests in the polar bear.  The Center's members, in and outside of, Alaska and the Arctic also enjoy the biological, scientific, recreational, and/or aesthetic values of the areas inhabited by these species.  I have been contacted on numerous occasions by Center members who have encouraged the Center to take all possible actions to protect the polar bear.

10.      The Center has a long history of advocating for the protection of polar bears in the Southern Beaufort Sea population which is shared between Alaska and Canada.  The Center has filed multiple comment letters and lawsuits seeking to protect these bears from the impacts of oil development.  This population is now declining and is showing some of the earliest ill-effects of global warming, including drowning, starving, reduced cub survival, and hungry bears resorting to cannibalism.  This population is also subject to trophy hunting in Canada, with many of the hunters (at least prior to May 15, 2008) being U.S. citizens who would generally seek to import their trophies into the U.S. Given importation of polar bear carcasses into the U.S. is now prohibited, it is highly unlikely that U.S. trophy hunters will continue to kill bears from this population.

4

11.    The Center's interest in polar bears extends beyond the bears in the Southern Beaufort Sea population.  The Center has members who have visited and intend to return to visit polar bear habitat in Alaska and Canada occupied by bears in populations subject to trophy hunting.  Many of our members have visited Churchill, Canada to view polar bears from the Western Hudson Bay population.  This population is perhaps the most impacted by global warming to date, having declined by over 20% since the late 1980s as the sea-ice season in Hudson Bay has diminished.  This population is also overhunted.  Many of the hunters who kill bears from this population have been (at least prior to May 15, 2008) U.S. citizens who would generally seek to import their trophies into the U.S.  Given importation of polar bear carcasses into the U.S. is now prohibited, it is highly unlikely that U.S. trophy hunters will continue to kill bears from this population.

12.    Plaintiffs' claims in this lawsuit threatens the Center's and our members' interests in protection of polar bears.  While Plaintiffs' current claims concern only the imports of sport-hunted polar bear trophies, Plaintiffs have indicated that they will file a notice letter and seek to amend in additional claims regarding the listing decision.  However, even if Plaintiffs' case only concerns the question of whether or not trophy hunted polar bear trophies may be imported, any judicial decision on this issue would impact the Center and its members.

13.    As mentioned above, U.S. trophy hunters have regularly killed polar bears from the Southern Beaufort Sea, Western Hudson Bay and other populations.  These populations are declining, both as a result of global warming, and (in the case of Western Hudson Bay) as a result of unsustainable harvest.  The Center believes that the prohibition of the importation of polar bear carcasses will likely mean that far fewer U.S. trophy hunters will kill polar bears as they will no longer be able to import their trophies.  Ultimately, this will likely lead to a reduction in the number of polar bears killed.

14.    A court ruling agreeing with Plaintiffs' position and allowing polar bear carcasses to be imported into the U.S. once again will likely result in a resumption of polar bear hunting by U.S. citizens and renewed harvest pressure on polar bears. Such impacts would harm the interests of the Center and its members. Such a court ruling would also have legal implications beyond the polar bear as it would address the relationship between the ESA and Marine Mammal Protection Act ("MMPA"), and could consequently lessen the protections for all ESA-listed marine mammals, as these species would no longer be subject to the protections provided by "depleted" status under the MMPA.

15.    A court ruling in Plaintiffs' favor would also harm the procedural and informational interests of the Center and its members, as to obtain the same level of protection for polar bears that they currently enjoy, would require a separate rulemaking under the MMPA, the results of which are uncertain and potentially less protective of the polar bear.

16.    Moreover, because Plaintiffs have indicated that they will broaden their challenge of the final listing rule for polar bears, this case threatens to impair additional interests of the Center and its members in the current protections afforded the species under the ESA and MMPA. The Center and its members will be irreparably harmed if the listing decision for the polar bear is overturned or modified to reduce protections that the polar bear desperately needs from greenhouse gas emissions and global warming, oil development and oil spills, overhunting, and other threats. If the polar bear is stripped of its threatened status, or if the protections of the listing are reduced, there would be far less to prevent the decline and extinction of this species. Thus Plaintiffs' lawsuit threatens the Center's interests both in protecting the polar bear and in carrying out our broader organizational goals of preserving biological diversity.

17.    The Center does not believe that Defendants adequately represent the Center's interests in protecting the polar bear. The current ESA protection for the polar

bear only came about after a petition and subsequent litigation by the Center against Defendants to force them to impose statutorily-mandated protections for the species. As described above, the Center is also currently in litigation against Defendants over the inadequacy of current protective measures for the species under the ESA.

18.    If the Center is not allowed to intervene in this action, its ability to carry out its mission and protect its members' interests, as described above, will be severely impeded.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 12, 2008, at Tucson, Arizona.

_____
KIERAN SUCKLING

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**Civil Action No. 1:08-cv-00881 EGS**

# EXHIBIT B

# Declaration of Linda Lopez in Support of Motion to Intervene

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**SAFARI CLUB INTERNATIONAL, et al.,**

**Plaintiffs,**

**vs.**

**DIRK KEMPTHORNE, et al.,**

**Defendants,**

**and**

**CENTER FOR BIOLOGICAL DIVERSITY,**
**1333 N. Oracle Rd.**
**Tucson, AZ  85705**

**NATURAL RESOURCES DEFENSE COUNCIL,**
**40 West 20th Street**
**New York, NY 10011**

**GREENPEACE, Inc.,**
**75 Arkansas St.**
**San Francisco, CA 94107**

**Intervenor-Defendant –Applicants.**

Civil Action No. 1:08-cv-00881 EGS

**DECLARATION OF LINDA LOPEZ IN SUPPORT OF
MOTION TO INTERVENE**

I, LINDA LOPEZ, declare as follows:

1.       I have personal knowledge of the facts stated herein and, if called upon to

testify, could and would give competent testimony thereto.

