IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL, *et al.,* ) | |
| ) | |
| Plaintiffs, ) | Case No. 08-0881 (EGS) |
| ) | |
| v. ) | |
| ) | |
| DIRK KEMPTHORNE, *et al.,* ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | |

OPPOSITION OF SAFARI CLUB INTERNATIONAL AND
SAFARI CLUB INTERNATIONAL FOUNDATION
TO MOTIONS TO INTERVENE AS OF RIGHT

## I.    INTRODUCTION

Plaintiffs Safari Club International ("SCI") and Safari Club International Foundation

("SCIF") (collectively "SCI and SCIF") brought this action challenging the legal

determination of the Secretary of the Interior and the Director of the United States Fish and

Wildlife Service (collectively "the Service") that the listing of the polar bear as threatened

under the Endangered Species Act ("ESA") creates a ban on the import of sport-hunted polar

bear trophies otherwise legal under the Marine Mammal Protection Act ("MMPA"). 73 Fed.

Reg. 2812 (May 15, 2008) ("Final Rule"). Two groups of organizations have each filed a

motion to intervene as defendants: (1) The Center for Biological Diversity *et al.* ("CBD

Group"), Dkt. 11 and (2) the Humane Society of the United States, *et al.* ("HSUS Group"),

Dkt. 10. SCI and SCIF respond to both of these motions in this single opposition. For the

reasons explained below, SCI and SCIF oppose intervention as of right, but do not oppose

permissive intervention.

Neither group has satisfied the test for intervention of right under Federal Rule of Civil Procedure 24(a), which, in this Circuit, includes a showing of standing. Neither has demonstrated a legally cognizable interest in the subject matter of this lawsuit – the importation of sport-hunted polar bears – that will be impaired by the relief SCI and SCIF request here. In standing terms, they have not demonstrated an injury in fact that will be caused by the relief SCI and SCIF request.

Both groups erroneously allege that the import ban will reduce the number of polar bears harvested through hunting each year, which they allege would benefit their members' interests in viewing the polar bear in the wild. The elimination or reduction of sport hunting of polar bears by U.S. citizens simply will not reduce polar bear mortality. Sport hunters use a small number of the tags (the right to take one polar bear out of a scientifically established annual harvest quota) that have been allotted to native arctic communities in Canada. If the native communities do not sell these tags to U.S. citizens, then they will sell the tags to hunters from other countries or use them for subsistence purposes. Either way, the same number of polar bears will be taken. Thus, overall mortality does not change in the absence of U.S. hunters and any alleged interest in viewing polar bears in the wild would not be affected by a reversal of the import ban.

Another flaw in the groups' declarations in support of intervention is that they are not sufficiently definite in terms of time or place. The arctic is a vast place. U.S. hunters are not permitted to hunt (and import trophies from) everywhere polar bears exist. The declarants' largely "some day" intentions to visit mostly unspecified areas of the arctic do not meet the intervention and standing tests.

In addition, both groups describe interests in the ***listing of the polar bear*** and allege injuries that would arise from a reversal of the ***ESA listing*** of the polar bear. Both groups claim or suggest that SCI and SCIF are here challenging the Service's final polar bear listing decision. This is incorrect. As is clear from the Complaint, this lawsuit only challenges the ban on the import of polar bears that the Service claims arose as a matter of law as a result of the listing of the polar bear. SCI and SCIF's Complaint contains no claim challenging the listing decision itself. The CBD Group and the HSUS Group cannot rely on alleged injuries from such a claim as the basis for intervention.

In their motions to intervene, both groups mischaracterize SCI and SCIF's role in ongoing litigation in the Northern District of California over the listing of the polar bear under the ESA. Both groups claim that SCI and SCIF have asked for the same relief in that case as they are seeking here. This is completely false. SCI and SCIF did participate in that case as amici, and only on limited issues. In the California litigation, SCI and SCIF did not ask for relief concerning the import ban. In fact, after the Federal Government and the CBD Group (plaintiffs in the Northern California lawsuit) wrongly claimed that SCI and SCIF sought that relief, SCI and SCIF filed a document with the District Court in California explicitly explaining that SCI and SCIF had not requested relief from the import ban.[1] The HSUS Group and the CBD Group were well aware of this filing but chose to not inform the Court of it.[2]

---

[1] Another hunting/conservation group filed the request that prompted the response from the government and CBD Group.

[2] Attachment 1. This document, filed on June 3, 2008, is publicly available on PACER. The HSUS Group, which appears to be informed on the proceedings in the California litigation, certainly was aware of this document.

Finally, although SCI and SCIF oppose both groups' motion for intervention *as of right*, SCI and SCIF do not oppose their request for permissive intervention, on the condition that the CBD Group and HSUS Group abide by all briefing schedules and do not take action to delay or prejudice SCI and SCIF's right to a hearing in this Court on the claims SCI and SCIF have brought.

## II.    BACKGROUND FACTS

Until the recent action by the Service detailed in SCI and SCIF's Complaint, U.S. hunters, including members of SCI, could import polar bear trophies into the United States. An amendment to the MMPA enacted in 1994, 16 U.S.C. § 1374(c)(5), authorizes such imports under certain conditions.  When the Service listed the polar bear as a threatened species under the ESA, they made the legal determination that such imports are no longer permitted.  As detailed in SCI and SCIF's Complaint, the Service's polar bear import ban is unlawful.  Therefore, SCI and SCIF seeks relief (a) declaring the Service's determination on importation to be erroneous, (b) setting aside any portion of the Final Rule announcing an import ban, and (c) ordering the Service to continue accepting and processing polar bear import permit applications under 16 U.S.C. § 1374(c)(5) and other applicable law.  SCI and SCIF's Complaint does not challenge the final listing decision itself and does not ask the Court to set aside the listing.[3]

Safari Club International is a nonprofit corporation incorporated in the State of Arizona, operating under § 501(c)(4) of the Internal Revenue Code, with principal offices

---

[3] SCI and SCIF have submitted a 60-day notice letter to the Service regarding violations of the ESA in adopting the Final Rule, as required by the citizen suit provision of the ESA before filing legal claims.  16 U.S.C. § 1540(g).  Whether SCI and SCIF will file claims challenging the final listing decision at all, in this case, in this Court, or elsewhere is not known at this time.

and place of business in Tucson, Arizona.  SCI maintains an office in Washington D.C.  Its

membership includes approximately 53,000 individuals from the United States and many of

the countries around the world.  Its missions are the conservation of wildlife, protection of

the hunter, and education of the public concerning hunting and its use as a conservation tool.

Members of SCI have hunted polar bears in the past, including recently, and intend to hunt

polar bears in the future.  All or most of them desire to import the polar bear they have

harvested or will harvest into the United States.

SCI carries out its conservation mission through its sister organization, Safari Club

International Foundation.  SCIF is a non-profit corporation, incorporated in the State of

Nevada, operating under § 501(c)(3) of the Internal Revenue Code, with principal offices and

place of business in Tucson, Arizona.  SCIF maintains an office in Washington D.C.  Its

missions are conservation of wildlife, education of the public concerning hunting and its use

as a conservation tool, and humanitarian services.  The conservation mission of SCIF is: (a)

to support the conservation of the various species and populations of game animals and other

wildlife and the habitats on which they depend, and (b) to demonstrate the importance of

hunting as a conservation and management tool in the development, funding and operation of

wildlife conservation programs.

**III.     ARGUMENT**

   **A.     SCI and SCIF did not Request in the California Litigation the Relief they
            Seek Here**

A factual account of the California litigation reveals that SCI and SCIF did not

challenge the import ban and did not request any relief related to the import ban.  The CBD

Group brought a lawsuit in the District Court for the Northern District of California

challenging the U.S. Fish and Wildlife Service's failure to issue a final listing decision on the

polar bears by January 9, 2008, the statutory deadline.  In their summary judgment motion in that case, the CBD Group sought an order directing the FWS to issue a final listing decision by May 15, 2008 and to make any listing decision effective immediately.  The federal government admitted that it missed the deadline but argued the court should allow the FWS until June 30, 2008 to make a final decision.  SCI and SCIF moved for amici status to support the government's request to have until June 30, 2008 to issue its listing decision.  Another hunting/conservation group, Conservation Force, moved to intervene in support of the government.  The Court granted the CBD Groups' motion for summary judgment and ordered the FWS to make a final decision by May 15, 2008 and to make any listing effective immediately (and denied as moot SCI and SCIF's request for amici status and Conservation Force's motion to intervene).

SCI and SCIF renewed their request for amici status and submitted a second amici brief for the *sole* purpose of arguing the court lacked jurisdiction to order the FWS to make any listing decision effective immediately.[4]  Conservation Force also filed a motion for reconsideration of the Court's order and asked the court to order the Service to allow the import of polar bears taken before May 15, 2008.  The California court granted SCI and SCIF leave to file the second amici brief on the "effective immediately" issue, but reconfirmed its earlier order that any listing decision be made effective immediately.  Order of May 13, 2008, at 2, Dkt. 69.  In contrast, the Court ordered further briefing on **Conservation Force's** motion for reconsideration on whether the court could issue relief allowing imports to

---

[4] Obviously, SCI and SCIF's reason for participating in this case involved the importation of polar bear trophies.  If the Service was able to exercise the discretion to determine when to make any listing decision effective, it could have provided the customary 30 days before the rule was effective.  This time period would have allowed at least some SCI members to import their trophies before the ban went into effect.

continue:  "Conservation Force may intervene in this action for the limited purpose of resolving the issue of whether provision may be made under the Endangered Species Act for the import of trophies from bears that were killed and for which an import permit application had already been filed as of April 28, 2008, the date of the Court's order granting summary judgment in this case."  *Id.*  The court went on to invite the federal government, the CBD Group, and Conservation Force to file briefs on this issue.  *Id.*

Despite the clear understanding by the court that ***only*** Conservation Force requested this relief, both the federal government's and the CBD Group's brief on this issue claimed that SCI and SCIF also requested this relief.  To correct these misstatements and to make clear that, as non-parties, SCI and SCIF could not be bound by any decision of that court on the legality of the import ban, SCI and SCIF filed a brief explaining what the court, but not the CBD Group or the federal government, seemed to already understand:  SCI and SCIF did not request relief from the import ban in that litigation.  Response and Clarification of Safari Club International *et al.* to Briefs on Importation of Polar Bear Trophies, Dkt. 91 (June 3, 2008), Attachment 1.  Conservation Force filed its own separate response.  The Court has not yet ruled on this issue.

Despite these facts, both the CBD Group and the HSUS Group attempt to blur the facts by stating and insinuating that SCI and SCIF are seeking in this Court relief that they already sought in the California court.  For example, the CBD Group stated:  "The court in California … has not yet issued any rulings in response to the further briefing it requested ***on the hunting issue raised by Safari Club.***"  *Id.* at 9 (emphasis added). [5]  The CBD Group also

---

[5] The CBD Group even misstated the topic of the briefs:  "the Service and [the CBD Group] filed briefs regarding the ***hunting*** issue, as did Conservation Force and the Safari Club."  As the CBD Group is well aware, the issue is importation, not hunting (hunting in

stated that "The [California] Court also ordered that the parties provide the Court with further briefing on the effect that listing the polar bear under the ESA would have on the ability of *Safari Club's members* to import polar bear trophies into the United States."  CBD Motion to Intervene at 7 (emphasis added). The HSUS Group also mischaracterized SCI and SCIF's role in the California litigation:  "It is not clear why SCI chose to raise matters here that are pending in the California suit, rather than allowing them to be resolved in that forum – where there has been considerable litigation over the polar bear listing, and *where SCI itself has sought some of the same relief at issue here*."  HSUS Memo in Support of Motion to Intervene, at 6-7 n.1.  The HSUS Group even titled this section of their brief "The Present Suit Raising [sic] Matters Already Pending in the California Court."  *Id.* at 6.

Although not relevant to their motions to intervene, both groups try to prejudice SCI and SCIF's right to bring claims in this Court.  They misstate SCI and SCIF's role in the California litigation and claim that SCI and SCIF are trying to litigate claims here that they brought in the California court.  SCI and SCIF participated as non-parties in the California court, in a case that at the time involved only whether the Service missed the statutory deadlines and what remedy would be appropriate.

SCI and SCIF regret having to devote so much of their opposition brief on intervention on this issue, but the mischaracterizations in CBD Group's and HSUS Group's motions to intervene compelled SCI and SCIF to clarify the record.

---

Canada by U.S. citizens is unaffected by the listing of the polar bear under the ESA).  As noted above, SCI and SCIF's second amici brief was not about importation, but about clarifying misstatements about SCI and SCIF's role in that case.

**B.      SCI and SCIF's Lawsuit Does not Challenge the Listing of the Polar Bear and Alleged Injuries that Would Arise from Delisting the Species are Not Relevant Here**

SCI and SCIF challenge only the Service's legal determination that the listing of the polar bear as threatened under the ESA gives rise to a ban on the import of polar bears under the MMPA.  Complaint, ¶¶ 2, 9, Dkt. 1.  SCI and SCIF do not challenge the final listing decision itself.  Despite this fact, both CBD Group and HSUS Group pursue intervention based in part on alleged interests in the final listing decision and the alleged benefits to their members arising from the listing.  Any alleged interests related to the ***listing*** of the polar bear are irrelevant to the Court's determination of whether the two groups have satisfied the tests for intervention and standing.  As noted above, although SCI and SCIF have submitted a 60-day notice letter to the Service regarding violations of the ESA in ***adopting the Final Rule itself,*** the current lawsuit only challenges the Service's legal determination that the listing of the polar bear as threatened creates an import ban ***under the MMPA.***  After the running of the 60-days, SCI and SCIF could file its ESA claims challenging the final listing decision as a supplementation of this case; in a separate lawsuit in this Court; as plaintiff-intervenors in another case challenging the listing decision; or not at all, depending on events between now and then.

The CBD Group erroneously asserts that:  "In this case, Plaintiffs Safari Club International and Safari Club International Foundation ("Safari Club") challenge the final listing rule for the polar bear which the Conservation Groups have worked for the past four years to obtain."  CBD Motion to Intervene at 2.  CBD Group then devotes five pages of their brief to describing their efforts to bring about the listing of the polar bear.  *Id.* at 3-8.  The CBD Group then converts the possibility of SCI and SCIF supplementing their claims here

with a challenge to the listing decision itself (SCI and SCIF only asserted that they "may" supplement its Complaint here with such a claim, Complaint ¶ 19) into a solid intent: "the Safari Club intends to bring additional claims pursuant to the ESA." *Id.* at 9. One of the CBD Group's declarants asserts that her "interests are threatened by Plaintiffs' challenge to the FWS's final rule listing the polar bear as a threatened species." Declaration of Melanie Duchin in Support of Motion to Intervene, ¶ 23. The HSUS Group twice reference the benefits of "the ESA listing of the polar bear" and of the import ban, as if to suggest that the so-called "benefits" of an ESA listing will be lost if SCI and SCIF succeed in this case. HSUS Memo in Support at 9, 10 n.3.