2.       I am the Director of Membership and Public Education for the Natural

Resources Defense Council ("NRDC").  I have been the Director of Membership and

Public Education for 21 years.  My duties in this position include supervising the

.

1

maintenance and updating of NRDC's membership database, which is a listing of those persons who are members of NRDC.

3.      NRDC is a New York not-for-profit membership corporation, recognized under section 501(c)(3) of the United States Internal Revenue Code.  NRDC has offices in New York, Washington, D.C., San Francisco, Santa Monica, Chicago, and Beijing.

4.      NRDC's certificate of incorporation states that one of NRDC's purposes is "[t]o preserve, protect and defend natural resources, wildlife and the environment against encroachment, misuse and destruction" and "[t]o take whatever legal steps may be appropriate and proper to carry out the foregoing purposes."

5.      NRDC's membership database is maintained in computer format at Public Interest Data, Inc., 1800 Diagonal Road, Suite 400, Alexandria, Virginia, 22314.  I and the staff of NRDC's Membership and Public Education work at the NRDC's headquarters located at 40 West 20th Street, New York, NY 10011.  The membership database is accessible by computer from the NRDC office.

6.      NRDC's by-laws state that: "[u]nless otherwise directed by the Board of Trustees, a person shall become a member . . . by submitting a membership application offered by the Corporation or by making a contribution to the Corporation accompanied by a statement requesting membership in the Corporation."

7.      Membership in NRDC is renewed on an annual basis through payment of renewal membership dues.

8.      A typical NRDC membership sign-up form states, "YES, I WANT TO JOIN NRDC.  Please take legal action and wage campaigns on my behalf to defend our planet's endangered wildlife, wilderness, and environment."  The membership sign-up

form states further that NRDC's work depends in part on our members' "participation in our citizen lawsuits."

9.    The protection of threatened species is an important part of NRDC's institutional mission.  In keeping with this mission, NRDC regularly campaigns for the protection of polar bears.  NRDC maintains a "Polar Bear SOS" website (www.polarbearsos.org) that features news updates, action alerts, and educational materials concerning the protection of polar bears.  NRDC members are also updated on issues impacting polar bears through information available on the NRDC website, annual reports, the quarterly On Earth magazine, and other mailings.  The participation and input that we have received from members demonstrates that polar bear preservation issues are among the most important issues to our members.

10.    NRDC has more than 421,550 members nationwide.  There are NRDC members residing in each of the fifty United States and in the District of Columbia and Puerto Rico.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on June 12, 2008, at New York, New York.


_____
LINDA LOPEZ

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
Civil Action No. 1:08-cv-00881 EGS

# EXHIBIT C

# Declaration of Melanie Duchin in Support of Motion to Intervene

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAFARI CLUB INTERNATIONAL, et al.,

Plaintiffs,

vs.

DIRK KEMPTHORNE, et al.,

Defendants,

and

CENTER FOR BIOLOGICAL DIVERSITY,
1333 N. Oracle Rd.
Tucson, AZ 85705

NATURAL RESOURCES DEFENSE COUNCIL,
40 West 20th Street
New York, NY 10011

GREENPEACE, Inc.,
75 Arkansas St.
San Francisco, CA 94107

Intervenor-Defendant –Applicants.

Civil Action No. 1:08-cv-00881 EGS

DECLARATION OF MELANIE DUCHIN IN SUPPORT OF
MOTION TO INTERVENE

I, MELANIE DUCHIN, declare as follows:

1.      I reside in Anchorage, Alaska. I am a member of Greenpeace, Inc. and

have been an employee of Greenpeace, Inc. and its corporate predecessors for over 20

years. I am also a member of the Center for Biological Diversity ("Center"). I rely upon

these organizations to represent my interests in the protection of the environment,

including wildlife such as the polar bear.

1

2.      Greenpeace works to raise public awareness of environmental problems and promote changes that are essential to a green and peaceful future.  There are approximately 250,000 current Greenpeace members in the United States.  Since the 1980's, Greenpeace has been a lead advocacy organization working to raise awareness of global warming and the protection of wildlife, and to advocate for serious cuts in greenhouse gas emissions through local, national and global action.  For the past decade, Greenpeace has campaigned on the causes and impacts of climate change in the Arctic, including the impacts on polar bears and other species who are threatened by continued Arctic warming.  My current position with Greenpeace is as a climate and energy campaigner. In this capacity, I work to document the impacts of global warming on the environment and work for clean energy solutions that will reduce emissions of pollution that cause global warming. Since 1997 my work has had a particular focus on the causes and impacts of global warming in the Arctic, including protection of polar bears and their habitat.

3.      I am also extremely concerned about the protection and preservation of polar bears on a personal level. I choose to live in Alaska in large part because I am close to the Arctic where I am able to observe polar bears and the sea-ice environment on which they depend. As described below I have observed and attempted to observe polar bears in the Arctic many times and plan to continue to do so in the future.

4.      Greenpeace has been working on global warming issues since the late 1980s. Greenpeace has had an office in Anchorage, Alaska since the early 1980s, and staff in that office have historically campaigned on oil and climate issues, including the impact of oil drilling and global warming on ice dependent species such as polar bears. In

the early 1990s, Greenpeace campaigned to halt oil exploration and drilling in the

Chukchi and Beaufort Seas, in part because of its impact on polar bears.

5.     In the late 1990s, Greenpeace campaigned to end new oil exploration in

the Arctic Ocean off the north coast of Alaska, in part to protect polar bears and other ice

dependent species not only from the direct impacts of oil exploration, extraction and

transportation, but also from the impacts of global warming that would be exacerbated

when that oil is burned. Greenpeace sent its icebreaker, Arctic Sunrise, to the Alaskan

Arctic every summer from 1997 through 2000 to oppose offshore oil drilling in the Arctic

Ocean as well as to document the impacts of global warming on polar bears, Pacific

walrus and other ice dependent species.                                    .