Both groups try to paint with a broad stroke what is at stake here. As this litigation currently stands, and what is relevant for the Court's decision on intervention, SCI and SCIF have only challenged the import ban that the Service claims exists under the MMPA by virtue of the listing of the polar bear as threatened under the ESA. If SCI and SCIF are successful on these claims, the polar bear will remain a threatened species under the ESA. If in the future, SCI and SCIF bring ESA claims in this case, the two groups could renew their request for intervention as of right based on alleged interests and injuries related to those claims. But currently, whether the two groups satisfy the test for intervention of right and standing must be measured solely against the impacts of reversing the import ban.

## C.      The Two Groups Have Not Satisfied the Interest and Impairment Standards for Intervention of Right

The fact that the reinstatement of import authority will not increase polar bear mortality in Canada undermines both groups' assertions of an injury to their members' alleged interests in viewing the polar bear in the wild. In addition, the declarants asserting such an interest have not alleged sufficiently definite plans to visit areas containing

populations of polar bears that U.S. citizens might hunt if imports were again allowed. Finally, the two groups and their declarants have not demonstrated with sufficient detail or support that a reinstatement of import authority would adversely impact their alleged interests in viewing the polar bear in the wild. Thus, neither group has asserted a sufficient interest, impairment of that interest, or injury in fact.

Sport hunting by U.S. and other foreign hunters in Canada does not increase polar bear mortality in any given year. Canadian authorities establish annual quotas (the number of bears of each sex that can be harvested that year) for each polar bear population.[6] These quotas are assigned to the local communities, which use the majority of their quota (provided as individual "tags" representing in total the number of bears that can be taken, by whatever means, by that community) for subsistence and management purposes.[7] The communities sell a number of the tags to sport hunters.[8] If U.S. hunters do not purchase these tags because of the FWS-imposed ban on imports, the native communities will sell them to hunters from

---

[6] Comments of the Government of Nunavut, Canada, on polar bear listing, page 2 (October 22, 2007) ("Nunavut Comments") ("an annual quota in stable or increasing subpopulations is divided among the communities."), Attachment 2; Comments of the Canadian Polar Bear Administrative Committee on the polar bear listing, page 7 of attachment (June 16, 2006) ("PBAC Comments") ("In Nunavut and the [Northwest Territories], a flexible quota system is being applied which takes the sex ratio of each year's harvest into account, …."), Attachment 3. The Court can take judicial notice of these documents, filed in an official U.S. FWS proceeding by governmental or organizational entities. *See* Fed. R. Evid. 201. These documents will or should be part of the administrative record of the final rule listing the polar bear.

[7] PBAC Comments at 8 ("Typically, outfitted hunts account for less than 25% of the total annual harvest in NWT and Nunavut."); Comments of Dr. Lee Foote, Director, IUCN North American Sustainable Use Specialist Group on polar bear listing, page 3 (April 5, 2006) ("SUSG Comments") (approximately 75% of polar bears harvested in Canada are for "subsistence and cultural reasons"), Attachment 4.

[8] Nunavut Comments at 2. In most cases, the meat and other non-trophy portions of the harvested polar bear remain with the native communities to be used for subsistence purposes.

other nations or use the tags themselves for subsistence purposes.[9]  In other words, the annual

polar bear quotas, set by Canadian authorities, establish annual polar bear mortality from all

types of hunting. Whether or not U.S. hunters participate, the same number of polar bears

will be taken.  Consequently, hunting by U.S. hunters (and importation of the products of

those hunts) does not increase overall mortality.[10]

    In contrast to these facts, the CBD Group simply asserts that reinstatement of the

import ban will increase polar bear mortality, without providing any explanation or proof.

The CBD Group claims that if SCI and SCIF are successful, "additional polar bears *may* be

killed through trophy hunting" and "ultimately, more bears *will* be killed."  CBD Motion to

Intervene at 16, 17 (emphasis added).  In support, they cite only the declaration of Suckling

and Duchin.  Suckling merely offers his opinion that fewer U.S. hunters will hunt in Canada

because of the import ban and "[u]ltimately, this will likely lead to a reduction in the number

of polar bears killed."  Suckling Decl., ¶ 13.  Nothing supports this opinion.  From the same

premise of fewer U.S. hunters, Duchin only concludes that "the adverse impacts of such

hunting [meaning sport hunting] on Southern Beaufort Sea bears will be reduced…."  Duchin

Decl., ¶ 20.  She does not even allege that overall mortality will decline, let alone try to

factually justify her suppositions.

    The HSUS Group vaguely asserts that their members travel to Canada to observe

polar bears and that because the "listing" and import ban advance polar bear conservation,

these members possess the interests recognized for purposes of standing.  HSUS Group

---

[9] SUSG Comments at 4 ("In the absence of foreign hunting options the subsistence take is expected to swell to fill the same quota number."); Nunavut Comments at 2.

[10] Nunavut Comments at 2 ("Polar bears harvested by U.S. hunters are not additional to community quotas.  Listing the polar bear throughout its range under the ESA will not decrease the number of bears harvested in Nunavut.")

Memo in Support at 9. They go on to assert baldly that these interests will be impaired by the relief SCI and SCIF seek in this case. Their supporting declarations focus on the opinion that U.S. hunters target larger males, that native subsistence hunters are less gender selective and that the targeting of males adversely impacts the population. HSUS Group Memo in Support at 10 n.3, citing Rose Declaration. This opinion is undermined by several facts. First of all, the quotas set by the Canadian government authorities take gender into account.[11] Second, groups that have long studied the issue hold the opinion that some targeting of older males benefits the populations by limiting the harvesting of females and younger bears.[12] Third, only speculation supports any claim that the targeting of fewer older males would result in an enhanced experience by members of the HSUS Group who profess an intent to travel to Canada to observe polar bears.

To the extent that the declarants assert interests in viewing polar bears in the wild, those allegations are insufficiently definitive and lack the detail required by the standing and intervention tests. Under Supreme Court precedent, it is not enough to allege "some day" intentions to visit an area where the subject species exists:

> And the affiants' profession of an 'inten[t]' to return to the places they had visited before – where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species – is simply not enough. Such 'some day' intentions – without any description of concrete plans, or indeed even any specification of *when* the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require.

---

[11] PBAC Comments, page 7 of attachment ("In Nunavut and the [Northwest Territories], a flexible quota system is being applied which takes the sex ratio of each year's harvest into account, ….")

[12] *Id.* at 8 ("Outfitted hunts target male bears resulting in less of an impact on the reproductive portion of the polar bear population.").

*Defenders of Wildlife v. Lujan,* 504 U.S. 555, 564 (1992).  It is also not enough to allege an intent to visit a large general area when the impact of the relief sought in the case would be much more localize or specific.  *See Lujan v. National Wildlife Federation,* 497 U.S. 871, 886-89 (1990) (standing not established by allegations of recreational activities "in the vicinity" of vast tracts of land, small sections of which would be affected by the challenged action ).  What is required is evidence of definite plans to visit specific areas containing the animals that definitely will be affected by the relief the plaintiff seeks.

The declarations supporting the motions to intervene are not definitive and specific enough in terms of time and place.  For example, Declarant Duchin alleges:  "I have every intention to continue traveling to the Arctic most summers …."and "I intend to return to the Beaufort and/or Chukchi seas in May of 2009 and in subsequent years to help with ringed seal research on the pack ice."  Duchin Decl., ¶¶ 8, 16.  The Beaufort and Chukchi Seas are vast water bodies.  The Chukchi Sea does not border Canada and polar bears are not sport-hunted there.  Sport-hunting of polar bears only occurs in the portions of the Beaufort Sea bordering Canada.   Declarant Lentfer claims:  "I plan to continue traveling to Arctic Alaska."  "Lentfer Decl. ¶ 8.  "Arctic Alaska" is a huge area and no sport hunting of polar bears occurs there.  Declarant Poulsen asserts "I will be returning to wild polar bear habitat within the next two years,", but does not say when in the next two years or even whether it will be to areas that could be hunted by U.S. hunters but for the import ban.  Poulsen Decl. ¶ 8.

In addition to being vague as to time and place, Declarant Laidlaw says exactly what the Supreme Court has ruled is insufficient:  "I am going to return to view polar bears in the wild within the next few years. …. I will be able to ***someday*** soon visit the polar bears in

14

their natural habitat."  Laidlaw Decl. ¶ 6 (emphasis added).  Declarants Burns and Zerweck are somewhat more specific as to place, but remain vague as to time.  Burns Decl. ¶ 5 ("I will return to Churchill in the next few years, …."); Zerweck Decl., ¶ 11 (she has gone to the "Western Hudson Bay area" "and plan[s] to go again to see polar bears").  Finally, although Declarant Potts asserts plans to travel to Churchill Manitoba in November 2008, Potts Decl. ¶ 7, the polar bear sport hunting season is over for 2008 and will not resume until February 2009.  The reinstatement of import authority would not even conceivably affect the number of polar bears available for observation in 2008.

Especially considering the fact that the import ban will not reduce polar bear mortality, these allegations are not sufficiently definite in time or place to establish the interest and injury necessary for intervention as of right.[13]

### D.     Other Theories do not Warrant Intervention as of Right

Both groups present a number of other theories to support their intervention and standing, none of which support intervention.  The HSUS Group tries to manufacture standing and injury in fact by claiming that they have devoted resources to trying to secure an import ban and will have to again if SCI and SCIF are successful in this case.  HSUS Memo in Support at 11.  Such a theory would allow any organization to manufacture standing merely by devoting some resources to bringing about a regulatory change and then claim injury from having to continue to make such expenditures.  This nearly unlimited approach to standing is inconsistent with the standing doctrine.  *See, e.g., Barnes v. Shalala,* 865 F. Supp.

---

[13] The two groups' general concern that polar bears are being sport hunted in Canada is not a sufficient interest for purposes of intervention or standing.  Such a general concern could be shared by the general public and does not represent the concrete interests the courts require for intervention and standing.  *See Defenders of Wildlife,* 555 U.S. at 566 (rejecting idea that anyone with "a professional interest in such animals can sue").

550, 561 (W.D. Wis. 1994) ("The foundation's allegations establish no more than that its resources are being sapped by this litigation and by the activities the foundation has engaged in to oppose the approval of rbST.  To grant standing on these allegations would eviscerate the constitutional requirement of the standing doctrine: any plaintiff with a disagreement with the government could manufacture an injury to establish standing simply by filing a lawsuit. *See Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 482-83, 102 S.Ct. 752, 764-65, 70 L.Ed.2d 700 (1982)"); *Regional Ass'n of Concerned Environmentalists v. U.S.D.A.,* 765 F. Supp. 502, 505 (S.D. Ill 1990) (plaintiff visited area at issue only after agency decision and not for recreational purposes.  "To allow the plaintiff standing under these circumstances would, in effect, allow the plaintiff to manufacture his own standing.  This Court is unwilling to hold that one may manufacture standing.").

In addition, the HSUS Group attempt to create informational standing where there is none.  They reference the creation of a recovery plan under the ESA due to the threatened listing and a conservation plan under the MMPA.  HSUS Group Memo in Support at 11 n.4.  SCI and SCIF only challenge the establishment of an import ban under the MMPA.  They do not challenge the creation of an ESA recovery plan, which is triggered by the threatened listing, and do not challenge whether the FWS must create a conservation plan under the MMPA.  Even if the HSUS Group satisfies all the requirements of "informational standing" – and it is questionable whether Congress designed the MMPA conservation plan provision to provide information to the public – such interests are not at risk in this litigation.

The CBD Group alleges other theories for standing and impairment of interest, none of which are persuasive.  They assert that (1) no one challenged their standing in the

California case; (2) this litigation could undermine the CBD Group's efforts to obtain

endangered status for the polar bear; and (3) a ruling in SCI and SCIF's favor could set an

adverse precedent for other species.   CBD Group Motion to Intervene at 14-16.  The CBD

Group's standing in the California case is irrelevant to their standing here, as that case

involved claims under the ESA regarding statutory deadlines.  SCI and SCIF's challenge to

the import ban has nothing to do with efforts to someday list the polar bear as endangered.

As explained above, this case does not involve the listing decision.  Finally, the import

authorization for polar bears from Canada in the MMPA is applicable only to polar bears, so

judicial rulings in this case are unlikely to adversely affect any alleged interest in other

species (not to mention that this alleged interest is far too speculative to establish standing).

### E.    SCI and SCIF Do Not Oppose Permissive Intervention with Conditions

Although neither group has demonstrated they are entitled to intervention as of right,

SCI and SCIF do not object to their participation in this case as permissive intervenors, on

the condition that they do not attempt to delay or prejudice SCI and SCIF's right to have their

claims heard in this Court.  The Groups appear to satisfy the common defense and other

requirements for permissive intervention under Federal Rule of Civil Procedure 24(b).  While

the Court might want to consider reasonable page limits or other limitations on the two

groups if it grants intervention, the appropriate time to consider such limits is when the

briefing schedule is set.

## IV.    CONCLUSION

For the reasons described above, SCI and SCIF oppose intervention of right for both

groups, but do not oppose permissive intervention.

Dated this 30th day of June, 2008.

Respectfully submitted,


_/s/ Douglas S. Burdin_____
Douglas S. Burdin
(D.C. Bar No. 434107)
Anna M. Seidman
(D.C. Bar No. 417091)
Safari Club International
501 2nd Street N.E.
Washington, D. C.  20002
Telephone: (202) 543-8733
Facsimile: (202) 543-1205
dburdin@safariclub.org
aseidman@safariclub.org

Counsel for
Safari Club International and
Safari Club International Foundation

ATTACHMENT 1

Safari Club International v. Kempthorne

Case No. 08-881 (EGS) (D.D.C.)