6.     In 2005 and 2006, two Greenpeace volunteers attempted the first ever

summer expedition to the North Pole to highlight the impact of global warming on polar

bears. Greenpeace has a long and continuous history working on energy and climate

issues in the United States and abroad, with a particular focus on the Arctic and the

wildlife that live there, including polar bears.

7.     Also in 2005, the Arctic Sunrise undertook an expedition to Greenland to

highlight the impact of global warming on the Greenland ice sheet, glaciers, and ice

dependent species such as polar bears.

8.     I have traveled extensively in the Arctic both professionally and

recreationally to observe polar bears and their habitat. I have every intention to continue

traveling to the Arctic most summers as I have in the recent past and observing and

attempting to observe polar bears and their sea ice habitat. In total, I have been to the

Arctic at least a dozen times, ranging from ship-based trips lasting longer than a month,

3

to shorter trips to coastal areas, to camping out on a barrier island and on sea ice in the

Beaufort Sea. I have been to the Beaufort Sea at least half a dozen times, including this

year,  and plan to return again in the near future, both on my own and in my work

capacity.

9.      I saw my first polar bear in August, 1997, when I was on the Greenpeace

ship Arctic Sunrise in the Beaufort Sea a few miles offshore from Prudhoe Bay. A polar

bear swam up to the stern of the ship and then climbed up onto a nearby ice floe to get a

better look or smell. This polar bear was so thin its ribs were showing and it was

shivering. This is likely because it was so far from the pack ice and prime hunting

opportunities, because the edge of the pack ice was at least 100 miles distant from where

we spotted this bear. The sight of this bear in such poor condition brought me to tears.

10.      Later on the same expedition, in August and early September I saw at least

three additional polar bears in the pack ice in the Beaufort Sea, including one sow with a

cub. One of the bears I observed was at a recent successful hunting site. These bears were

all very healthy looking compared to the first bear.  I observed polar bears again in 1998,

also on an expedition on board the Arctic Sunrise.

11.      When we were in the Beaufort Sea in August that year, I saw a sow and a

cub walking on the offshore island that the community of Nuiqsut uses for their whaling

camp.  Later on in the expedition the Arctic Sunrise traveled to the Chukchi, Beaufort

and East Siberian Seas. We had scientists on board to observe and count Pacific walrus,

polar bears and black guillemot, so we were looking for areas of the ice edge and pack ice

where those species would be living. I observed polar bears in the Chukchi, Beaufort and

East Siberian Seas, at Wrangell and Herald islands. The bears I observed on this

expedition were healthy looking. I also observed polar bears in August, 1999 and in August, 2000, again on expeditions to the Chukchi and Beaufort seas on the Arctic Sunrise.

12.    In March, 2005, I accompanied Arctic explorers on a training trip to Churchill, Manitoba, Canada. While I did not observe any polar bears in the wild on this occasion, I did attempt to observe the bears and did see their tracks on the pack ice.

13.    In May, 2005, I saw polar bears on the pack ice from the air while flying by helicopter from Sredny to Cape Arctichesky in the Severnaya Zemlya archipelago. At this time I was accompanying two Arctic explorers to the starting point (the northernmost point of Cape Arctichesky) for their attempt of  the first summer expedition to the North Pole.  .

14.    In July, 2005, I saw two solitary polar bears and one sow with two cubs on the pack ice in the Greenland Sea while on board the vessel Arctic Sunrise between Scoresbysund and Daneborg on the northeast coast of Greenland. In addition, I spent July 11-13 at the Zackenberg Environmental Research Station on the northeast coat of Greenland.  When sea ice disappears in summer, some polar bears are stranded on land and roam the Zackenberg Valley and research station in search of food.  Although I did not observe any polar bears in the wild during my time at Zackenberg, I did attempt to observe them while at the station and out on the tundra.

15.    In May, 2008, I traveled to Barrow, Alaska and assisted with ringed seal research on the Beaufort and Chukchi Seas. This involved helping collect seal skin at breathing holes for genetic testing, handling the seal dog, and helping to set nets for trapping seals that would then be measured and tagged by biologists.  I observed ringed

seals basking and polar bear tracks on the sea ice. I also looked for polar bears and other marine mammals that use the sea ice and inhabit the Arctic marine and coastal environments.

16.     I also intend to travel back to the Arctic to view polar bears and other wildlife. Specifically, I intend to return to the Beaufort and/or Chukchi seas in May of 2009 and in subsequent years to help with ringed seal research on the pack ice. I am also writing a proposal to send one of my organization's icebreakers on an ice-edge expedition to the Beaufort, Chukchi and East Siberian Seas in late summer/early fall of 2009. If approved, I will be on board the icebreaker during the expedition. If the ice-edge expedition does not take place in 2009, a similar expedition is virtually certain in 2010 or 2011, and I will be on board. Beyond my professional interest in the Arctic, I also hope to spend some personal recreation time in the Arctic during the summer of 2009 or 2010. Specifically, I intend to organize a rafting trip that concludes at the Arctic Ocean. I enjoy traveling in the Arctic in my personal time to observe wildlife in their natural environment, which includes polar bears and other marine mammals which are dependent on the sea ice.

17.     I am extremely concerned about the health of the environment and the maintenance of biological diversity. I choose to live in Alaska in large part because it puts me closer to the Arctic and polar bear habitat. Being able to visit and appreciate the beauty of the Arctic and the unique species such as polar bears that live there is very important to me. Witnessing the disappearance of the Arctic sea-ice habitat due to global warming and the degradation of polar bear habitat due to oil and gas development has a highly negative psychological impact on me and causes me great sadness.

18.    I am extremely concerned about the survival of polar bears and their sea-ice habitat in the Arctic. I derive great professional, scientific, recreational, aesthetic and spiritual benefit from the existence of this unique animal. I also derive great benefit from the existence and persistence of its Arctic environment. The continued existence of polar bears and their habitat greatly enhances the quality of my life personally, professionally and spiritually.