Safari Club International et al. Opposition

to Motions to Intervene

1  J. Jeffries Goodwin, CASBN 099310
   Goodwin Law Corporation
2  2300 Bell Executive Lane
   Sacramento, CA 95825
3  Telephone:  (916) 929-6000
   Facsimile:  (916) 929-5137
4  jjg@goodwinlawcorp.com

5
   Douglas S. Burdin
6  Admitted Pro Hac Vice
   D.C. Bar # 434107
7  Safari Club International
   501 2nd Street N.E.
8  Washington, D. C.  20002
   Telephone: (202) 543-8733
9  Facsimile: (202) 543-1205
   dburdin@safariclub.org
10

11
   Counsel for Safari Club International and
12 Safari Club International Foundation

13            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF CALIFORNIA
14                     (OAKLAND DIVISION)

15
   CENTER FOR BIOLOGICAL DIVERSITY, *et al.*  )    Case No. 08-cv-1339 (CW)
16                                            )
             Plaintiffs,                      )    **RESPONSE AND CLARIFICATION**
17                                            )    **OF SAFARI CLUB INTERNATIONAL**
          v.                                  )    **ET AL. TO BRIEFS ON**
18                                            )    **IMPORTATION OF POLAR BEAR**
   DIRK KEMPTHORNE, *et al.*                  )    **TROPHIES**
19                                            )
             Defendants,                      )
20                                            )
                                              )
21 SAFARI CLUB INTERNATIONAL, SAFARI          )
   CLUB INTERNATIONAL FOUNDATION              )
22                                            )
             Amici Curiae.                    )
23                                            )
                                              )
24                                            )
                                              )
25                                            )
                                              )
26                                            )
                                              )
27 _____ )
28

1
2          Safari Club International and Safari Club International Foundation ("SCI and SCIF"), by
3
    and through counsel, submit this brief response and clarification to the Federal Defendants' and
4
    Plaintiffs' briefs on "the issue of whether provision may be made under the Endangered Species
5
    Act for the import of trophies from bears that were killed and for which an import permit
6
    application had already been filed as of April 28, 2008." Order of May 13, 2008, page 2, Dkt.
7
8   69. In their briefs, both the Federal Defendants and Plaintiffs indicate that the Court's request
9   for briefing arose in part from a request by SCI and SCIF for this relief. Fed. Def. Response at
10  2, Dkt. 81; Pls. Response at 1, 3, Dkt. 86. This is not accurate. SCI and SCIF did not raise this
11  issue or ask for this relief. Only intervenor Conservation Force asked for this relief. As
12  provided by the law of this Circuit and longstanding Supreme Court precedent, SCI and SCIF, as
13  non-party *amici* who are not litigating this issue, will not be bound by any ruling of the Court on
14
    this issue.
15
16         In their two *amici* briefs, SCI and SCIF raised issues different than that presently before
17  the Court. SCI and SCIF's first brief supported the Federal Defendants' request that the Court
18  give them until June 30, 2008 to issue a final decision.
19         SCI and SCIF's second *amici* brief addressed whether the Court had jurisdiction to order
20  the Federal Defendants to make any listing determination effective immediately. As part of this
21  second brief, SCI and SCIF included the declarations of SCI members who had applications
22  before the U.S. Fish and Wildlife Service for polar bear imports. These declarations proved that
23
    SCI and SCIF and these members had strong interests in the Court reconsidering, *sua sponte*,
24
25  whether it had jurisdiction to order the Federal Defendants to make any listing determination
26  effective immediately. This was SCI and SCIF's only interest in including these declarations
27  and discussing the import permit issue.
28

                                                  2

The Court's May 13, 2008 Order makes clear that the Court was only responding to the request from Conservation Force to provide relief to members of the public who had hunted polar bear and had submitted, or wanted to submit, applications for import permits. "***Conservation Force*** may intervene in this action for the limited purpose of resolving the issue of whether provision may be made under the Endangered Species Act for the import of trophies from bears that were killed and for which an import permit application had already been filed as of April 28, 2008 …. ***Conservation Force*** may file a reply of up to five pages within one week of the government's response to this order." May 13 Order, page 2 (emphasis added).

SCI and SCIF want to make it clear that any ruling by this Court on the issue of whether the MMPA currently allows the import of such trophies, an issue raised only by Federal Defendants and Plaintiffs in response to Intervenor Conservation Force's motion for reconsideration, will not be binding on SCI and SCIF in any future litigation on this issue. As mentioned above, SCI and SCIF did not raise this issue and has not litigated it here.  Nonparties are not bound (*e.g.,* under res judicata, estoppel, or law of the case principles) by rulings in a case in which they participate only as amici curiae  *Munoz v. County of Imperial*, 667 F.2d 811, 816 (9th Cir. 1982) ("the filing of an amicus brief has never been enough to bind a non-party to the result of a proceeding"); *Stryker v. Crane,* 123 U.S. 527, 539-40, 8 S.Ct. 203 (1887) (filing of a brief by a non-party does not bind the non-party to the decree or estop the non-party from raising the same issue in another case).  SCI and SCIF are raising related issues in another proceeding, which should not be affected by any ruling issued by this Court.

1    Dated:  June 3, 2008.

2                                    Respectfully Submitted,

3                                    /s/ J. Jeffries Goodwin
                                     J. Jeffries Goodwin, CASBN 099310
4                                    Goodwin Law Corporation
                                     2300 Bell Executive Lane
5                                    Sacramento, CA 95825
                                     Telephone:  (916) 929-6000
6                                    Facsimile:  (916) 929-5137
                                     jjg@goodwinlawcorp.com
7

8                                    /s/ Douglas S. Burdin
                                     Douglas S. Burdin
9                                    Admitted Pro Hac Vice
                                     D.C. Bar # 434107
10                                   Safari Club International
                                     501 2nd Street N.E.
11                                   Washington, D. C.  20002
                                     Telephone: (202) 543-8733
12                                   Facsimile: (202) 543-1205
                                     dburdin@safariclub.org
13

14                                   Counsel for
                                     Safari Club International and
15                                   Safari Club International Foundation

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTACHMENT 2


Safari Club International v. Kempthorne

Case No. 08-881 (EGS) (D.D.C.)


Safari Club International et al. Opposition

to Motions to Intervene

◁◁ᑭᖅ-ᓄᑖᖑᒃ ᐃᖅᑲ

Avatiliqiyikkut
ᐊᕙᑎᓕᕆᔨᒃᑯᑦ

Department of Environment
Department of Environment
Ministère de l'Environnement

Ministère de l'Environnement

October 22, 2007

Tom Melius
Director, Alaska Region
U.S. Fish and Wildlife Service
Marine Mammals Management Office
1011 East Tudor Road
Anchorage, Alaska
99503

Dear Director Melius,

The Government of Nunavut welcomes the opportunity to provide comment on the nine U.S. Geological Survey (USGS) Administrative Reports that were released in September of 2007. As you are aware, 60% of the world's polar bears occur in our territory of Nunavut, and we have an active research and harvest management program in twelve subpopulations. Polar bears hold nutritional, economic, cultural and spiritual value for the Inuit people of Nunavut. We have therefore read your reports with great interest.

We have previously commented to the USFWS on the listing of the polar bears under the *Endangered Species Act*. We do not support the listing of the polar bear as "threatened throughout its range". We do not support such a listing, as we believe our harvest management and research program is adaptable, pro-active conservation for polar bears in light of an uncertain future.

It is becoming increasingly apparent that polar bear subpopulations will respond differentially to climate change. We acknowledge the variation in ecological circumstances, and acknowledge that some polar bear populations will be negatively impacted by climate change. We know that many subpopulations within Nunavut are doing well and are in fact thriving. Our research and management program provides the opportunity to manage these populations sustainably on an on-going basis.

Nunavut's polar bear research and management program

The Government of Nunavut is mandated by the *Nunavut Land Claims Agreement* to employ *"an effective system of wildlife management that complements Inuit harvesting rights…and that contributes to the conservation of wildlife and protection of wildlife habitat" [NLCA, 5.1.2(e)]*. Further, our *"wildlife management system … (is) subject to the principles of conservation" [NLCA, 5.1.2(g)]*.

We strive to adhere to a 15-year polar bear subpopulation inventory cycle; this cycle has been approved by local Hunter and Trapper Organizations (HTO's), the NWMB and our government. Therefore, our research and monitoring efforts for polar bears are well-supported and will continue.

Drikus Gissing
Director, Wildlife Management
Department of Environment
Government of Nunavut

P.O. Box 389
Pond Inlet, NU
Iqaluit, NU
X0A 0S0

Phone  867-899-8034
Fax     867-899-8017
dgissing@gov.nu.ca



ᐃᕙᑎᓕᒋᔨᐃᑦ

Avatiligiyiit

Department of Environment

Ministère de l'Environnement

The primary focus of our population inventories is to determine population size and status (increasing, decreasing or stable) from intensive mark-recapture studies. From these studies and Population Viability Analysis (PVA), we determine whether polar bear subpopulations can sustain a harvest. In turn, an annual quota in stable or increasing subpopulations is divided among the communities. Community HTOs can then determine how to implement the annual harvest; they can decide to allow a non-aboriginal (*i.e.*, Canadian or foreign) hunter to harvest a polar bear from their annual quota. Polar bears harvested by U.S. hunters are not additional to community quotas. Listing the polar bear throughout its range under the ESA will not decrease the number of bears harvested in Nunavut, it will only decrease economic benefits to Inuit due to the *ESA*'s interaction with the *Marine Mammal Protection Act* by banning the import of polar bear hides into the United States.

In light of climate change – a phenomenon that our government and the Inuit of Nunavut are intimately aware of – we have been increasing and will continue to increase efforts for polar bear research and monitoring. For example, we have started ecological research projects including the examination of changes in polar bear diet over time in Baffin Bay and Davis Strait. Further, one of our current projects examines polar bear movement and ice habitat selection in Foxe Basin – a population in the seasonal ice ecoregion.

Finally, we are engaged in collaborations to improve our PVA model to incorporate changes in demographic rates over time. Demographic rates of polar bears (*i.e.*, recruitment and survival) as a result of changes in body condition, ultimately as a result of changes in ice-habitat, can no longer be assumed to be constant.

In this way, we are managing our polar bear populations in the face of an uncertain future, rather than assuming stasis in polar bear habitat and demographic rates.

Brief Comments on US Geological Survey Administrative Reports

The USGS reports cover a diversity of ecological analysis and here we offer our comments with respect to consequences for listing the polar bear as *threatened*.

1) Durner, et al. *Predicting the Future Distribution of Polar Bear Habitat in the Polar Basin from Resource Selection Function Models Applied to 21st Century General Circulation Model Projections of Sea Ice*

Durner, et al.'s report using RSF modeling illustrates the reduction of polar bear optimal ice habitat in the pelagic ecoregion in the 21st century. This report uses long term telemetry data and state-of-the-art habitat modeling. It also incorporates a range of ice models, as it uses 10 GCM models accepted by the IPCC.

We appreciate that USGS incorporated variation in ice models, as it is important to model such uncertainty and variation in scientific modeling. However, the report only focuses on one ecological region - the pelagic ecoregion. While we understand the time limitations imposed on the USGS researchers, this report is only relevant for a handful of polar bear subpopulations,

Drikus Gissing
Director, Wildlife Management
Department of Environment
Government of Nunavut

P.O. Box 389
Pond Inlet, NU
Iqaluit, NU
X0A 0S0

Phone  867-899-8034
Fax    867-899-8017
dgissing@gov.nu.ca



ᐊᕙᑏᓕᒋᔩᑦ

Avatiligiyiit

Department of Environment

Ministère de l'Environnement

and only is relevant to one population managed by the Government of Nunavut (the North Beaufort). Most polar bears are not distributed in pelagic areas, as they occur on continental shelf waters, thus the implications of this analysis to a range-wide up-listing of polar bears are ambiguous.

2) Amstrup et al. *Forecasting the Range-wide Status of Polar Bears at Selected Times in the 21st Century*

We appreciate the effort of the USGS to attempt to tie complex demographic and behavioral information with habitat modeling. The deterministic model is straightforward and provides a good baseline prediction of polar bear densities in the future. We commend the USGS for not extrapolating information on optimal polar bear habitat – determined only in the pelagic ecosystem – to predict densities in the other ecoregions.

Your Bayesian-Network modeling is still a work-in-progress, as only one polar bear expert has contributed. Perhaps in future you will engage the expertise of our Nunavut polar bear biologists and other biologists in your future modeling. In that way, information and expertise from research incorporating 60% of the world's polar bears will be included.

This modeling effort – which is in its infancy – and not peer-reviewed – should be regarded as preliminary, and should not be used as conclusive prediction of immediate, range-wide decline in polar bear population densities.

3) Stirling, I., et al. *Polar Bear Population Status in the Northern Beaufort Sea*

This report concludes that the northern Beaufort Sea polar bear subpopulation is fairly stable due in part to a relatively low harvest rate. There is a great degree of overlap between the northern and southern Beaufort Sea populations.

The difficulties currently being experienced in the southern Beaufort population, yet not in the northern Beaufort, are germane to the argument that a range-wide up-listing is premature. The adjacent and genetically indistinct northern Beaufort Sea population appears to have remained relatively constant through-out the past 20 years. Our contention that each population must be considered individually because each population has unique ecological characteristics is supported.

4) Obbard, et al. *Polar Bear Population Status in the Southern Hudson Bay, Canada*

The Government of Nunavut contributed financially and logistically to the data collected for the current population analysis of polar bears in the southern Hudson Bay – a population that we share with Ontario. However, we were not invited to participate in the analysis of these data.

We acknowledge that there is evidence of a trend of decline body condition and survival rates in these polar bears, and given the pattern observed in western Hudson Bay, a decline in population number may be imminent. We do, however, assert that the population numbers may be biased low as a result of not including bears on the Twin and Akimiski islands of Nunavut

Drikus Gissing
Director, Wildlife Management
Department of Environment
Government of Nunavut

P.O. Box 389
Pond Inlet, NU
Iqaluit, NU
X0A 0S0

Phone  867-899-8034
Fax     867-899-8017
dgissing@gov.nu.ca



ᐊᕐᓇᑐᓕᕆᔨᒃᑯᑦ

Avatiliqiyiit

Department of Environment

Ministère de l'Environnement

**Nunavut**

and in James Bay. Because bears were not surveyed in these areas, it is likely that survival rates are also biased low.

5) Rode, et al. *Polar bears in the Southern Beaufort Sea: Stature, Mass and Cub Recruitment in Relationship to Time and Sea Ice Extent between 1982 and 2006*

6) Regher, et al. *Polar Bears in the Southern Beaufort Sea I:  Survival and Breeding in Relation to Sea Ice Conditions, 2001-2006*

7) Hunter, C.M., et al. 2007.  *Polar Bears in the Southern Beaufort Sea I: Demography and Population Growth in Relation to Sea Ice Conditions*

We acknowledge that body condition of polar bears is likely to change as a result of changes in ice condition, but also due to intermediate density effects as a result of changes in ice distribution.

The rationales of the demographic and body metrics analyses were apparent and the results presented in these reports are credible. We were able to evaluate the simulation model, which had a structure that was consistent with the analysis models for the demographic input variables in the companion papers. The simulation model was correct and confidence in the demographic and morphometric and body condition analyses were high.

The results from these papers are credible because they were mixed, demonstrating the complexity of ecological relationships even within a single subpopulation of bears. There seems to be a time trend in some of the demographic rates and body measurements.  Body metrics of subadult males and of cubs-of-the-year were the only age-sex classes that had positive relationships with increasing ice-cover.

The failure to demonstrate a correlation with ice in other sex-age classes may have been due to a limited sample size or the coarse grain of remote sensing of ice habitat. The differential relationship with ice and age-sex classes may also be a function of the relatively recent changes in ice conditions, affecting a long-lived animal and/or differential behavior of the sex-age classes (alluded to by the authors). The final alternative (not necessarily mutually exclusive) is that the declines over time were not related to changes in ice conditions. However, the authors discuss and dismiss other contributing factors such as disease and sex-selective hunting, but do not provide analyses to support this contention.