19.    In recent years I have become increasingly concerned about the threats to the continued existence of polar bears in the wild. Polar bears are threatened by the melting of their sea-ice habitat, a consequence of global warming brought about by society's burning of fossil fuels for energy and the resulting greenhouse gas emissions. Polar bears are also threatened in a number of ways by the proliferation of oil and gas development in their habitat, both onshore and offshore. The risks include the disturbance of denning polar bears, the risk of oiling of polar bears and their prey from oil spills, as well as increased interactions with humans and other forms of industrial disturbance, and increased shipping in the Arctic due to decreasing summertime Arctic sea ice.  Polar bears are also imperiled by over hunting in parts of Canada, Russia, and Greenland.

20.    Many of the polar bears I have seen or whose habitat I have visited are part of the Southern Beaufort Sea population.  This population, which is in many ways the most imperiled of all polar bear populations as it is subject to global warming, oil development, and trophy hunting, is shared between the U.S. and Canada.  It is now declining.  Canada allows bears from this population to be hunted. Prior to the listing of the polar bear, many of the hunters killing bears from this population were from the U.S. The prohibition of importation of sport-hunted bears will likely mean that few if any U.S.

7

hunters will continue to kill bears from this population.  As such, I believe that the

adverse impacts of such hunting on Southern Beaufort Sea bears will be reduced and this

population will have a better chance of persisting in the face of the numerous challenges

to its continued survival.  As such, I will have a greater opportunity to continue to see and

enjoy bears from this population in their habitat in Alaska.

21.     I believe that the U.S. Fish & Wildlife Service's ("FWS") final rule issued

May 15, 2008 listing the polar bear as a threatened species under the Endangered Species

Act helps protect polar bears from these threats and greatly increases the chances that

polar bears will persist in the wild in coming years. For example, the Endangered Species

Act listing ensures that oil and gas development in polar bear habitat will be subject to

more stringent review prior to approval, thereby increasing protection for polar bears

from oil spills and disturbance.  The Endangered Species Act listing also impacts the

ability of trophy hunters to import polar bear parts into the U.S., thereby helping to

address overhunting of polar bears in Canada.

22.     I believe that if the polar bear listing decision is overturned or modified in

a way which decreases protections to polar bears, then the polar bear is more likely, if not

certain, to suffer substantial population declines and to become extinct.  If polar bear

populations decline or become extinct, I will suffer in a number of ways. I believe that

the entire Arctic web of life will be degraded at best and destroyed at worst if it loses the

polar bear and/or its sea-ice habitat which is the underpinning of the entire ecosystem.  I

will also suffer a loss of psychological and spiritual well-being, from knowing that polar

bears are in decline and/or are extinct. I would suffer a professional, aesthetic, spiritual

and recreational loss from my inability to observe and appreciate these animals in the

wild. My enjoyment of the Arctic is diminished when animals are missing from the ecosystem.

23.     My interests are threatened by Plaintiffs' challenge to the FWS's final rule listing the polar bear as a threatened species.  Plaintiffs' challenge to the rule could result in the polar bear losing all or part of the broad and significant protections it needs under the Endangered Species Act.  If this decision is modified or overturned, however, there will be far less to prevent the decline and extinction of this species.   I believe that the final listing decision for the polar bear, at issue in this lawsuit, gives the polar bear a much greater chance of persisting in the wild, and therefore increases the chances that I and others will be able to continue to observe, enjoy, and appreciate this species and its habitat in the Arctic.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 13, 2008, at San Francisco, California

MELANIE DUCHIN

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**Civil Action No. 1:08-cv-00881 EGS**

# <u>EXHIBIT D</u>

# Declaration of Jack Lentfer in Support of Motion to Intervene

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SAFARI CLUB INTERNATIONAL, et al.,** | Civil Action No. 1:08-cv-00881 EGS |
| **Plaintiffs,** | |
| **vs.** | |
| **DIRK KEMPTHORNE, et al.,** | |
| **Defendants,** | |
| **and** | |
| **CENTER FOR BIOLOGICAL DIVERSITY,**<br>**1333 N. Oracle Rd.**<br>**Tucson, AZ 85705** | |
| **NATURAL RESOURCES DEFENSE COUNCIL,**<br>**40 West 20th Street**<br>**New York, NY 10011** | |
| **GREENPEACE, Inc.,**<br>**75 Arkansas St.**<br>**San Francisco, CA 94107** | |
| **Intervenor-Defendant –Applicants.** | |

**DECLARATION OF JACK W. LENTFER
IN SUPPORT OF CONSERVATION GROUPS'
MOTION TO INTERVENE**

I, Jack W. Lentfer, declare as follows:

1.       I reside in Homer, Alaska.  I have been a member of the Natural

Resources Defense Council since 1982 and of the Center for Biological Diversity since

2005.

2.       I am a former employee of both the Alaska Department of Fish and Game

("ADFG") and the U.S. Fish and Wildlife Service ("FWS").  Shortly after joining ADFG

in the early 1960s I became Polar Bear Project Leader and directed polar bear research and management for the State of Alaska.  ADFG's research focused on assessing polar bear distribution, abundance, and life history, including movement patterns, breeding age, breeding interval, litter size, age-specific mortality, and reproductive rate.  Population discreteness was assessed to determine if a single circumpolar population required an international management regime or if a number of discrete populations required separate management regimes by the various polar bear nations.  Research also provided the basis for regulating hunting and defining critical habitat.

3.      The Marine Mammal Protection Act of 1972 ("MMPA") transferred polar bear management authority from ADFG to FWS, which I then joined as FWS's polar bear project leader.   At FWS we continued the research program started by ADFG with additional emphasis on effects of industrial activities, mainly oil exploration and development, in polar bear habitat.