We accept that the population and demographic impacts of recent reductions of sea ice on the southern Beaufort polar bear populations are real. However, the relevance of these findings to a range-wide up-listing of polar bears was not demonstrated.

8) Bergen, et al. *Predicting Movements of Female Polar bears between Summer Sea Ice Foraging Habitats and Terrestrial Denning habitats of Alaska in the 21st Century: Proposed Methodology and Pilot Assessment*

Drikus Gissing
Director, Wildlife Management
Department of Environment
Government of Nunavut

P.O. Box 389
Pond Inlet, NU
Iqaluit, NU
X0A 0S0

Phone  867-899-8034
Fax    867-899-8017
dgissing@gov.nu.ca



ᐊᕙᑏᓕᒋᔨᐃᑦ

Avatiligiyiit

Department of Environment

Ministère de l'Environnement

This report was restricted to the projected (IPCC climate model projections) impacts of ice reductions to denning polar bears in Alaska. This report was well written and provides a good discussion of potential impacts of progressive ice reductions to Alaskan polar bears. The paper provides a coherent extrapolation of the IPCC ice projects to the distances between summer foraging areas and onshore denning areas. However, it does not explore other options for polar bears, such as onshore summer retreats similar to those that occur in southern populations.

The paper was well-written and properly qualified, but it's relevance to a range-wide up-listing of polar bears (or even the status of Alaskan polar bears) was not clear.

9) DeWeaver, E. *Climate Model Projections of Arctic Sea Ice Decline: An Evaluation Relevant to Polar Bears*

This reports concerns uncertainties in the IPCC climate models, and their ability to accurately forecast changes in ice. The other USGS reports presented on the interaction of ice habitat and polar bears inherently rely on uncertainty in ice models. This report concludes that uncertainty is inherent in climate models, and that the best use of these data are to use ensemble means (used in the RSF and Bayesian Networking reports) and to use those models that corroborated by present-day empirical observations. As a result of the latter, the author suggests that most ice predictive models are likely conservative.

As stated before, we have actively been involved in incorporating habitat change into our PVA models, which we use to manage our harvest.

Conclusion

Our current and proposed polar bear research and management programs constitute proactive polar bear conservation, while allowing our people to practice a traditional, and sustainable, subsistence harvest.

We will continue to ensure that our polar bear harvest, research and habitat protection is regulated with best-available scientific data and Inuit knowledge.

Despite a thorough review on these papers, we failed to find evidence that would provide the basis for range-wide up-listing of polar bears. Therefore, the Government of Nunavut continues to firmly oppose the listing of the polar bear as "threatened throughout its range.

Sincerely,

Drikus Gissing
Director of Wildlife Management

---

Drikus Gissing
Director, Wildlife Management
Department of Environment
Government of Nunavut

P.O. Box 389
Pond Inlet, NU
Iqaluit, NU
X0A 0S0

Phone  867-899-8034
Fax     867-899-8017
dgissing@gov.nu.ca

ATTACHMENT 3


Safari Club International v. Kempthorne

Case No. 08-881 (EGS) (D.D.C.)


Safari Club International et al. Opposition

to Motions to Intervene





Wildlife Division
Department of Environment and Natural
Resources
Government of the Northwest Territories
PO Box 1320
YELLOWKNIFE NT X1A 2L9

Phone:  (867) 920-8064
Fax:    (867) 873-0293

**To:** Super visor
USF&W Service
**Fax:** Marine Mammals Mgt

**From:** Susan Fleck
**Pages:** 29
**Date:**

**Phone:** 907-786-3816
**Re:**
**CC:**

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

● Comments:

Re: Petition to List Polar Bear
as Threatened.

**WARNING:** The documents accompanying this transmission contain confidential information intended for a specific individual and purpose. The information is private, and is legally protected by law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reference to the contents of this faxed information is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and RETURN THE ORIGINAL to us by regular mail. Thank you.



Northwest
Territories  Environment and Natural Resources          JUN 1 6 2006

Supervisor
US F&W Service
Marine Mammals Management Office
1011 East Tudor Road
Anchorage, AK USA
FAX 907-786-3816
EMAIL AK_Polarbear@fws.gov

**Attention:   Polar Bear - Re:  50 CFR Part 17 Endangered and Threatened
Wildlife and Plants: Petition to List the Polar Bear as Threatened**

Thank you for extending the public comment period regarding the Petition to List
the Polar Bear as Threatened.   The Canadian Polar Bear Administrative
Committee (PBAC) would like to provide the attached information on
management and conservation initiatives in place to ensure that polar bear
populations in Canada remain productive and that harvesting remains
sustainable. The PBAC members represent jurisdictions, boards or agencies that
have legal responsibility for polar bear management in Canada including
representatives from each of the provinces and territories that have management
authority for polar bears (Manitoba, Newfoundland and Labrador, Northwest
Territories, Nunavut, Ontario, Québec, and Yukon); the Canadian Wildlife
Service; Parks Canada Agency; and co-management committees or boards that
share legal responsibility for polar bears on behalf of Aboriginal people.
Currently, these include the Wildlife Management Advisory Council (NWT),
Inuvialuit Game Council, the Nunatsiavut Government, Makivik Corporation,
Nunavut Tunngavik Incorporated and the Nunavut Wildlife Management Board.

We respect the views of those organizations that have filed the petition to have
polar bears listed under the US *Endangered Species Act* and recognize that the
petition and US Fish and Wildlife Service review is not specific to Canada but
rather concerns the impacts of climate change on polar bears throughout the
world.  However, such a listing would have a significant impact in Canada and,
therefore, is of great concern to the PBAC.

...⁄2



- 2 -

We understand that there may be further opportunity to comment on the finding
once completed.  Should additional information with respect to the management
and conservation of polar bears in Canada be required for this review, the PBAC
would be pleased to provide such information.

Susan Fleck
Chair, PBAC

Attachments (2)

c    Polar Bear Administrative Committee
     Polar Bear Technical Committee
     Mr. Scott Schliebe, US F&WS
     Mr. Don MacLauchlan, Association of Fish and Wildlife Agencies

Attachment 1: PBAC Response to USF&W - Petition to List the Polar Bear as Threatened

## 1.    Canadian Polar Bear Populations - Summary

Approximately 15,000 polar bears, distributed in 13 relatively discrete populations occur in Canada. This represents 60 – 70% of the total number of polar bears throughout the world. Nine of these populations lie solely within the boundaries of Canada, one is shared with Alaska (USA) and three are shared with Greenland.



**Figure 1.** Canadian polar bear populations as of 31 December 2005. BB: Baffin Bay; DS: Davis Strait; FB: Foxe Basin; GB: Gulf of Boothia; KB: Kane Basin; LS: Lancaster Sound; MC: M'Clintock Channel; NB: Northern Beaufort Sea; NW: Norwegian Bay; SB: Southern Beaufort Sea; SH: Southern Hudson Bay; VM: Viscount Melville Sound; WH: Western Hudson Bay.

Polar bears in Canada are managed at the population level because each population faces a different set of conditions that affect productivity, survival, and ultimately, population size. Research to improve our understanding of polar bear ecology and population status continues and ongoing results are incorporated into the specific management initiatives for each population. As you will be aware, research and management are reviewed annually by the Canadian Polar Bear Technical Committee (PBTC). The members of PBTC represent the same agencies as the PBAC. Recommendations are then provided to the PBAC.

Attachment 1: PBAC Response to USF&W - Petition to List the Polar Bear as Threatened

Canadian research has been undertaken to identify and monitor the immediate impacts of threats to polar bears that include not only climate change but also environmental contaminants, industrial development, and human harvest.

Management includes a high level of local community input as well as regional, national and international involvement. In some areas, where polar bears are at the extreme southern edge of their range, such as in western Hudson Bay, reduced sea ice conditions, likely related to climate change, are having a negative impact on polar bears. The responsible management authorities are closely watching these populations and new management approaches are being discussed to address the decreasing habitat capacity.

At the May 2006 meeting of the PBAC, all jurisdictions agreed to begin work on a Canadian Polar Bear Management Strategy (2007-17). Furthermore, immediate action is being undertaken to complete and finalize interjurisdictional agreements for shared polar bear populations (see attached minutes).

## 2.    Canadian Polar Bear Populations - Population Status

Both the IUCN/SSC Polar Bear Specialist Group and the Canadian Polar Bear Technical Committee are finalizing their status reports on polar bear populations. It is the understanding of the PBAC that both status reports will be completed shortly and will be made available to your agency for this review.

## 3.    Polar Bear Management and Conservation Programs

### International

3.1.    *International Agreement for the Conservation of Polar Bears and their Habitat (1973)*

In the 1960s and 1970s, polar bears were considered in danger of extinction. Recognizing that an international cooperative effort would be required, the five nations with polar bear populations, Canada, Denmark/Greenland, Norway, the former Soviet Union and the United States, signed an International Agreement for the Conservation of Polar Bears and Their Habitat in 1973.

This agreement has been effective in promoting polar bear recovery and has been the basis for all polar bear management actions in Canada and guides other member countries.

Under the terms of the agreement, a committee of experts – IUCN/SSC Polar Bear Specialist Group (PBSG) meets every 3 – 5 years to review and exchange information on progress in the research and management of polar bears throughout the Arctic and to review the status of polar bears. At their meeting in

Attachment 1:  PBAC Response to USF&W - Petition to List the Polar Bear as Threatened

Seattle in June 2005, the PBSG highlighted the importance of polar bear harvesting to the culture and economy of Aboriginal groups throughout much of the Arctic and emphasized the need to maintain a harvest that is within sustainable limits in relation to subpopulation size and trends.  This approach already forms the backbone of polar bear management in Canada.  The PBSG also recognized the importance of wildlife and environmental observations made by Aboriginal residents of the Arctic and confirmed the importance of integrating traditional ecological knowledge with scientific studies so that management decisions are based on the best available data.

3.2    *Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES)*

Polar bears are listed under CITES Appendix II, which prohibits the export of polar bear parts without a permit.  An export permit can only be issued if the bear was legally obtained and if the export will not be detrimental to the survival of the species and will not likely contribute to the illegal trade in bear parts.  Canada is a signatory to this agreement and recognizes the value of this Convention as a conservation tool.

<u>Within Canada</u>

3.3    General Status of Polar Bear in Canada

The Government of Canada passed the *Species at Risk Act* (SARA) on 12 December 2002. The purposes of SARA are to prevent wildlife from becoming extinct in Canada, to provide for the recovery of wildlife species that are extirpated, endangered or threatened as a result of human activity, and to manage species of special concern to prevent them from becoming endangered or threatened.  Under the Act, the Committee on the Status of Endangered Wildlife in Canada (COSEWIC) continues to provide independent, scientific assessments of the status of species at risk in Canada. These assessment reports are provided as recommendations to the Government and a copy is placed in the Public Registry.

COSEWIC uses the best available scientific and traditional knowledge to assess status, independent of economic, social or political concerns.  Assessments are based on comprehensive status reports that include identification of existing and potential threats to the species.  Polar bears were assessed by COSEWIC as a species of Special Concern in April 1991.

Special Concern is an indication that a species may become threatened or endangered because of a combination of biological characteristics and identified threats.  A designation of Special Concern indicates that monitoring and preventive management is warranted to ensure that a species remains healthy. Canadian polar bear management programs have incorporated this approach.

Attachment 1: PBAC Response to USF&W - Petition to List the Polar Bear as Threatened

The status was re-examined and the designation of Special Concern was re-confirmed in April 1999 and again in November 2002. The status of polar bears in Canada is currently being re-assessed; a report is expected to be released for public consultations in 2008.

3.4    Protection and Management of Canadian polar bear populations

Within Canada, the authority for the management of polar bears lies with the seven provincial and territorial jurisdictions in which they occur (Nunavut, Northwest Territories, Yukon, Manitoba, Ontario, Québec, Newfoundland and Labrador). As polar bear populations are an international resource, the Government of Canada has always been involved with the research, monitoring, management and conservation efforts that are coordinated across jurisdictions through the PBTC and PBAC. These committees provide a forum to share information and coordinate decisions with respect to the management of polar bears. Both committees meet annually to review the status of each population, its sustainable harvest and the annual harvest. Research is published as it is completed.

Canadian management objectives for polar bears focus on maintaining productive populations. Where hunting is allowed, quotas are set to keep the harvest within sustainable limits. Quotas and other management decisions are based on extensive research and monitoring of population size and distribution. Programs to monitor and record the annual harvest and incidental removal of polar bears are in place in all jurisdictions. Infractions of polar bear regulations are almost non-existent.

The vast majority of polar bear populations in Canada occur in Nunavut and the Northwest Territories, within either the Inuvialuit or Nunavut land claim settlement areas. Decisions on polar bear management are made within a co-management process with input from both government and Aboriginal user groups. In the 1980s, measures were successfully implemented to reduce harvests where polar bear populations were declining.

*Transboundary Agreements*

In the case of the South Beaufort Sea population, which is shared between Canada and Alaska, an international conservation agreement has been signed between the traditional harvesters of polar bears - the Inupiat of Alaska and Inuvialuit of Canada. This international agreement was first signed in 1988, then renegotiated, reviewed and signed again in 1999. Among other conservation actions, the agreement establishes harvest limits and allocates the limits between the jurisdictions.

The Inuvialuit/Inupiat Co-management Agreement is being used as a model in developing other conservation agreements throughout the north. A similar

Attachment 1: PBAC Response to USF&W - Petition to List the Polar Bear as Threatened

agreement has been developed for the Chukchi/Bering Sea polar bear population shared between the Inupiat of Alaska and the Chukotka natives of Russia. As well, an agreement was recently signed in February 2006 between the Inuit of the Kitikmeot West region of Nunavut and the Inuvialuit for the two populations they share. A draft government-to-government agreement between the Northwest Territories and Nunavut has also been prepared for these two populations. This draft agreement will be shared with other jurisdictions in order to prepare similar agreements for all shared polar bear populations in Canada.

## Climate Change

As the management regimes involve annual reviews, these provide an appropriate framework within which to respond to the impact of climate change on polar bear populations.

## Development Activities

Land claim agreements require regulatory review processes for exploration and development activities. These reviews include a consideration of impact on polar bear populations and all wildlife from human activities and establishing conditions for operation. Provincial governments have similar regulatory review processes.

## Harvest

Enforceable quotas are in effect for all polar bear harvesting that occurs in Newfoundland and Labrador, the NWT and Nunavut. These quotas represent more than 80% of all polar bear harvest in Canada. Quotas are reviewed annually.

In Nunavut and the NWT, a flexible quota system is being applied which takes the sex ratio of each year's harvest into account, by population, and adjusts the allowable quota in the following year to account for any over-harvest that might occur. Defence kills are included in the quotas. Polar bear meat is still an important country food and, in most Inuit communities, there are more hunters who wish to harvest a bear than there are available tags; so tags are assigned through a lottery system or other means by the community hunters and trappers association. Management agreements and/or memoranda of understanding have been developed with local communities. There is a high level of hunter involvement in monitoring populations and setting quotas and a high level of compliance with quotas and regulations.