4.      In 1965, while at ADFG, I was a United States representative at the first international polar bear meeting, attended by researchers and managers from the five nations with polar bear populations.  From this meeting evolved the international Polar Bear Specialist Group ("PBSG"), on which I served until 1979.   The group met approximately every two years under the auspices of the International Union for the Conservation of Nature ("IUCN").  We developed a coordinated research program throughout the polar bears' range and, in conjunction with IUCN, began drafting an international polar bear agreement.  I was on the United States negotiating team that finalized the International Polar Bear Agreement in 1973.

5.      From 1973 to 1976 I served on the first Scientific Advisory Committee of the U.S. Marine Mammal Commission ("MMC"), which was established by the MMPA, and served again on the advisory committee in the 1980s.  Following this, I received a presidential appointment as a Commissioner of the MMC.  During my time at the MMC, it dealt with a number of polar bear issues, all of which I was involved with.

6.    The issue of polar bear hunting frequently came up during my professional career, first with ADFG and later at FWS and at the PBSG.  Additionally, the issue of polar bear trophy hunting in Canada, and the effect of the MMPA on that hunting, was an issue before the MMC during my time advising and serving on the Commission.

7.    Since retiring, I have stayed involved with polar bears by reviewing papers for scientific, peer-reviewed journals, advocating for protection of polar bear habitat, serving on a working group to establish a United States-Russian Agreement on Conservation of Polar Bears, assisting on a FWS research project to develop a polar bear census technique, and camping along Alaska's north coast to find dens and photograph bears emerging after winter hibernation.

8.    Polar bears and the Arctic have been major components of my professional and personal life and I have had years of contact with bears in their natural habitat.  In the 1970s I travelled to Hudson Bay Canada at the invitation of Charles Jonkel, a Canadian polar bear biologist to observe polar bears in the wild and work with him on his polar bear research project.

9.    I plan to continue traveling to Arctic Alaska.  Places my wife and I would like to visit in the near future include Teshekpuk Lake and the adjoining Beaufort Sea coastal area and also Kasegaluk Lagoon formed by barrier islands along the Chukchi Sea coast southwest of Icy Cape.  We would hope to be able to observe polar bears in both of these locations.  I also plan to visit the Kaktovik area in the fall when polar bears are concentrated on the beach feeding on bowhead whale carcasses.

10.    Because of my long history of polar bear research and working for polar bear conservation, I am extremely concerned about the threat that global warming poses to polar bears.  The disappearance of sea ice, on which polar bears depend, poses a threat not only to polar bears, but also to the entire Arctic ecosystem, a unique environment that is of great significance to me and that I have dedicated my career to studying and preserving.

3

11.    I am also concerned that the threat posed by global warming may be exacerbated by other stressors on polar bear populations, such as continued hunting in Canada and oil and gas development.

12.    I support the FWS's decision to list the polar bear under the Endangered Species Act, which it published on May 15, 2008, though I believe that, at a minimum, in some locations the polar bear should have been listed as an "endangered," rather than as a "threatened" species.  After more than a year of inaction on its proposed listing rule, I was relieved that the FWS finally listed the polar bear under the Endangered Species Act.  This rule will provide more protection for the polar bear and its disappearing sea ice habitat.

13.    Polar bears are in real need of this protection.  The latest science shows that the Arctic sea ice is melting faster than previously projected, and that the ongoing warming and melting of the Arctic is having a profound negative impact on polar bears.

14.    I am familiar with the projections of sea ice loss and polar bear decline produced by the U.S. Geological Survey ("USGS").  The USGS predicts that the last polar bear refugia will be located in the central part of the Canadian archipelago region, including in areas that are now subject to trophy hunting.  It is vital that the polar bear populations in these potential refugia areas be kept as healthy as possible, and we certainly do not want to be cutting into them with continued trophy hunting.

15.    I am also aware that most polar bear trophy hunters in Canada come from the United States.  I am further aware that FWS has taken the position that, because polar bears are now listed as a threatened species, no further importation of polar bear trophies into the United States is permissible under U.S. law.  Based on my experience as a polar bear biologist and wildlife professional, I believe that if the importation of trophy hunted polar bears into the United States is prohibited, less polar bear hunting will take place in Canada because efforts to solicit replacement hunters from other countries will have limited success.

16.    I know that Safari Club International and the Safari Club International Foundation have filed a lawsuit in an attempt to force the continued importation of polar bear trophies into the United States by U.S. trophy hunters, and that the Safari Club may otherwise challenge the polar bear listing.  As explained above, I believe that, if successful, this lawsuit will diminish the ability of polar bears to survive and, eventually recover throughout the Arctic by unnecessarily reducing polar bear populations in their most important potential refugia.

17.    As a former MMC Commissioner, I am also aware of the procedural requirements that the Marine Mammal Protection Act imposes on the federal government to protect species listed and endangered or threatened under the Endangered Species Act. I believe that these requirements are a vital part of the Marine Mammal Protection Act and as a wildlife professional, someone who cares about polar bears, and a citizen, I have in interest in seeing those procedures correctly applied to the polar bear.

18.     The listing of the polar bear under the Endangered Species Act provides much needed protection to this species.  If the protections of the Endangered Species Act relating to trophy-hunting or other threats are weakened through this lawsuit, the polar bear will lose these important protections.  If this happens, I believe the polar bear is more likely to become extinct. The extinction or substantial decline of polar bears would deprive me of my ability to observe and appreciate polar bears in their natural habitat and would harm my professional, scientific, recreational, and aesthetic interests. I am therefore directly harmed by Plaintiffs' suit.

19.  I depend upon NRDC and the Center for Biological Diversity to represent my interests in the protection and preservation of imperiled species and their habitats, including polar bears, and to represent my interests in this lawsuit.

///

///

I declare under penalty of perjury that the foregoing is true and correct and was executed on June 13th at Homer, Alaska.