Outfitted polar bear hunts currently only occur in Nunavut and NWT. Tags for outfitted hunting are taken from the same pool as the subsistence hunting tags. The high value of the outfitted hunts and the traditional subsistence hunt to community members result in a high value placed on the polar bears as a

resource and a concomitant high level of compliance with conservation measures.

In Manitoba, polar bears are a protected species under the *Manitoba Wildlife Act* and all hunting, including harvesting by Aboriginal people, is prohibited.

Although there is no quota in Ontario, polar bears are classified as furbearers. There is no open season. Some native trappers are allowed to take a limited number each year. Polar bear dens are protected from damage or destruction.

In Québec, the *James Bay Agreement* entitles Inuit to a guaranteed harvest level of 62 bears annually as long as there are no conservation issues. In recent years, harvest has declined to 30 – 40 bears a year. Quebec Inuit hunters agreed to constrain harvesting to current levels, which appear to be sustainable.

## 4.    Outfitted Hunting - Potential Impacts Of Listing Polar Bears Under the US *Endangered Species Act*

Outfitted hunts for polar bears are carried out on most polar bear populations in the NWT and Nunavut. American hunters form a majority of the clientele. The hunts are highly regulated and carried out within the total annual allowable harvests set for each polar bear population.

Territorial legislation requires that all non-resident and non-resident alien hunters engage the services of an Inuit outfitter and guide and must hunt using a dog team. All hunters, including Aboriginal hunters, must have a tag to harvest a polar bear. Each community has the responsibility of allocating the tags among subsistence hunters and outfitters. Typically, outfitted hunts account for less than 25% of the total annual harvest in NWT and Nunavut (Table 1).

Outfitted hunts generate a substantial amount of income for the Inuit outfitters and guides and play an important economic role in Canada's Arctic communities. The hunts bring seasonal employment and approximately $20,000 per hunt into the community. The estimated economic value of outfitted polar bear hunting in Nunavut ranges between $1.2 million and $2.5 million dollars a year. This is a significant cash input into Inuit communities that typically have less than 500 residents, are isolated and where economic opportunities in the wage economy are limited to the teacher, nurse, water and sewage truck driver, cooperative grocery store, hotel and a few government positions. The loss of this seasonal employment associated with outfitted hunting would greatly reduce the cash income needed by Inuit to purchase equipment and supplies for subsistence harvesting and for housing, food and clothing.

Outfitted hunts target male bears resulting in less of an impact on the reproductive portion of the polar bear population. The high monetary value of the outfitted hunts also provides an incentive to ensure that harvests are sustainable

Attachment 1: PBAC Response to USF&W - Petition to List the Polar Bear as Threatened

because existing management systems reduce the allowable harvests in populations that are negatively impacted by harvesting. Furthermore, populations currently approved by the USFWS for exemptions under the *Marine Mammal Protection Act* (*MMPA*) would lose approval status if management concerns arose.

## Table 1: Outfitted Hunts in Canadian Polar Bear Harvest

| Population | Quota | Total 2004/05 harvest | Tags allocated for outfitted hunting | Successful Outfitted Hunts | % harvest through outfitted hunts |
|---|---|---|---|---|---|
| Southern Beaufort Sea | 40 | 19 | 16 | 9 | 47% |
| Northern Beaufort Sea | 65 | 36 | 22 | 17 | 47% |
| Viscount Melville Sound | 7 | 5 | 3 | 3 | 71% |
| Norwegian Bay | 4 | 4 | 2 | 2 | 50% |
| Lancaster Sound | | 87 | 38 | 33 | 38% |
| M'Clintock Channel | 3 | 2 | 2 | 2 | 100% |
| Gulf of Boothia | | 66 | 9 | 6 | 9% |
| Foxe Basin | | 94 | 17 | 14 | 15% |
| Western Hudson Bay | | 43 | 7 | 4 | 9% |
| Southern Hudson Bay | | 27 | 0 | 0 | 0% |
| Kane Basin | 5 | 1 | 0 | 0 | 0% |
| Baffin Bay | 105 | 97 | 19 | 14 | 14% |
| Davis Strait | | 48 | 2 | 2 | 4% |
| Total | 229 | 529 | 139 | 108 | 20% |

## 5.    Conclusion

Listing polar bears under the US ESA will not stop the impacts of climate change on loss of sea ice and polar bears. Canadian management and conservation initiatives are already in place to respond to changes in population size. Canadian jurisdictions have a proven history of taking corrective measures to ensure that polar bear populations remain productive. Provisions under the US MMPA (approval, disapproval) for exemptions of Canadian polar bear populations already exist and provide a mechanism for the US to influence the impact their citizens have on polar bear populations in Canada. A potential listing seems excessive and unnecessarily punitive on Canadian citizens considering mechanisms are already in place both within Canada and the US with respect to conservation of Canadian polar bear populations.

PBAC 2006 – Draft Minutes

# Minutes of the 2006 Meeting of the Federal-Provincial-Territorial Administrative Committee for Polar Bear Research and Management

Fredericton, New Brunswick

9 May 2006

5

Chair:     Susan Fleck
10          NWT Dept. of Environment and Natural Resources

Secretary:  Nick Lunn
           Canadian Wildlife Service

15

## Agenda

1. Introductory remarks, review of minutes of 2005 PBAC meeting.................................................. 2

20  2. Business arising from the 2005 meeting of the PBAC.................................................. 2

3. Report on the 2005 meeting of the IUCN Polar Bear Specialist Group (Seattle).................... 3

4. Report on the 2006 meeting of the Technical Committee (St. John's) ............................... 4

5. Terms of Reference – PBAC and PBTC ............................................................... 6

6. US Marine Mammal Protection Act.................................................................. 7

25  7. Petition to have polar bears listed as threatened under the US Endangered Species Act.................... 9

8. Status of management agreements and memoranda of understanding.................................. 10

9. Inventories of populations within or shared by Canada .............................................. 11

10. Additional business ........................................................................... 12

11. Adjournment .................................................................................. 13

30  12. Summary of action items...................................................................... 13

13. Members and participants ...................................................................... 15

Attachment 2: Minutes from May 2006 PBAC Meeting

1. **Introductory Remarks**

    Susan Fleck called the 2006 meeting of the Polar Bear Administrative Committee to order at 1914h in the St. Croix Room, Crowne Plaza Fredericton-Lord Beaverbrook Hotel, Fredericton, New Brunswick. Bill Gummer represented the Canadian Wildlife Service. Stephen Woodley (Parks Canada) was unable to attend. Arnold Boer, Jane Cooper (Assistant Deputy Minister, Department of Environment, Nunavut) and Greg Thompson (Director, Species at Risk, Canadian Wildlife Service, Environment Canada) also participated.

    Nick Lunn had electronically distributed a preliminary agenda and background material for the evening's meeting.

    Fleck reviewed the agenda and asked for any additional items. Drikus Gissing asked to be able to discuss sample collections related to the Nunavut harvest.

2. **Business Arising from the Minutes of the 2005 Meeting of the PBAC**

    Lunn briefly summarized the status of business arising from the 2005 meeting.

    a) **Draft Terms of Reference for both the Administrative and Technical Committees**
    Drafts to be developed and circulated for discussion at this year's meeting.

    *Completed* – To be discussed under Item #5

    b) **Development of a Canadian Conservation Strategy and Management Plan for Polar Bears**
    A need had been identified by the PBAC for the development of a national plan with respect to the conservation of polar bears and that each jurisdiction should contribute to the development. The final document would be considered to be advice to government. Each jurisdiction agreed to nominate an individual to participate on a Working Group to develop a Table of Contacts and subsequently a draft document.

    *Not Completed.*

There was agreement that a Canadian polar bear conservation strategy was important, especially given the current attention polar bears are receiving (e.g., petition to list them as a threatened species in the US, the recent IUCN Red List upgrading to Vulnerable, and general concerns related to climate change). Jack Dubois thought that in order to

Attachment 2:  Minutes from May 2006 PBAC Meeting

complete it would need to be tasked with specific deadlines rather than everyone simply agreeing it is important and indicating willingness to contribute.  He thought that the Technical Committee would seem to be the most logical to be given the task of completion.  Lunn commented that the Technical Committee would need clear direction from the Administrative Committee with respect to what the strategy is expected to address, especially if management issues are to be included.

Jim Hancock asked about the status of the Non-Detrimental Findings report for polar bears.  Dubois replied that he had been asked to look into the process of the drafting of NDF reports but thought the need had been overshadowed by the upcoming COSEWIC re-assessment and the potential listing of polar bears in the US.  Both of these will amass the same information that would be needed in an NDF report should one be formally requested.

Fleck cautioned that a conservation strategy and a management plan were two separate things.

There was consensus to move on completing this item.  The NWT, Nunavut, and Manitoba are to prepare an outline for a conservation strategy and management plan that will be reviewed by both the Administrative and Technical Committees.  The intent is to complete the strategy in time for review and approval at the May 2007 meeting of the Canadian Wildlife Directors Committee.  Subsequently, it would be given to Deputy Ministers and Ministers to approve.

3.  **Report on the 2005 Meeting of the IUCN Polar Bear Specialist Group (Seattle)**

The IUCN Polar Bear Specialist Group (PBSG) met in Seattle, WA, 20th-24th June, 2005.  The members of the Canadian delegation followed the direction given by the PBAC.  The three Canadian-appointed members were Ian Stirling (senior delegate), Mitch Taylor (representing Nunavut), and Marty Obbard (representing the other provinces and territories).  Andy Derocher and Nick Lunn attended as PBSG Chair-appointed members.  Invited Specialists from Canada were Larry Carpenter (WMAC (NWT)), David Lee (NTI), Phil McLoughlin (University of Saskatchewan), Gabriel Nirlungayuk (NTI), Frank Poklak (IGC), and Evan Richardson (CWS).

The meeting consisted of research and management reports given by each of the 5 polar bear nations (Canada, Denmark/Greenland, Norway, Russian Federation, and the United States), as well as presentations on climate change and a workshop of population inventory and assessment techniques.  Dr. Andy Derocher from the University of Alberta was elected the new chair of the PBSG. His term will run through the end of the next meeting (4-5 years). Minutes of the meeting have been finalized and will be part of the proceedings that will be published by the IUCN hopefully before the end of 2006.

At the meeting there was considerable debate about the recent changes in population estimates and quota increases for some populations in Nunavut.

Attachment 2:  Minutes from May 2006 PBAC Meeting

The PBSG supported the use of local knowledge but suggested that an increasing population may not be the only explanation for why hunters are seeing more bears. It was noted that the international *Agreement on the Conservation of Polar Bears and Their Habitat* (1973) states that the management of polar bears should be based on the best scientific knowledge available. As a result of these discussions a resolution (Resolution #1-2005) was drafted stipulating a precautionary approach when setting polar bear catch limits in the Arctic. In addition a resolution (Res#3-2005) was made recognizing that the Western Hudson Bay population is in decline and recommended that 'appropriate management action' be taken without delay. A total of six resolutions were drafted at the meeting and were circulated to both the Administrative and Technical Committees shortly after the Seattle meeting.  These resolutions are also on the PBSG website (http://pbsg.npolar.no/).

Using the 1994 Red List Categories and Criteria, the last IUCN assessment of polar bears resulted in a classification of Lower Risk- Conservation Dependent. New assessment criteria were implemented in 2001. Prior to the 2005 Seattle meeting, the PBSG reviewed the red list status of polar bears using these new criteria. Øystein Wiig (Norway) undertook the review on behalf of the PBSG and concluded that polar bears would now qualify as a *Vulnerable* species based on Population Reduction criteria (suspected reduction of $\geq$ 30% that would be met within the next 10 years or 3 generations (up to 100 years) whichever is greater). The PBSG supported Wiig's review and agreed to recommend to the IUCN that polar bears should be listed as *Vulnerable* given the potential threat of global warming possibly resulting in a loss of up to 30% of the world's polar bear population within three generations. On 2 May, the World Conservation Union (IUCN) released the 2006 Red List of Threatened Species. Polar bears are listed as *Vulnerable,* which is the lowest of three threatened categories used by the IUCN (critically endangered and endangered are the other two).

Bill Gummer asked about the equivalent COSEWIC and IUCN Red List categories. Both Fleck and Lunn thought that Special Concern (COSEWIC) and Least Concern – Conservation Dependent (IUCN) were equivalent. Threatened was thought to be the equivalent COSEWIC category to an IUCN Red Listing of Vulnerable. Fleck felt that the recent IUCN Red Listing may cause difficulties for the COSEWIC re-assessment that has just begun. Fleck asked how often the IUCN updates their Red List and whether there is an opportunity to provide new information for consideration when it is available. Lunn did not know the specifics of the process but said he would find out.

Gissing noted that Nunavut's perception was that the IUCN Red Listing and the petition in the US were both initiated as a direct response to the quota changes in Nunavut. He felt these actions were inappropriate given that Nunavut has a quota system in place, that only 2 of 13 populations in Canada currently have management concerns, and that consultations on appropriate management options for these two populations are underway. Lunn replied that the timing was coincidental and neither were a direct response to quota changes in Nunavut. Both the IUCN Red Listing and the US-based petition before the US Fish and Wildlife Service were triggered by and based on climate change model projections of significant loss of sea ice cover throughout the Arctic within the next 50-100 years and the impact that this would have on polar bears.

Attachment 2: Minutes from May 2006 PBAC Meeting

Cameron Mack expressed concern that the Polar Bear Specialist Group may be going down a slippery slope with respect to Traditional Ecological Knowledge. Jane Cooper echoed that concern and noted that there did not appear to be a way to incorporate TEK into the IUCN decision-making process. Mack noted that the international Agreement is over 30 years old and does not address some of the issues that have recently emerged, especially within Canada. Dubois suggested that the Administrative Committee could recommend to the Canadian Wildlife Service Director-General that Canada look into reopening and/or revisiting the Agreement to address issues of common concern. Fleck agreed to write letter.

## 4.   Report on the 2006 Meeting of the PBTC (St. John's)

The 2006 meeting of the Technical Committee was held in St. John's, Newfoundland and Labrador (6-8 February). The meeting was well attended (27 individuals). The Government of Québec was unable to attend; all other jurisdictions and management boards participated. Representatives from the USFWS (Division of Management Authority), USFWS (Marine Mammals Management) and USGS (Biological Resources Division) also attended the meeting.

Nick Lunn was nominated and unanimously elected to continue as Chair. Evan Richardson (Canadian Wildlife Service) was appointed Secretary and Martha Dowsley (McGill University) volunteered to help Richardson record and produce minutes of the meeting. Draft minutes were distributed to the Administrative Committee as part of the background material to this meeting. The draft minutes are still under review and should be finalized once Richardson returns from the field later this month.