Jack W. Lentfer

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SAFARI CLUB INTERNATIONAL, et al.,** | **Civil Action No. 1:08-cv-00881 EGS** |
| **Plaintiffs,** | |
| **vs.** | |
| **DIRK KEMPTHORNE, et al.,** | |
| **Defendants,** | |
| **and** | |
| **CENTER FOR BIOLOGICAL DIVERSITY,**<br>**1333 N. Oracle Rd.**<br>**Tucson, AZ  85705** | |
| **NATURAL RESOURCES DEFENSE COUNCIL,**<br>**40 West 20th Street**<br>**New York, NY 10011** | |
| **GREENPEACE, Inc.,**<br>**75 Arkansas St.**<br>**San Francisco, CA 94107** | |
| **Intervenor-Defendant –Applicants.** | |

## [PROPOSED]
## ANSWER OF INTERVENOR DEFENDANTS CENTER FOR BIOLOGICAL DIVERSITY, NATURAL RESOURCES DEFENSE COUNCIL, AND GREENPEACE, INC. TO PLAINTIFFS' COMPLAINT

Intervenor Defendants Center for Biological Diversity, Natural Resources Defense Council, and Greenpeace, Inc. (collectively "Conservation Groups") submit the following Answer to the complaint for injunctive and declaratory relief ("Complaint") filed by Safari Club International and Safari Club International Foundation in the above captioned action.  All factual allegations not expressly admitted are denied.

## I.       INTRODUCTION

1.       Conservation Groups admit the allegations in Paragraph 1.

2.       Paragraph 2 characterizes the allegations set forth in the Complaint, to which no response is required.

3.       The allegations in the first and second sentences of Paragraph 3 consist of conclusions of law, to which no response is required, and characterizations of the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §§1361 et seq., which speaks for itself and is the best evidence of its contents.  Conservation Groups lack knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of Paragraph 3, and on that basis deny the allegations.

4.       Conservation Groups lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 4 and, on that basis, deny the allegations.  The third sentence of Paragraph 4 also purports to characterize the contents of the *Federal Register*, which speaks for itself and is the best evidence of its contents.

5.       The allegations in Paragraph 5 consist of Plaintiffs' characterizations of the Determination of Threatened Status for the Polar Bear (Ursus maritimus) Throughout its Range, 73 Fed. Reg. 28212-28303 (May 15, 2008) ("Final Rule").  Conservation Groups aver that the Final Rule speaks for itself and is the best evidence of its contents.

6.       Conservation Groups deny the allegations in Paragraph 6.

7.       Conservation Groups deny the allegations in Paragraph 7.

8.      The allegations in Paragraph 8 are legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

9.      Paragraph 9 consists of Plaintiffs' characterization of their Complaint to which no response is required.  To the degree a response is required, Conservation Groups deny the allegations.

**II. JURISDICTION AND VENUE**

10.      The allegations in Paragraph 10 consist of legal conclusions to which no response is required.

11.      The allegations in the first portion of Paragraph 11 consist of legal conclusions to which no response is required.  Conservation Groups lack sufficient information or knowledge to form a belief as to the allegations in the second and third portions of Paragraph 11, and on that basis, deny the allegations.

12.      Conservation Groups deny the allegations in Paragraph 12.

13.       The allegations in Paragraph 13 are legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

14.      The allegations in Paragraph 14 consist of legal conclusions to which no response is required.

**III. PARTIES**

15.    Conservation Groups lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 and, on that basis, deny the allegations.

16.    Conservation Groups lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 and, on that basis, deny the allegations.

17.    Conservation Groups lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first and second sentence of Paragraph 17 and, on that basis, deny the allegations.  The third sentence of Paragraph 17 constitutes a conclusion of law, to which no response is required.

18.    Conservation Groups lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 and, on that basis, deny the allegations.

19.    The allegations in Paragraph 19 consist of Plaintiffs' characterizations of their likely future actions, to which no response is required.

20.    Conservation Groups admit the allegations of the first and second sentences in Paragraph 20.  The third sentence of Paragraph 20 consists of Plaintiffs' characterization of their lawsuit to which no response is required.

21.    Conservation Groups admit the allegations of the first and second sentences in Paragraph 21.  The third sentence of Paragraph 21 consists of Plaintiffs' characterization of their lawsuit to which no response is required.

22.    Conservation Groups admit the allegations in Paragraph 22.

## IV.  LEGAL BACKGROUND

**The Endangered Species Act**

23.     The allegations in Paragraph 23 represent Plaintiffs' characterization of the Endangered Species Act, 16 U.S.C. §§ 1531 et seq. ("ESA") and its implementing regulations, and conclusions of law, to which no response is required.

24.     The allegations in Paragraph 24 represent Plaintiffs' characterization of the Endangered Species Act, 16 U.S.C. §§ 1531 et seq. ("ESA") and its implementing regulations, and conclusions of law, to which no response is required.

25.     The allegations in Paragraph 25 represent Plaintiffs' characterization of the Endangered Species Act, 16 U.S.C. §§ 1531 et seq. ("ESA") and its implementing regulations, and conclusions of law, to which no response is required.

26.     The allegations in Paragraph 26 represent Plaintiffs' characterizations and contentions regarding the ESA and the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), and conclusions of law, to which no response is required.

**The Marine Mammal Protection Act**

27.     The allegations in Paragraph 27 represent Plaintiffs' characterizations and contentions regarding the MMPA, and conclusions of law, to which no response is required.

28.     The allegations in Paragraph 28 consist of Plaintiffs' characterization of the MMPA and conclusions of law, to which no response is required.  The last sentence in Paragraph 28 also characterizes a Fish and Wildlife Service fact sheet, which speaks for itself and provides the best evidence of its contents.

29.     The allegations in Paragraph 29 consist of Plaintiffs' characterizations of the MMPA and conclusions of law, to which no response is required. The last sentence of Paragraph 29 also characterizes a Fish and Wildlife fact sheet, which speaks for itself and provides the best evidence of its contents.