Attachment 2: Minutes from May 2006 PBAC Meeting



**Figure 1.** Canadian polar bear populations as of 31 December 2005. BB: Baffin Bay; DS: Davis Strait; FB: Foxe Basin; GB: Gulf of Boothia; KB: Kane Basin; LS: Lancaster Sound; MC: M'Clintock Channel; NB: Northern Beaufort Sea; NW: Norwegian Bay; SB: Southern Beaufort Sea; SH: Southern Hudson Bay; VM: Viscount Melville Sound; WH: Western Hudson Bay.

a) **Nunavut quotas**
Regional meetings with respect to both the Baffin Bay and Western Hudson Bay populations have been undertaken. The current quotas for both are believed to be unsustainable (Baffin Bay – serious overharvest; Western Hudson Bay – unsustainable harvest due to significant population decline as a consequence of environmental change). It was noted that Inuit knowledge does not support scientific knowledge in WH and BB. Communities in BB were approached about the potential for over harvest. In general there was little support for a decrease in the harvest quotas. People expressed concern about property damage saying that there are more bears around. In general there was mixed acceptance of the scientific information. Consultations in WH revealed that some people don't agree with the current population boundaries. People felt the environment supports different numbers of bears at different times.

b) **COSEWIC**
COSEWIC had hoped that the bidding process to update the status report on polar bears would have been completed and the person(s) selected in time to attend the 2006 meeting of the PBTC.

Attachment 2:  Minutes from May 2006 PBAC Meeting

Unfortunately, that did not happen.  There was a general discussion of the process and willingness expressed by those in attendance to work with the report writer.

Subsequent to the meeting, COSEWIC has awarded a contract so that the process of updating the status report on polar bears for COSEWIC re-assessment has begun.  The report is supposed to incorporate traditional ecological knowledge together with western science and the intent is for the writer(s) to work closely with the Polar Bear Technical Committee.  Although not confirmed, there are suggestions that the report is supposed to be completed and submitted to COSEWIC in 2008.

c) **Status report on Canadian polar bear populations**
In the past few years, the PBTC has not developed a status table summarizing each Canadian population.  One of the main reasons for this has been the differing views and comfort level using a Maximum Sustainable Yield approach (how the PBTC used to develop a status table) versus a Risk Analysis approach (the approach that Nunavut is using).  Similar discussion and debate has also occurred within the Polar Bear Specialist Group.  Agreement was reached in St. John's on a means to summarize status for all Canadian populations.  A small Working Group was struck to develop the new table and it should be available by the end of the month.

d) **2007 Meeting**
Next year's meeting is tentatively planned for the week of 6-9 February 2007 in Edmonton.

Dubois asked what the US Fish and Wildlife Service was reviewing with respect to Western Hudson Bay.  Lunn replied that the US Marine Mammal Protection Act prohibits the importation of marine mammals and marine mammal products into the US.  The Act was amended and allowed for the issuance of permits to import sport-hunted polar bear trophies from Canada provided that a number of findings are made including that:

1. Canada has a monitored and enforced sport hunting program consistent with the purposes of the Agreement on the Conservation of Polar Bears;
2. Canada has a sport hunting program based on scientifically sound quotas ensuring the maintenance of the affected population stock at at a sustainable level;
3. the export and subsequent import are consistent with the provisions of CITES and other international agreements and conventions; and,
4. the export and subsequent import are not likely to contribute to illegal trade in bear parts.

The US Fish & Wildlife Service has a legal obligation to ensure that approved populations continue to meet the requirements of their Marine Mammal Protection Act. At the time of the amendment, the Gulf of Boothia population did not qualify.  New information has since become available, that is now being reviewed by the USFWS for consideration of approved status.  Given the population decline in Western Hudson Bay, that population is being reviewed to see if it still qualifies for approved status.

Attachment 2: Minutes from May 2006 PBAC Meeting

## 5.    Terms of Reference – Polar Bear Administrative and Technical Committees

Draft *Terms of Reference* for both Committees were developed and circulated in mid-April for review and comment at this meeting.

### a)  Polar Bear Technical Committee

It was agreed that editorial comments should simply be forwarded to Fleck to incorporate. Traditional knowledge needs to be incorporated and membership needs to be reviewed. Gissing indicated that Nunavut generally agreed with the Terms of Reference but does not feel that it is appropriate for US or others outside of Canada to participate. Nunavut recognizes the value in exchange of scientific results but is concerned that outside agencies are privy to internal discussions and have access to minutes that have not been finalized by the Technical Committee and not reviewed by the Administrative Committee. Gissing suggested that Nunavut would like to see non-Canadian agencies request the information they require.

Fleck thought that additional functions of the Technical Committee would be to (1) assess harvest and population trends and (2) evaluate management actions and recommendations. Cooper added that assessing harvest should also include generating harvest statistics.

Mack added that high-level endorsement of both Terms of Reference is required. In particular, the Administrative Committee will need the authority to discuss quota allocations for shared populations.

Dubois suggested that the current Terms of Reference be revised based on received comments and then distributed to the Technical Committee for comment. Jessup agreed and felt these be ready for the CWDC meeting in October. Fleck indicated a much tighter schedule – the Administrative Committee to get comments in within next two weeks, incorporate these and send next draft to Technical Committee with a one month deadline, Lunn then incorporate Technical Committee comments and return to Fleck. Such a schedule should see the Terms of Reference ready in July.

Gummer noted that there was reference to the meetings not being open forums for public participation and wondered whether we had the authority to exclude anyone. Lunn replied that the intent of the language was to prevent NGOs, lobby groups, and the media from attending. Gummer thought that by including such wording that it might result in some challenging their exclusion. He suggested it might be more prudent to simply remove the sentence.

### b)  Polar Bear Administrative Committee

Fleck thought additional functions to include would be to provide advice to Canada and to coordinate decisions with respect to the management of polar bears.

Attachment 2: Minutes from May 2006 PBAC Meeting

Gummer did not think that it was clear that these Committees were 'creatures' of the CWDC and that the functions and purpose need to be tightened. Mack added that the CWDC cannot be all things to all wildlife in Canada but that the CWDC does have a role where populations are shared between jurisdictions.

Cooper suggested another function would be to have a role in the development of inter-jurisdictional management agreements.

## 6.   US Marine Mammal Protection Act (MMPA)

### a)   Importation of polar bear trophies

The Service issued import permits and collected issuance fees for 61 polar bear trophies during 2005. Of these, 4 permits were for "grandfathered" trophies, bears legally sport hunted in Canada prior to February 18, 1997. (A November 2003 amendment to the MMPA allowed for the imports of these "grandfathered" trophies.) From 1997 to 2005, the Service has issued a total of 766 import permits.

A fact sheet for the general public with information about what populations are approved for the import of polar bear trophies by permit, what permits are required, and step-by-step guidelines on how to import these trophies is available on-line at:
http://international.fws.gov/pdf/polarbearsporthunted.pdf

### b)   Review of the Gulf of Boothia and Western Hudson Bay populations

The Service has been conducting a review of the approval of Canadian polar bear populations for the import of polar bear trophies taken by U.S. sport hunters. The review has focused on the status of the Gulf of Boothia (currently deferred) and Western Hudson Bay (currently approved) populations in light of updated survey data and recent quota changes for these populations. The Service monitors developments with respect to all populations on an ongoing basis and will consider, once these two reviews are complete and on the basis of the results of the 2006 PBTC meeting, whether to conduct a more general review of all approved populations.

In order for a polar bear population to be approved for the import of sport-hunted trophies, the Service must make the following determinations:

i)   Canada has a monitored and enforced sport-hunting program consistent with the purposes of the international Agreement on the Conservation of Polar Bears;

ii)   Canada has a sport-hunting program based on scientifically sound quotas ensuring maintenance of the affected population stock at a sustainable level; and,

Attachment 2: Minutes from May 2006 PBAC Meeting

iii) Export from Canada and subsequent import into the United States are consistent with CITES, and not likely to contribute to the illegal trade in bear parts.

Prior to making the above determinations, the Service must consider the overall sport-hunting program, including such factors as whether the program includes:

i) Reasonable measures to make sure the population is managed for sustainability;

ii) Harvest quotas based on scientific data and principles;

iii) A management agreement between the communities that share the population to achieve the sustainability of the program; and,

iv) Compliance with quotas and other aspects of the program as laid out in the management or other international agreements.

The Service will review the most current management and scientific information received at the 2006 PBTC meeting before finalizing and proposed changes to the approved populations. The Service will publish any proposed changes to the list of approved populations in a rule in the *Federal Register* and seek public comment on the proposed changes to the regulations. Comments may be submitted by all interested parties. The rule will also propose updates to the Service's regulations to reflect the 2003 changes in the MMPA which grandfathered the import of trophies legally sport hunted prior to February 18, 1997, from Nunavut or Northwest Territories, Canada.

c) **Status of report on the impact U.S. hunters may have had on Canadian polar bear populations**
The MMPA directs the Service to undertake a scientific review of the impact of the issuance of import permits on polar bear populations in Canada. The Service previously received information for the report from the Canadian Wildlife Service, Government of Nunavut DSD, Government of Northwest Territories DRWED, and the PBTC. Due to Nunavut's changing polar bear management, as well as other priorities, the Service has not focused on completing the polar bear assessment report. Should the report be completed, it will be announced in the *Federal Register*, and the Service will notify the PBTC that it is available for review and comment. The final report will include a response to public comments.

There was little new discussion because the MMPA had been discussed during the report on the 2006 meeting of the Technical Committee. Dubois did remark that he found it curious that the USFWS has been directed to complete the impact of US hunters yet there appear to be no timelines for completion.

Attachment 2: Minutes from May 2006 PBAC Meeting

### 7. Petition to Have Polar Bears Listed as a Threatened Species Under the US Endangered Species Act

The US Fish and Wildlife Service received a petition from the Center for Biological Diversity dated 16 February 2005, to list the polar bear as threatened throughout its range with critical habitat in the United States. The petition, which was clearly identified as such, contained detailed information on the natural history and biology of the polar bear, and the current status and distribution of the species. It also contained information on what they reported as potential threats to the species from climate change, oil and gas development, contaminants, hunting, and poaching. The Natural Resources Defense Council and Greenpeace, Inc. joined the petition on 5 July 2005. The petitioners further submitted new information on 27 December 2005, to be considered, along with the information in the initial petition. The USFWS found that the petition presented substantial scientific or commercial information indicating that the petitioned action of listing the polar bear may be warranted. A status review of the polar bear has been initiated to determine if listing under the US Endangered Species Act is warranted. To ensure that the status review is comprehensive, the USFWS solicited scientific and commercial information regarding this species by opening a 60-day public comment period to allow all interested parties an opportunity to provide information on the status of the polar bear throughout its range, including: (1) information on taxonomy, distribution, habitat selection (especially denning habitat), food habits, population density and trends, habitat trends, and effects of management on polar bears; (2) information on the effects of climate change and sea ice change on the distribution and abundance of polar bears and their principal prey over the short- and long-term; (3) information on the effects of other potential threat factors, including oil and gas development, contaminants, hunting, poaching, and changes of the distribution and abundance of polar bears and their principal prey over the short and long term; (4) information on management programs for polar bear conservation, including mitigation measures related to oil and gas exploration and development, hunting conservation programs, anti-poaching programs, and any other private, tribal, or governmental conservation programs which benefit polar bears, and (5) information relevant to whether any populations of the species may qualify as distinct population segments. The USFWS will base its finding on a review of the best scientific and commercial information available, including all information received during the public comment period. The 60-day public comment period was to close 10 April 2006.

The PBAC sent a letter to the Association of Fish and Wildlife Agencies asking for their assistance in requesting an extension to the 60-day comment period until 31 May 2006 in order to allow Canadian jurisdictions to provide a complete submission regarding scientific and commercial information on this species.

Gummer asked about the status of the extension that had been requested. Fleck responded that although it has not yet been published in the *Federal Register*, she has been told that there will be a 30-day extension period. In addition to the letter from the

Attachment 2:  Minutes from May 2006 PBAC Meeting

Administrative Committee, other submissions were received from the Government of Nunavut, the Inuvialuit Game Council, the IUCN Sustainable Resource Group, Nunavut Tunngavik Incorporated, and Conservation Force.

Jane Cooper noted that there would be a tremendous socio-economic impact in northern communities. For some individuals, the revenue from a polar bear sport-hunt is the only source of income for an entire year.  Lunn asked would there be opportunities to market sport-hunts to other countries should the US list polar bears.  Gissing replied that other countries, particularly in Europe, would probably follow the US lead.  There is great concern that polar bear sport-hunting would simply end in Canada.

Fleck suggested that the Government of Canada should make a submission on behalf of all jurisdictions and be tasked with keeping on top of the issue.

Mack wondered why the letter from the Administrative Committee was not submitted directly to the USFWS but rather via the International Association of Fish and Wildlife Agencies.  Harvey Jessup thought that CWS should probably contact USFWS independently and not as part of the Administrative Committee.  Dubois wondered whether other federal departments such as Indian and Northern Affairs should be more active and why CWS has been seemingly silent when it was the federal government that signed the International Agreement. Gummer replied that there had been considerable discussion within CWS. There was concern that because polar bears are currently being re-assessed for COSEWIC review, any CWS involvement in a submission to the USFWS might be seen as pre-judging the COSEWIC outcome.

Jessup wondered whether it would be useful and/or appropriate, under the circumstances, for CWS to write the USFWS to caution them that there was forthcoming information and that a review at this stage might be premature.

Gummer indicated that he would be willing to take concerns back to senior levels and that perhaps CWS could simply advise where we are at the moment with respect to polar bears and that that might be helpful and sufficient.

Fleck and Dubois indicated a willingness to participate a package of material together to submit.

## 8.  Status of Management Agreements and Memoranda of Understanding

a)  **Nunavut**
Nunavut is interested in developing inter-jurisdictional co-management agreements to address any concerns from other jurisdictions that share polar bear populations with Nunavut.

b)  **Nunavut-NWT**
On 4 February 2006, the Inuvialuit and the Inuit of the Kitikmeot West Region of Nunavut signed a user-to-user agreement for the management of the Northern Beaufort Sea and Viscount Melville

Attachment 2:  Minutes from May 2006 PBAC Meeting

Sound polar bear populations that was modelled after the
Inuvialuit/Inupiat agreement for the Southern Beaufort Sea.

In addition, a government-to-government agreement is also being
developed for the management of these two shared populations.
Both agreements would establish a Joint Commission and Technical
Advisory Committee.

c) **Manitoba-Nunavut**
There have been no new discussions or progress to report.  A draft
MOU for the management of the Western Hudson Bay polar bear
population was written a few years ago but remains unsigned.

d) **Ontario-Nunavut**
There have been no new discussions or progress to report.

e) **Nunavut-Québec-Newfoundland/Labrador**
Although there remains a high degree of interest in developing an
agreement between Nunavut, Québec and Newfoundland/Labrador
for the management of bears in Davis Strait, there has been no new
discussion or progress.

f) **Canada-Greenland**
There is considerable interest in developing a co-management
agreement for shared polar bear sub-populations.  Discussions are
occurring at senior levels between the Governments of Nunavut and
Canada with respect to the timing, process, and format.  In 2005,
Greenland announced the implementation of a quota system for polar
bears effective January 2006, which is a significant first step in a
potential management agreement.