30.     Conservation Groups lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30 and, on that basis, deny the allegations.

31.     The allegations in Paragraph 31 consist of Plaintiffs' characterizations of the MMPA and conclusions of law, to which no response is required.

32.     The allegations in Paragraph 32 constitute conclusions of law, to which no response is required.  To the extent a response is required, Conservation Groups deny the allegations in Paragraph 32.

33.     The allegations in Paragraph 33 constitute conclusions of law, to which no response is required.  To the extent a response is required, Conservation Groups deny the allegations in the second sentence of Paragraph 33.

**The Administrative Procedure Act**

34.     The allegations in Paragraph 34 constitute conclusions of law, to which no response is required.

35.     The allegations in Paragraph 35 constitute conclusions of law, to which no response is required.

36.     The allegations in Paragraph 36 constitute a partial quotation of Section 553(b) of the Administrative Procedure Act, 5 U.S.C. § 551 et seq. ("APA"), and conclusions of law, to which no response is required.

37.     The allegations in Paragraph 37 represent a partial quotation of Section 553(c) of the Administrative Procedure Act, 5 U.S.C. § 551 et seq. ("APA"), and conclusions of law, to which no response is required.

## V.  FACTUAL BACKGROUND

38.     Conservation Groups admit the allegations in Paragraph 38.

39.     Conservation Groups admit that the Final rule stated that imports of polar bears taken in sport hunts in Canada would no longer be allowed.

40.     Conservation Groups lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first, second, third, and fourth sentences of Paragraph 40 and, on that basis, deny the allegations.  Conservation Groups admit the allegations in the fifth sentence of Paragraph 40.

41.     Conservation Groups deny the allegations in the first sentence of Paragraph 41.  Conservation Groups deny the remaining allegations in the second sentence of Paragraph 41, except to aver that a Fish and Wildlife Service fact sheet cited by Plaintiffs in Paragraph 29 states that the fee for an import permit is $1,000.

42.     Conservation Groups lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 and, on that basis, deny the allegations.  To the degree the allegations in the fourth sentence of Paragraph 42 consist of Plaintiffs' characterization of the Final Rule, Plaintiffs aver that the Final Rule speaks for itself and is the best evidence of its contents, and on this basis Conservation Groups deny the allegations.

43.     Conservation Groups deny the allegations in the first sentence of Paragraph 43.  Conservation Groups admit the allegations of the second sentence of

Paragraph 43.  Conservation Groups lack knowledge or information sufficient to form a belief as to the truth of the allegations in the third, fourth, and fifth sentences of Paragraph 43 and, on that basis, deny the allegations.  Conservation Groups deny the allegations in the sixth and seventh sentences of Paragraph 43.

## VI. CLAIMS FOR RELIEF

### First Claim for Relief
### (Import Ban Contrary to Express Authorization of Imports)
### Violation of the APA and MMPA

44.     Responding to the allegations set forth in Paragraph 44, Conservation Groups incorporate their responses to Paragraphs 1 through 75, inclusive, as set forth above.

45.     The allegations in Paragraph 45 consist of the Plaintiffs' characterization of their claim and legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations in Paragraph 45.

46.     The allegations in Paragraph 46 consist of legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

47.     The allegations in Paragraph 47 consist of legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

48.     The allegations in Paragraph 48 consist of the Plaintiffs' characterization of their claim and legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations in Paragraph 48.

49.    The allegations in Paragraph 49 consist of legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

50.    The allegations in Paragraph 50 consist of legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

## Second Claim for Relief
### (Import Ban Not Supported by Designation of Polar Bear as Depleted)
### Violation of APA and MMPA

51.    Responding to the allegations set forth in Paragraph 51, Conservation Groups incorporate their responses to Paragraphs 1 through 75, inclusive, as set forth above.

52.    The allegations in Paragraph 52 consist of legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

53.    Conservation Groups deny the allegations in Paragraph 53.

54.    The allegations in Paragraph 54 consist of legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

55.    Conservation Groups deny the allegations in Paragraph 55.

56.    The allegations in Paragraph 56 consist of legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

57.    The allegations in Paragraph 57 consist of legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

58.    The allegations in Paragraph 58 consist of legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

59.    The allegations in Paragraph 59 consist of legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

**Third Claim for Relief**
**(No Rulemaking Occurred For "Depleted" Designation)**
**Violation of the APA**

60.    Responding to the allegations set forth in Paragraph 60, Conservation Groups incorporate their responses to Paragraphs 1 through 75, inclusive, as set forth above.

61.    The allegations in Paragraph 61 consist of legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

62.    Conservation Groups deny the allegations in Paragraph 62.

63.    Conservation Groups lack knowledge or information sufficient to form a belief as to the truth of the factual allegations in Paragraph 63 and, on that basis, deny the allegations.  The remaining allegations consist of legal conclusions to which no response is required.  To the extent a response is required, Conservation Groups deny the allegations.

64.    The allegations in Paragraph 64 consist of legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

65.    The allegations in Paragraph 65 consist of legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

66.    The allegations in Paragraph 66 consist of legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

67.    The allegations in Paragraph 67 consist of legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

**Fourth Claim for Relief**
**(MMPA Import Ban Only Applies to Animals Taken While**
**Designated a "Depleted Species")**
**Violation of the APA and MMPA**

68.    Responding to the allegations set forth in Paragraph 68, Conservation Groups incorporate their responses to Paragraphs 1 through 75, inclusive, as set forth above.

69.    The allegations in Paragraph 69 consist of legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

70.    The allegations in Paragraph 70 consist of legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

71.     Conservation Groups lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 71 and, on that basis, deny the allegations.

72.     The allegations in Paragraph 72 consist of legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

73.     The allegations in Paragraph 73 consist of legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

74.     The allegations in Paragraph 74 consist of legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

75.     The allegations in Paragraph 74 consist of legal conclusions to which no response is required.  To the extent that a response is required, Conservation Groups deny the allegations.