Gissing reiterated the desire of Nunavut to develop inter-jurisdictional agreements with
all co-management partners but that they simply have had no capacity to do so.  He
indicated that the Nunavut Wildlife Management Board would like to see a standard
agreement used for all populations for which Nunavut is a co-management partner.

Dubois commented that Manitoba is still interested.  However, there has been change at
senior levels.  From his perspective there needs to be a re-initiation of an inter-
jurisdictional agreement and that a formal letter from the Nunavut Minister to the
Manitoba Minister would be the best way to proceed.  Cooper replied that that would be
arranged.

Gummer asked that when the standard template for these inter-jurisdictional agreements
has been developed that he would like to have a copy for use in scoping an agreement
with Greenland.

9.  **Inventories of Populations within or shared by Canada**

a) **Davis Strait**

Attachment 2: Minutes from May 2006 PBAC Meeting

A full-scale population inventory began in August 2005 and will require 2 more years to complete the field component. In the first year, over 600 polar bears were captured and marked.

b) **Beaufort Sea**
In 2003, a multi-partner initiative was undertaken to re-assess the size of polar bear populations throughout the Canadian Sector of the Beaufort Sea and Amundsen Gulf. Financial and/or logistic support is being provided by the Northwest Territories Department of Resources, Wildlife, and Economic Development, the National Fish and Wildlife Federation (Washington, DC), the USGS Biological Resources Division (Anchorage, AK), the Polar Continental Shelf Project, the Canadian Wildlife Service, and the Inuvialuit Game Council,. The field work in the Canadian Sector is being led by the Canadian Wildlife Service with local participation from communities. The field component should be completed in May 2006.

c) **Southern & Western Hudson Bay**
The field work to re-estimate the size of the Southern and Western Hudson Bay sub-populations was completed in Fall 2005 by Canadian Wildlife Service (Western Hudson Bay) and Ontario Ministry of Natural Resources (Southern Hudson Bay) staff. Financial and/or logistic support has been provided by the Ontario Ministry of Natural Resources (Wildlife Research & Ontario Parks), Canadian Wildlife Service, Manitoba Conservation, Parks Canada Agency, Nunavut Department of Sustainable Development, Nunavut Wildlife Research Trust Fund, Fondation de la faune du Québec and Societé de la faune et des parcs du Québec, Makivik Corporation, Les Brasseurs du Nord, University of Alberta, World Wildlife Fund Arctic Programme, and Safari Club International.

Analysis of the Southern Hudson Bay data is not yet complete. For Western Hudson Bay, the analysis has demonstrated a decline from approximately 1200 bears in 1987 to less than 950. Over this period of time, estimates of apparent natural survival (i.e., excluding human caused mortality) for prime age (5-19 years) bears of both sexes has remained stable at approximately 0.94. However, for all other age classes, a statistical relationship was established between the earlier break-up of sea ice and decreased survival.

There has been some concern expressed by Nunavut residents that some of the bears may have shifted their summer distribution northward into Nunavut and were not available to the CWS capture teams working in Manitoba. To address this concern, a mark-recapture survey will be undertaken this fall along the Nunavut coast.

Attachment 2:  Minutes from May 2006 PBAC Meeting

The objective is to capture all bears encountered to determine
whether there has been a shift in distribution of bears.

There was no discussion on this agenda item.

## 10. Additional Business

### a) Sample collections and the Nunavut harvest

Gissing asked Lunn whether there was any value in aging teeth
collected from the Nunavut harvest and, if there was value, why the
Technical Committee has not asked Nunavut to provide that
information.  It is expensive for Nunavut and aging has not occurred
since 1998.  Lunn replied that there was definite value in aging the kill
because it provides data on the age structure of the harvest sample,
which can provide information relative to population trend.  He could
not comment on when Nunavut last aged harvest samples, however,
he thought that 1998 seemed like far too long a period and he would
have thought perhaps the past 3 or 4 years.  With respect to why the
Technical Committee has not asked Nunavut to provide this
information, Lunn replied that Nunavut has been aging harvest
samples until recently and that the Technical Committee was aware of
the move of the lab and the capacity issues within Nunavut.

Gissing also asked about the storing of Nunavut harvest data in the
National Database and apparent access issues to these data by
Nunavut staff.  Lunn expressed surprise by the question and replied
that there were no such issues.  CWS maintains a National Polar
Bear Database that includes CWS data and copies of the data of
other jurisdictions.  Jurisdictions provide the data to CWS if they want
a copy kept in the National Database, there is no requirement to do
so.  Nunavut and CWS have the same database program (Advanced
Revelation).  Data has been collected and entered by Nunavut staff.
These new data are then transferred to CWS where they are
incorporated into the National Database.  An updated and complete
copy of all of Nunavut's data is then sent back to Nunavut.  Lunn was
certain that the last data exchange occurred in December
2005/January 2006 when Paul Frame spent a few days in the CWS
lab prior to heading up to Igloolik.  Lunn further noted that
jurisdictional data belongs to the jurisdiction that collected it.  Access
to it requires jurisdictional approval.  CWS does not access and
analyze Nunavut data or any jurisdiction's data without prior approval.
Lunn advised that Wendy Calvert (CWS) has spent considerable time
showing Nunavut staff how to use the database over a number of
years.  Francis Piugattik is certainly capable of using Nunavut's own
copy of the database to access Nunavut data.

### b) Election of Chair

June 16, 2006

Attachment 2: Minutes from May 2006 PBAC Meeting

Susan Fleck agreed to continue as Chair of the Administrative Committee for the coming year.

## 11.  Adjournment

Susan Fleck thanked the members for their attendance and adjourned the meeting at 2115h.

## 12.  Summary of Action Items

### Northwest Territories, Nunavut, and Manitoba:
- prepare an outline for a Canadian polar bear conservation strategy and management plan for review by the Administrative and Technical Committees; the intent is to have a completed document for review and approval at the May 2007 meeting of the Canadian Wildlife Directors Committee
- draft submission material to send to IAFWA and the USFWS with respect to the petition to list polar bears as threatened under the US Endangered Species Act

### Northwest Territories and Nunavut:
- prepare draft inter-jurisdictional polar bear management agreement to form a template for all Canadian inter-jurisdictional polar bear management agreements

### Nunavut:
- Minister to write to respective counterpart in other jurisdictions with respect to the development of inter-jurisdictional polar bear management agreements

### CWS:
- as signatory to the international Agreement, provide comments to the USFWS on the status of the current re-assessment of polar bears by COSEWIC and other issues that might be relevant to the petition to list polar bears as threatened under the US Endangered Species Act

### All Jurisdictions:
- each jurisdiction to review Terms of Reference for both the Administrative and Technical Committees and provide comments to Fleck within two weeks

### Fleck:
- write the CWS Director General, on behalf of the Administrative Committee, to request that Canada reviews the international Agreement on the Conservation of Polar Bears and Their Habitat (1973) in order that traditional ecological knowledge can be included as a source of information used for decision making
- incorporate comments from the jurisdictions into the next draft of the Terms of Reference for both the Administrative and Technical Committees and forward the Terms of Reference for the Technical Committee to Lunn; when penultimate draft returned by Lunn, Fleck to

Attachment 2: Minutes from May 2006 PBAC Meeting

> **finalize with Administrative and then forward to CWDC to present to Deputy Ministers and Ministers for approval**
> - provide copy of inter-jurisdictional agreement template to CWS (Gummer) for use in scoping agreement with Greenland
>
> **Lunn:**
> - help get details with respect to the IUCN Red List process, how often it is updated, and whether or not new information can be submitted for consideration at any time
> - distribute the revised Terms of Reference for the Technical Committee, that will be sent by Fleck, to the Technical Committee for comment, Technical Committee to be given one month turnaround, Lunn to incorporate comments received into a penultimate draft and send back to Fleck by 1 July

Attachment 2: Minutes from May 2006 PBAC Meeting

## 13.  Polar Bear Administrative Committee

**Susan Fleck (Chair)**
Director, Wildlife Division
Dept. of Environment and Natural Resources
600, 5102 - 50th Avenue
Yellowknife, NT  X1A 3S8
ph:  (867) 920-8064
fax:  (867) 873-0293
email:  susan_fleck@gov.nt.ca

**Nick Lunn (Secretary)**
Canadian Wildlife Service
Environment Canada
5320 - 122nd Street
Edmonton, AB  T6H 3S5
ph:  (780) 435-7208
fax:  (780) 435-7359
email:  nick.lunn@ec.gc.ca

**Michele Brenning**
Director General, Canadian Wildlife Service
Environment Canada
Place Vincent Massey
16th Floor, 351 St. Joseph Boulevard
Gatineau, QC  K1A 0H3
ph:  (819) 997-1301
fax:  (819) 953-7177
email:  michele.brenning@ec.gc.ca

**Michel Damphousse**
Directeur, Direction de la faune et des habitats
Faune et Parcs Québec
675, Boulevard René-Lévesque Est
11e étage
Québec, QC  G1R 5V7
ph:  (418) 521-4348
fax:  (418) 646-6863
email:  michel.damphousse@mef.gouv.qc.ca

**Jack Dubois**
Director, Wildlife & Ecosystem Protection Branch
Manitoba Conservation
Box 24, 200 Saulteaux Crescent
Winnipeg, MB  R3J 3W3
ph:  (204) 945-7761
fax:  (204) 945-3077
email:  jdubois@gov.mb.ca

**Drikus Gissing**
A/Director, Nunavut Wildlife Service
Department of Environment
Box 446
Pond Inlet, NU  X0A 0S0
ph:  (867) 899-8034
fax:  (867) 899-8017
email:  dgissing@gov.nu.ca

**Jim Hancock**
Director, Inland Fish and Wildlife Division
Dept. of Environment and Conservation
Box 2007
Corner Brook, NL  A2H 7S1
ph:  (709) 637-2007
fax:  (709) 637-2033
email:  jimhancock@mail.gov.nf.ca

**Rickl Hurst**
Director, Pipeline Readiness Office
Dept. of Indian and Northern Affairs
Box 1500
Yellowknife, NT  X1A 2R3
ph:  (867) 669-2453
fax:  (867) 669-2406
email:  rick.hurst@inac.inac-ainc.x400.gc.ca

**Harvey Jessup**
A/Director, Fish and Wildlife Branch
Dept. of Environment
Box 2703, 10 Burns Road
Whitehorse, YT  Y1A 2C6
ph:  (867) 667-5715
fax:  (867) 393-6405
email:  harvey.jessup@gov.yk.ca

**Cameron Mack**
Director, Fish and Wildlife Branch
Ministry of Natural Resources
Box 7000, 300 Water Street
Peterborough, ON  K9J 8M5
ph:  (705) 755-1909
fax:  (705) 755-1900
email:  cameron.mack@mnr.gov.on.ca

**Stephen Woodley**
Chief Scientist, Ecological Integrity Branch
Parks Canada Agency
25 Eddy Street
Hull, QC  K1A 0M5
ph:  (819) 994-2446
fax:  (819) 997-3380
email:  stephen.woodley@pc.gc.ca

Attachment 2: Minutes from May 2006 PBAC Meeting

## Management Boards and Others:

**William Anderson III**
President, Labrador Inuit Association
12 Sandbanks Road
Nain, NL  A0P 1L0
ph:  (709) 922-2941
fax:  (709) 922-2931
email:  wanderson@nunatsiavut.com

**Doug Blake**
Deputy Minister, Lands & Natural Resources
Nunatsiavut Government
Happy Valley-Goose Bay, NL  A0P 1E0
ph:  (709) 896-8582
fax:  (709) 896-2610
email:  dblake@nunatsiavut.com

**Larry Carpenter**
Chair, Wildlife Management Advisory Council
(NWT)
Box 2120
Inuvik, NT  X0E 0T0
ph:  (867) 777-2828
fax:  (867) 777-2610
email:  wmac_c@jointsec.nt.ca

**Johnny Peters**
Vice President, Resource Development
Makivik Corporation
Box 179
Kuujjuaq, QC  J0M 1C0
ph:  (819) 964-2925
fax:  (819) 964-0371
email:  b_doidge@makivik.org

**Joe Tigullaraq**
Chair, Nunavut Wildlife Management Board
Box 1379
Iqaluit, NU  X0A 0H0
ph:  (867) 975-7300
fax:  (867) 975-7320
email:  jtigullaraq@nwmb.com

## Participants:  2006 Meeting of the PBAC

| | | | |
|---|---|---|---|
| Arnold Boer | Jane Cooper | Michel Damphousse | Jack Dubois |
| Susan Fleck | Drikus Gissing | Bill Gummer | Jim Hancock |
| Harvey Jessup | Nick Lunn | Cameron Mack | Greg Thompson |

ATTACHMENT 4


Safari Club International v. Kempthorne

Case No. 08-881 (EGS) (D.D.C.)


Safari Club International et al. Opposition

to Motions to Intervene



**Comments on Proposal to List Polar Bears as an Endangered Species**

**To:**    Supervisor, U.S. Fish & Wildlife Service, Dept. of Interior, 1011 East Tudor Rd., Anchorage, Alaska, 99503

**From:** Dr. Lee Foote, Director, IUCN North America Sustainable Use Specialist Group

**Re:**    Implications of U.S. listing of Polar Bear as an Endangered Species

**Date:** 5 April 2006

### Executive Summary

The North American Sustainable Use Specialist Group of IUCN recommends that the United States Department of Interior *not* list the polar bear as an endangered species. Reasons include: (1) Listing does not build on areas of stakeholder agreements; species protection is wrongfully used as a tool for other energy conservation agendas (2) Errors in the framing of listing factors; (3) Potential for substantial and unintended negative consequences on polar bear demographics if they are listed. (4) Near complete failure to recognize the socioeconomic and cultural context of polar bear hunting by indigenous people for domestic/subsistence use and as outfitters for small numbers of foreign sport hunters. (5) Failure to recognize that extensive biological and local information is currently in use to ensure a prudent off-take of polar bears that is within the realm of sustainable management. (6) Listing is a non-specific policy tool and redundant law for polar bear subpopulations most at-risk because they are already currently protected and managed by the Marine Mammal Protection Act, and State/regional conservation quotas.

### Introduction and Background

The U.S. Fish and Wildlife Service has solicited comments on the proposed change in legal status of the polar bear (*Ursus maritimus*) to a listed species under the Endangered Species Act (ESA). More recently, legal actions have been brought against the U.S. Secretary of the Interior and the U.S. Fish & Wildlife Service by groups desiring the ES designation be made more rapidly.