## VII. PRAYER FOR RELIEF

76.     Paragraphs 1-7 of the Plaintiffs' Prayer for Relief characterize Plaintiffs' requests for relief should they prevail on their claims and does not require a response.  To the extent a response is required, Conservation Groups denies that the Plaintiffs are legally or equitably entitled to any of the relief that they seek.

## VIII.  AFFIRMATIVE DEFENSES

Conservation Groups further answer Plaintiffs' Complaint by asserting the following defenses:

1.      Plaintiffs have failed to state a claim for which relief may be granted.

2.      Plaintiffs lack standing to bring their claims.

3.      Venue is improper and/or inconvenient.

4.      Some or all of Plaintiffs' claims are barred by the doctrines of ripeness, primary jurisdiction, and exhaustion of administrative remedies.

5.      Conservation Groups reserve the right to amend and/or supplement these affirmative defenses as appropriate.

Respectfully Submitted,

_____/s/  Benjamin Longstreth_____

Benjamin Longstreth (DC Bar # 974015)
Andrew Wetzler
Natural Resources Defense Council
1200 New York Ave., N.W. Suite 400
Washington, D.C. 20005
Telephone: 202-289-6868
Facsimile: 202-289-1060
blongstreth@nrdc.org
awetzler@nrdc.org

Michael Senatore (DC Bar # 453116)
Center for Biological Diversity
1601 Connecticut Avenue, N.W., Suite 701
Washington, D.C.  20009
Telephone:  202-232-1216
Facsimile:  202-232-1217
msenatore@biologicaldiversity.org

Brendan Cummings
Kassia Siegel
Center For Biological Diversity
P.O. Box 549
Joshua Tree, CA 92252
Telephone:  760-366-2232
Facsimile:  760-366-2669
bcummings@biologicaldiversity.org
ksiegel@biologicaldiversity.org

Dated:   June 16, 2008

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SAFARI CLUB INTERNATIONAL, et al.,** | Civil Action No. 1:08-cv-00881 EGS |

**SAFARI CLUB INTERNATIONAL, et al.,**

       **Plaintiffs,**

       **vs.**

**DIRK KEMPTHORNE, et al.,**

       **Defendants,**

       **and**

**CENTER FOR BIOLOGICAL DIVERSITY,**
1333 N. Oracle Rd.
Tucson, AZ  85705

**NATURAL RESOURCES DEFENSE COUNCIL,**
40 West 20th Street
New York, NY 10011

**GREENPEACE, Inc.,**
75 Arkansas St.
San Francisco, CA 94107

       **Intervenor-Defendant –Applicants.**

**Civil Action No. 1:08-cv-00881 EGS**

## CORPORATE DISCLOSURE STATEMENT

The undersigned, counsel of record for Center for Biological Diversity, Natural Resources Defense Council, and Greenpeace, certify that to the best of our knowledge and belief:

Center for Biological Diversity, Natural Resources Defense Council, and Greenpeace are non-profit corporations.  There are no parent companies or publicly held companies that have any ownership interest in these non-profit corporations.

Respectfully submitted,

      /s/  Benjamin Longstreth
Benjamin Longstreth (DC Bar # 974015)
Andrew Wetzler
Natural Resources Defense Council
1200 New York Ave., N.W. Suite 400
Washington, D.C. 20005
Telephone: 202-289-6868
Facsimile: 202-289-1060
blongstreth@nrdc.org
awetzler@nrdc.org

Michael Senatore (DC Bar # 453116)
Center for Biological Diversity
1601 Connecticut Avenue, N.W., Suite 701
Washington, D.C.  20009
Telephone:  202-232-1216
Facsimile:  202-232-1217
msenatore@biologicaldiversity.org

Brendan Cummings
Kassia Siegel
Center For Biological Diversity
P.O. Box 549
Joshua Tree, CA 92252
Telephone:  760-366-2232
Facsimile:  760-366-2669
bcummings@biologicaldiversity.org
ksiegel@biologicaldiversity.org

Dated: June 16, 2008

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SAFARI CLUB INTERNATIONAL, et al.,** | Civil Action No. 1:08-cv-00881 EGS |
| **Plaintiffs,** | |
| **vs.** | |
| **DIRK KEMPTHORNE, et al.,** | |
| **Defendants,** | |
| **and** | |
| **CENTER FOR BIOLOGICAL DIVERSITY,**<br>1333 N. Oracle Rd.<br>Tucson, AZ  85705 | |
| **NATURAL RESOURCES DEFENSE COUNCIL,**<br>40 West 20th Street<br>New York, NY 10011 | |
| **GREENPEACE, Inc.,**<br>75 Arkansas St.<br>San Francisco, CA 94107 | |
| **Intervenor-Defendant –Applicants.** | |

**[PROPOSED] ORDER ON INTERVENOR-CONSERVATION GROUPS'
MOTION TO INTERVENE AS DEFENDANTS**

This Court, having reviewed Applicants' Motion to Intervene as Defendants and

accompanying papers, hereby GRANTS Applicants' Motion for Intervention.

IT IS SO ORDERED.

Dated this _____ day of _____ 2008.

_____
UNITED STATES DISTRICT JUDGE

**LOCAL RULE 7(k) LIST OF PERSONS TO BE SERVED WITH ORDER**

Please serve the following electronically:

Benjamin Longstreth
Natural Resources Defense Council
1200 New York Ave., N.W. Suite 400
Washington, D.C. 20005

Michael Senatore
Center for Biological Diversity
1601 Connecticut Avenue, N.W., Suite 701
Washington, D.C.  20009

Douglas Scott Burdin
Safari Club International
501 2nd Street, NE
Washington, DC 20002

Kristen Byrnes Floom
U.S. DEPARTMENT OF JUSTICE
601 D Street, NW
3rd Floor
Washington, DC 20004