Approximately half of all polar bears in the world occur in North America with the bulk of those in Canada (Freese 2000). Canada has developed very rational and prudent conservation plans based on a long history of management, research, and consumptive use of these bears. The International Union for the Conservation of Nature (IUCN) North American Sustainable Use Specialist Group (NA-SUSG) is pleased to offer a perspective on the anticipated effects of this ES listing, particularly the proposed listing's influence on the subsistence and sport hunt components of polar bear use.

We recognize that there are other potentially important and beneficial influences of ES listing, in general, such as protection of critical habitat for recovery, reductions of markets to quell illegal trading, ramifications for access to oil extraction areas and access to US funding for status evaluations. We do not speak to these issues directly. The mission of our group is to engage resource users, researchers and policy makers to find novel approaches involving continued sustainable use of renewable natural resources, especially through practices that enhance that sustainability.

It is important to assess the areas of agreement and disagreement among stakeholders at the outset of this discussion.

## Areas of Agreement

All groups involved in the ES listing debate, regardless of whether they support or oppose listing, agree that:

1. polar bear populations should remain healthy and occupy all suitable habitats.
2. unintended environmental threats exist to polar bears and their habitats and should be avoided or mitigated (Ferguson et al. 2000, Freese 2000).
3. the weight of evidence confirms that deleterious global climate change effects are affecting at least some regions of bear habitat, and consequently, some regional bear sub-populations (Stirling and Derocher 1993).
4. uncertainties should be reduced about population status, survival and mortality rates.
5. activities promoting welfare of people in the arctic should be encouraged where it doesn't negatively affect polar bear sustainability (Freeman et al. 2005).
6. incentives are to be encouraged for hunters to conserve through moderating or minimizing their harvest of females and younger aged bears (Freese 2000) .

## Areas of Disagreement

Where key points of belief systems are diametrically opposed, they predictably lead to value-based disagreement. Intransigence and factional entrenchment leads to an inability to function adaptively. Table 1 shows a hypothetical dichotomy of beliefs in support and opposition to ES listing.

**Table 1.** A generalized typology (there are exceptions) of beliefs that channel stakeholders' decisions toward support or opposition of polar bear ES designation.

| List Polar Bears | Do Not List |
| --- | --- |
| ESA designation will lead to increases in bear numbers by reducing US imports of legally harvested bears. | Designation will not affect total polar bear harvest, although it is very likely to reduce economic benefit to native outfitters and communities. |
| Sufficient information exists to merit endangered status. | Unanticipated responses to any such listing require more study and consultation before endangered status would be an appropriate management response. Adaptive management is the proper tool, not overt protection. |
| Sport hunting off-take lowers bear populations. | Sport hunting does not affect total bear mortality by humans. Sport hunting is completely compensatory with the legal domestic harvests, which will continue to occur and are regulated to remain at sustainable levels. |

| | |
|---|---|
| Provide little recognition of the cultural importance of aboriginal bear harvests. | Recognize Inuit harvests as legitimate uses of bears. |
| Hunting of bears has insufficient moral or ethical basis. | Support concept of regulated bear harvests within biological, economic, and cultural norms of the region. No violation of morals, ethics or national laws. |
| Population estimation and projections based exclusively on conservative (prudent) western biological enumeration. | Population estimation integrative. Considers biological science, social science, and local knowledge. |

## False Dichotomies

Simple contrasts (Table 1) do not fully capture all the dimensions of this debate. Securing the welfare of polar bear populations is much more complex than simple, first-principle cause-effect actions. A focus on agreement is more beneficial than a focus on disagreements.

Listing the polar bear as endangered is an overly simplistic and possible counter-productive reaction to a questionable chain of assumed cause and effects. For example, a seemingly logical but deeply flawed summary may be expressed as:

*Environmental stressors (climate change, pollutants etc.) → polar bear population problems → ES listing → reduced hunting pressure → higher bear populations.*

The assumptions underpinning this decision sequence are flawed in at least seven fundamental ways.

1. Errors of fact and exaggeration:  There is no consensus on how large the increases in mean temperatures are arctic-wide. There is substantial regional variation. Worst case scenarios from specific regions, such as the southernmost ranges in Western Hudson Bay, should not be extrapolated to the entire circumpolar range of polar bears. Species ranges shift northward and southward in response to climate change across climate shifts. Conditions may degrade in some areas and improve in others. The high pollutant levels known from bears, particularly Greenland and Russian regions, have been suggested but not clearly linked to reproductive or demographic responses (Hanneland et al. 1999). Bear numbers are expected to decrease in response to less sea-ice, yet, some populations exist with shore-ice only, albeit at lower population levels and sometimes higher densities. Where these concentrations overlap with human settlements, increased conflicts may be expected (Clark 2003). Strict protection will only serve to limit management options in these areas.

2. Error of insufficient data: Although strong scientific data predicts the western Hudson Bay population of bears has lost, and will continue to lose, habitat quality with warmer conditions (Stirling and Derocher 1993) there is insufficient data to conclude the same for all 20 subpopulations. The sea ice and more northerly coastal regions experience substantially different conditions from Hudson Bay which is one of the southern-most bear habitats occupied. The degree of population interchange and movement is still lacking for many designated subpopulations.

3. Errors of logic: ES listing is unlikely to result in reduced absolute hunting pressure.  At present the majority of Canadian bears are killed for subsistence and cultural reasons (approximately 75%) and demand from Inuit hunters alone is higher than the quotas set by bear biologists. Subsistence harvesters have the option to re-allocate some of their annual bear tag quota to village outfitters to guide foreign

sport hunters because such hunts benefit the community by generating $9000 – $25,000 per bear ( Lunn et al. 1997, Freeman and Wenzel 2006). This is important income for community members, a portion of which goes back to community benefits. In the absence of foreign hunting options the subsistence take is expected to swell to fill the same quota number. If bears lose economic value and tags are all used by Inuit hunters, the system reverts to the age-old "harvest any bear available" to the tag holder. Recently, between 1980 and 1990, Inuit hunters took 88.8% of bears, bears killed in human conflict took 5.2%, and non-Inuit hunters took 5.7% (Lee and Taylor 1994). The harvest may shift away from mature boars, thereby allowing the harvest of more sows and young bears than occurs under the present mix of subsistence and sport hunters. Mortality of breeding-age sows represents a larger impact on the population than does the harvest of large boars targeted by sport hunters. Some preliminary evidence suggests that reduction of mature boars through hunting allows greater sow and cub survival by reducing cannibalism mortality, especially in the crowded conditions of poor ice years.

4. Confusion of proximate and ultimate causes: The ultimate cause of polar bear population reductions (absolute decreases over decadal time frames) is habitat reduction, particularly when sea ice is reduced. In the absence of immediate proximate factors the long-term population levels of polar bears will be determined by ultimate factors. Proximate factors may include reduced fecundity, cub abandonment, cannibalism (Lunn and Stenhouse 1985), starvation, hunter harvests (including controlling the currently increasing nuisance bear encounters) and increased metabolic energy demands from changing conditions. ES listing has no apparent ability to address ultimate factors.


5. Errors of conflation:
Conflation is the inappropriate or misleading combination of information used to arrive at a forced and illogical conclusion. The protection of polar bear critical habitat may work to reduce the rate of energy development in Alaska. Oil reserves in Alaska's North Slope, particularly Arctic National Wildlife Refuge (ANWR) which supports the highest densities of natal polar bear dens on US soil. Bears are sensitive to disturbance during denning periods. Better tools of habitat restriction are called for here.

It is overly reductionist to adopt syllogisms such as the following:

> Lower polar bear populations are bad;
> Hunting kills polar bears;
> Therefore hunting is bad.

This is an error-filled combination of conflated assumptions. Hunting of some species (e.g. wolves (*Canis lupis*), coyotes (*Canis latrans*) and black bears (*Ursus americana*)) appears to cause immediate decreases followed by rebound increases in overall populations as a result of changes to breeding adults, and survival of young (Derocher and Taylor 1994).

6. Lack of specificity: The blanket listing of polar bears is a blunt and non-specific regulation that does not accurately target the threatened subpopulations of polar bears. The Endangered Species Act as applied to Grizzly Bears occurring on US lands shows the flexibility to list the grizzlies in the coterminous states as endangered, yet those in Alaska are abundant enough to support sustainable harvests and export. The Marine Mammal Protection Act provides for selective protection of those polar bear sub-populations shown to be at risk. Such a measured approach, in which restrictions can be

easily lifted when population recovery is demonstrated, provide important incentives encouraging full compliance with mutually agreed restrictions placed on hunting.

7. Errors of omission: Very importantly, no consideration has been given to the socio-cultural impacts of ES listing and this represents the most important source of disagreement identified by the NA-SUSG. Some sectors of social science are relevant areas of science for informing ESA policy decisions. Polar bear management plans and protection must recognize that a sustainable harvest relationship has existed between humans and polar bears for thousands of years in the Arctic. Indeed, even the advent of modern technology (firearms and snowmobiles) and the introduction of a commercial economy has not resulted in an unsustainable harvest of bears in the Canadian Arctic, an outcome due, in large part, to the indigenous societies' concern and willingness to protect this traditional human-bear relationship. Inuit hunters greatly value and appreciate the polar bears in their hunting regions and do not indiscriminately kill polar bears. Inuit hunters practice restraint partly because they recognize the value to their own young hunter's future access to bears (Keith 2005) and that the potential exists for an Inuit-guided hunter to pay $20,000 per bear for a sport hunt. The 15 bear subpopulations in Arctic Canada are monitored with an extensive program of surveys that systematically monitor each of these bear subpopulations. Prudent harvest quotas are set by expert panels of biologists in consultation with local people to provide input of their extensive local knowledge.

## NA-SUSG Recommendation

For the reasons listed above, the *NA-SUSG recommends not listing the polar bear* for ES status. ES listing in this context appears to be a disingenuous re-framing of "species conservation" as an obstructionist tool in attempts to indirectly apply pressure to alter energy policy. The polar bear is reduced to a protected symbol and loses much of its status, utility, and benefit to local people in affected jurisdictions. Indeed, lightly hunted polar bears are an asset yet they may be re-cast as a dangerous nuisance (Clark 2003) if rigid protection eliminates harvest options. Conservation, by definition, includes the *use* of resources but at a responsible and sustainable rate. Furthermore, as Adams (2004 p.223) observed "Conservation plans should be driven by science, not politics, economics or society".

Through conferences and publications the IUCN Sustainable Use Specialists' Groups' program has focused on the conservation benefits accruing to rural people from regulated hunting. It may appear counterintuitive to use hunting as a benefit-enhancing activity for wildlife populations but there are many examples of successes in game species, including wapiti, pronghorn, bighorn sheep, mountain goats, wild turkey, and wood bison that been effectively recovered under carefully regulated harvest management.

The NA-SUSG does not oppose policies designed to reduce greenhouse gas emissions but specifically opposes the US using ESA listing of polar bears in an attempt to influence energy policy. We oppose this action because of the real costs to northern peoples and the threats imposed on species conservation programs that are based on effective resource-user confidence and involvement in existing co-management agreements. The polar bear is a species that persists well under the value-enhancing management and protections offered under controlled harvests in addition to the cultural, totemic, iconic and spiritual values that affect the Inuit's stewardship behavior toward bears and other valued wildlife populations (Keith 2005).

# References

Adams, WM. 2004. Against extinction. Earthscan, London. 311 pp.

Clark, D. 2003. Polar bear-human interactions in Canadian national parks 1986-2000. Ursus 14(1):65-71.

Derocher, AE and M Taylor 1994. Density-dependent population regulation of polar bears. In: M Taylor , ed., Density dependent population regulation of brown, black, and polar bears. International conference on bear research and management. Monograph Series No. 3. Yellowstone National Park, Wyoming. International Association for bear research and management 25-30.

Derocher, AE and O Wiig. 1999. Infanticide and cannibalism of juvenile polar bears (*Ursus maritimus*) in Svalbard. Arctic 52(1):307-310.

Ferguson, SH, MK Taylor and F Messier. 2000. Influence of sea ice dynamics on habitat selection by polar bears. Ecology 81:761-772.

Freeman, MMR, RJ Hudson and L. Foote 2005. Conservation hunting: people and wildlife in Canada's North. Occasional Paper No. 56. Canadian Circumpolar Institute, Edmonton, Alberta.  112 pp.

Freeman, MMR. and GW Wenzel 2006. The nature and significance of polar bear conservation hunting in the Canadian Arctic. Arctic 59(1):21-30.

Freese, C.H. 2000. The consumptive use of wildlife species in the Arctic: challenge and opportunities for ecological sustainability. WWF-Canada and WWW-International Arctic Programme, Toronto and Oslo.

Keith, D. 2004. Inuit Qaujimaningit Nanurnut; Inuit knowledge of polar bears. Gjoa Haven Hunters' and Trappers' Organization and the Canadian Circumpolar Institute, Edmonton, Alberta. 242 p.

Lee, J and M Taylor. 1994. Aspects of the polar bear harvest in Northwest Territories, Canada. International conference on bear research and management. Nov. PP 50-59.

Lunn, NJ, M Taylor, W calvrt, I Stirling, M Obbard, C Elliot, G Lamontagne, j Schaeffer, S Atkinson, D Clark, E Bowden, and B Doidge. 1997. Polar bear management in Canada 1993-96. Report to the IUCN/SSC polar bear specialist group, February 1997. (as cited in Freese 2000)

Lunn, NJ and G B Stenhouse. 1985. An observation of possible cannibalism by polar bears (*Ursus maritimus*). Canadian Journal of Zoology 63(6):1516-1517.

Stirling, I. 1988. Polar bears. Ann Arbor, Michigan. Michigan University Press.

Stirling, I and AE Derocher. 1993. Possible impacts of climatic warming on polar bears. Arctic 46(3):240-245.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SAFARI CLUB INTERNATIONAL, *et al.,*   )
   )
         Plaintiffs,   )   Case No. 08-0881 (EGS)
   )
         v.   )
   )
DIRK KEMPTHORNE, *et al.,*   )
   )
         Defendants.   )
   )
_____ )

## [PROPOSED] ORDER

Upon consideration of the separate motions to intervene by the (1) Humane Society of the United States, International Fund for Animal Welfare, and Defenders of Wildlife; and (2) Center for Biological Diversity, Natural Resources Defense Council, and Greenpeace, the opposition to these motions filed by Plaintiffs Safari Club International and Safari Club International Foundation, and the entire record in this case, it is hereby:

**ORDERED**, that the motions to intervene as of right under Federal Rules of Civil Procedure, Rule 24(a) are **DENIED.**

**IT IS FURTHER ORDERED,** that the motions to intervene permissively under Federal Rules of Civil Procedure, Rule 24(b) are **GRANTED.**

**IT IS FURTHER ORDERED,** that the proposed answer filed by each group of permissive intervenors is deemed filed as of the date of this Order.

Dated this _____ day of _____, 2008.

                                                _____

                                                Judge Emmet G. Sullivan
                                                U.S. District Court Judge